1  ROBBINS GELLER RUDMAN
   & DOWD LLP
2  DAVID C. WALTON (167268)
   BRIAN E. COCHRAN (286202)
3  655 West Broadway, Suite 1900
   San Diego, CA 92101
4  Telephone: 619/231-1058
   619/231-7423 (fax)
5  davew@rgrdlaw.com
   bcochran@rgrdlaw.com
6
   Attorneys for Plaintiff
7
   [Additional counsel appear on signature page.]
8
                UNITED STATES DISTRICT COURT
9
              CENTRAL DISTRICT OF CALIFORNIA
10

| | |
|---|---|
| CITY OF NORTH MIAMI BEACH POLICE OFFICERS' AND FIREFIGHTERS' RETIREMENT PLAN, Individually and on Behalf of All Others Similarly Situated,<br><br>                    Plaintiff,<br><br>    vs.<br><br>NATIONAL GENERAL HOLDINGS CORP., BARRY KARFUNKEL and MICHAEL WEINER,<br><br>                    Defendants. | Case No. 2:19-cv-06468<br><br><u>CLASS ACTION</u><br><br>COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS<br><br><br><br><u>DEMAND FOR JURY TRIAL</u> |

Plaintiff City of North Miami Beach Police Officers' and Firefighters' Retirement Plan, individually and on behalf of all others similarly situated, by the undersigned attorneys, for plaintiff's complaint against defendants, alleges the following based upon personal knowledge as to plaintiff and plaintiff's own acts and upon information and belief as to all other matters based on the investigation conducted by and through plaintiff's attorneys, which included, among other things, a review of National General Holdings Corp. ("National General" or the "Company") press releases, U.S. Securities and Exchange Commission ("SEC") filings, analyst reports, court filings, media reports, and other publicly disclosed reports and information about the Company. Plaintiff believes that substantial additional evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## JURISDICTION AND VENUE

1.      The claims asserted herein arise under §§10(b) and 20(a) of the Securities Exchange Act of 1934 ("Exchange Act"), 15 U.S.C. §§78j(b) and 78t(a), and Rule 10b-5, 17 C.F.R. §240.10b-5. Jurisdiction is conferred by §27 of the Exchange Act, 15 U.S.C. §78aa.

2.      Venue is proper in this District pursuant to §27 of the Exchange Act. The Company transacts substantial business in this District and related proceedings against National General are pending in this District. The acts and transactions giving rise to the violations of law complained of occurred in part in this District, including the dissemination of false and misleading statements into this District. At oral argument before the Judicial Panel on Multidistrict Litigation in related proceedings, it was "represented that the primary witnesses would be found in the Central District of California." *In re Wells Fargo Auto Ins. Marketing & Sales Practices Litig.*, 273 F. Supp. 3d 1383, 1384 (J.P.M.L. 2017).

3.      In connection with the acts and conduct alleged in this complaint, defendants, directly or indirectly, used the means and instrumentalities of interstate

1  commerce, including, but not limited to, the mails and interstate wire and telephone
2  communications.

### NATURE OF THE ACTION

4      4.      This is a securities class action on behalf of all purchasers of National
5  General common stock between August 6, 2015 and August 9, 2017 (the "Class
6  Period"), against National General and certain of its officers and/or directors seeking
7  to pursue remedies under the Exchange Act.

8      5.      During the Class Period, National General and its predecessors, in
9  coordination with Wells Fargo Bank, N.A. and Wells Fargo & Company (together,
10 "Wells Fargo"), engaged in a massive insurance scheme to bilk Wells Fargo
11 customers out of millions of dollars.  Through this scheme, National General forced
12 thousands of customers to pay for auto insurance – commonly known as Collateral
13 Protection Insurance ("CPI") – that they did not need or want.  National General
14 served as Wells Fargo's CPI vendor for all aspects of the program from July 2015
15 until the program was discreetly terminated in September 2016, including, *inter alia*,
16 insurance tracking, borrower identification, policy placement, and underwriting the
17 force-placed CPI.  Defendants possessed information showing that these customers
18 already had their own insurance, but forced them to be subject to redundant,
19 unnecessary, and overly expensive CPI policies anyway.

20     6.      Defendants unlawfully generated profits by force-placing unnecessary
21 CPI on unsuspecting customers and then collected payments for insurance premiums,
22 interest, and other fees, while also providing undisclosed kickbacks to Wells Fargo in
23 the form of unearned commissions and other compensation, thereby increasing the
24 costs paid by every individual that defendants saddled with the policies.  These
25 concealed kickbacks increased the charges to all borrowers on whom defendants had
26 force-placed CPI and provided defendants with the financial incentive to perpetuate
27 the CPI scheme.  Although defendants had long known that the CPI scheme harmed
28 customers, it was only ended in September 2016 after Wells Fargo internally

1    recognized that maintaining the CPI scheme "could lead to reputational risk and
2    potential legal exposure."  However, even after the forced placement of new CPI
3    policies ended, Wells Fargo still continued to pay tracking fees to National General
4    for the CPI policies that National General had underwritten.

5        7.    During the Class Period, defendants concealed their participation in the
6    fraudulent CPI scheme, and the significant legal and reputational risks that it entailed,
7    and provided investors with revenues and earnings results that had been artificially
8    inflated by illegitimate proceeds from the scheme.  Rather than disclose the truth,
9    defendants repeatedly claimed to investors that National General assiduously
10   "***match[ed] the consumer to the product that the consumer needs***," provided auto
11   insurance policies that "***protect our customers***" and "***deliver[ed] insurance products
12   tailored to the needs of our affinity partners' members or customers***."  These, and
13   other similar statements by defendants, were materially false and misleading when
14   made.[1]

15       8.    Then, on July 27, 2017, *The New York Times* published an article that
16   revealed for the first time the CPI forced-placed insurance scheme.  The article cited
17   an internal report commissioned by Wells Fargo's executives, which reportedly stated
18   that more than 800,000 auto loan customers, including active military personnel, had
19   paid for unnecessary CPI, pushing nearly 274,000 of them into delinquency and
20   resulting in more than 20,000 unlawful vehicle repossessions.  As a result of the CPI
21   scheme, these individuals suffered financial harm, including inflated premiums,
22   delinquency charges, late fees, repossession costs, increased interest rates, overdraft
23   fees, and damage to their credit reports.

24       9.    In the days that followed, attention increasingly turned to National
25   General and its role in the scheme.  The Company faced numerous regulatory
26   investigations, congressional scrutiny, and civil lawsuits that caused a decline in the

27   _____
28   [1]   Emphasis is added throughout unless otherwise noted.

- 3 -

price of National General shares. Between July 26, 2017, before the story broke, and August 10, 2017, after the launch of a congressional inquiry into the scandal, the price of National General common stock fell more than 15%.

10.   As a result of the fraudulent conduct alleged herein, plaintiff and other members of the Class (defined below) purchased National General common stock at artificially inflated prices and suffered significant losses and damages.

## PARTIES

11.   Plaintiff City of North Miami Beach Police Officers' and Firefighters' Retirement Plan purchased National General common stock during the Class Period as described in the Certification attached hereto and incorporated herein by reference and suffered damages.

12.   Defendant National General is a specialty lines insurance holding company. Through its subsidiary, National General Insurance Company, National General served as the CPI vendor for all aspects of the forced-placed insurance scheme. During the Class Period, shares of National General common stock traded on the NASDAQ Global Market ("NASDAQ") under the ticker symbol "NGHC."

13.   Defendant Barry Karfunkel ("B. Karfunkel") is the Chief Executive Officer ("CEO") and Co-Chairman of the Board of Directors of National General.

14.   Defendant Michael Weiner ("Weiner") is the Chief Financial Officer ("CFO") of National General.

15.   Defendants B. Karfunkel and Weiner are referred to herein as the "Individual Defendants."

16.   During the Class Period, the Individual Defendants ran the Company as hands-on managers overseeing National General's operations and finances and made the materially false and misleading statements described herein. The Individual Defendants had intimate knowledge about core aspects of National General's financial and business operations, including its major contracts and revenue sources. They

1  were also intimately involved in deciding which disclosures would be made by

2  National General.

3                                    **BACKGROUND**

4          17.    Defendant National General is a specialty personal lines insurance

5  holding company that, through its subsidiaries, provides a variety of insurance

6  products, including personal and commercial automobile, homeowners, umbrella,

7  recreational vehicle, motorcycle, lender-placed, and supplemental health insurance.

8          18.    National General was formed in 2009 by insurance magnate Michael

9  Karfunkel ("M. Karfunkel") to acquire the private passenger auto business of the U.S.

10 consumer property and casualty insurance segment of General Motors Acceptance

11 Corporation ("GMAC," now known as Ally Financial).

12         19.    M. Karfunkel served as the CEO and Chairman of the Board of Directors

13 (the "Board") of National General until his passing in April 2016, at which point his

14 son, B. Karfunkel, was elevated from President of the Company to CEO.

15         20.    During the Class Period, National General, together with banking giant

16 Wells Fargo, perpetrated a secret scheme to bilk millions of dollars from unsuspecting

17 customers who were forced to pay for auto insurance they did not need or want.  The

18 scheme worked as follows: Wells Fargo automatically required auto insurance, known

19 as CPI, when customers took out automobile loans to cover the cost of damage to the

20 financed vehicle.  The insurance was underwritten by National General and was

21 generally more expensive than auto insurance that customers already had obtained or

22 could obtain on their own.  Ordinarily, if proof of auto insurance was not received by

23 National General or Wells Fargo, notices were required to be sent to borrowers in

24 order to prompt them to obtain the required coverage.  However, neither Wells Fargo

25 nor National General checked their internal database to see if their customers had

26 insurance coverage, or if they did, they simply ignored what they learned.  Instead,

27 Wells Fargo and National General imposed on their own customers unnecessary,

28 unwanted, and often duplicative auto insurance coverage, and then, frequently without

notice, automatically deducted the cost of the CPI insurance from the customers' bank account along with the regularly scheduled principal and interest payment for the auto loan. When customers complained, they would be asked to make the payments anyway. If they refused, they were subject to aggressive repossession and debt collection tactics to force them to pay.

21.     National General secured its role in the scheme by acquiring the lender-placed insurance business of QBE Insurance Group Limited ("QBE") in July 2015. Thereafter, and until the program's discreet termination, National General provided all CPI vendor services in furtherance of the scheme. The services provided by National General included, *inter alia*, insurance tracking, borrower identification, policy placement, and underwriting the force-placed CPI. In all, some 800,000 auto loan customers paid for unnecessary auto insurance policies, pushing up to 274,000 of them into delinquency and resulting in more than 20,000 unlawful vehicle repossessions.

22.     In July 2016, while Wells Fargo was being investigated in connection with another customer account scandal (which would ultimately result in a $100 million fine announced by the Consumer Financial Protection Bureau in September 2016), the bank commissioned an internal investigation and report into its practice of foisting, through National General and its predecessors, unwanted and unneeded auto insurance onto its customers. The investigation culminated in a 60-page internal report confirming the essential facts and the massive scale of the wrongdoing. Thereafter, in September 2016, Wells Fargo secretly wound down the program and phased out National General's CPI coverage, although it continued to pay National General fees for tracking services. Throughout the Class Period, defendants concealed the forced-placed CPI scheme and their role in it.

## DEFENDANTS' FALSE AND MISLEADING
## STATEMENTS DURING THE CLASS PERIOD

23.     The Class Period begins on August 6, 2015.  On that date, National General filed with the SEC a quarterly report on Form 10-Q announcing the Company's financial and operating results for the quarter ended June 30, 2015 (the "Q2 2015 10-Q").

24.     The Q2 2015 10-Q stated that National General "sell[s] insurance products with a focus on underwriting profitability through a combination of our customized and predictive analytics and our technology driven low cost infrastructure."  It also stated that the Company focused "on niche markets and regions where [it was] able to maintain premium rates at generally consistent levels and *maintain underwriting discipline* throughout these cycles."

25.     The Q2 2015 10-Q contained the signed certification of defendant Weiner, which stated that the financial information contained in the Q2 2015 10-Q was accurate, not misleading, and the product of effective internal controls over financial reporting.

26.     On November 9, 2015, National General filed with the SEC a quarterly report on Form 10-Q announcing the Company's financial and operating results for the quarter ended September 30, 2015 (the "Q3 2015 10-Q").  For the quarter, National General reported gross premium written of $546.8 million, net premium written of $482 million, and total revenues of $548.7 million.

27.     The Q3 2015 10-Q stated that National General "sell[s] insurance products with a focus on underwriting profitability through a combination of [its] customized and predictive analytics and [its] technology driven low cost infrastructure."  It also stated that the Company focused "on niche markets and regions where [it was] able to maintain premium rates at generally consistent levels and *maintain underwriting discipline* throughout these cycles."

28.    The Q3 2015 10-Q contained the signed certification of defendant Weiner, which stated that the financial information contained in the Q3 2015 10-Q was accurate, not misleading, and the product of effective internal controls over financial reporting.

29.    On February 29, 2016, National General filed with the SEC an annual report on Form 10-K announcing the Company's financial and operating results for the fiscal fourth quarter and year ended December 31, 2015 (the "2015 10-K").  For the quarter, National General reported gross premium written of $678.2 million, net premium written of $618.1 million, and total revenues of $752.5 million.  For 2015, National General reported gross premium written of $2.31 billion, net premium written of $2.06 billion, and total revenues of $2.35 billion.

30.    The 2015 10-K highlighted National General's purported focus on providing tailor-made insurance products appropriate for its customers' needs that were the product of rigorous underwriting discipline, detailed actuarial analyses, and a customer-centered distribution approach.  For example, the 2015 10-K stated that the "unique" distribution model of the Company allowed it to "***match the consumer to the product that the consumer needs***, whether it's a product underwritten by us or a third party carrier."

31.    The 2015 10-K further stated that National General's P&C segment included automobile insurance products that "***protect our customers*** against losses due to physical damage to their motor vehicles, bodily injury and liability to others for personal injury or property damage arising out of auto accidents."  The 2015 10-K also stated that the Company partnered with other organizations to "deliver insurance products ***tailored to the needs*** of [its] affinity partners' members or customers" in its P&C segment.

32.    With respect to National General's purported focus on underwriting discipline, the 2015 10-K stated that the Company utilized its "technology and extensive database of loss history ***in order to appropriately price and structure***

1  *policies*," and that the Company believed in a "**strong underwriting foundation**,"
2  which was "best accomplished through careful risk selection and continuous
3  evaluation of underwriting guidelines relative to loss experience."  The 2015 10-K
4  continued in pertinent part:

5  **Underwriting, Pricing and Risk Management, and Actuarial**
6  **Capabilities**

7  We establish premium rates for insurance products based upon an
8  analysis of expected losses using historical experience and anticipated
9  future trends.  Our product team develops the product and manages our
10  underwriting tolerances. ***Our actuarial team uses a detailed actuarial***
11  ***analysis to establish the necessary rate level for a given product*** and
12  territory to achieve our targeted return. For risks which fall within our
13  underwriting tolerances, we establish a price by matching rate to risk at a
14  detailed level of segmentation.  We determine the individual risk using
15  predictive modeling developed by our analytics team ***with a level of***
16  ***precision that we believe is superior*** to the traditional loss cost pricing
17  used by many of our competitors.  We believe that ***effective***
18  ***collaboration among the product, analytics and actuarial teams***
19  ***enhances our ability to price risks appropriately*** and achieve our
20  targeted rates of return.

21  33.    With respect to regulations and compliance, the 2015 10-K stated that
22  National General was "subject to extensive regulation in the United States," under
23  both state and federal laws, which "entails a review and examination of a company's
24  ***compliance with laws governing marketing, underwriting, rating, policy-issuance,***
25  ***claims-handling and other aspects of its insurance business*** during a specified
26  period of time."  The 2015 10-K also stated that the Company was barred from
27  "***misrepresenting pertinent facts or insurance policy provisions*** relating to coverages
28  at issue" and other unfair claims practices.

34.     With respect to National General's internal controls and procedures over financial reporting, the 2015 10-K stated in pertinent part:

**Disclosure Controls and Procedures**

Our management, with participation and under the supervision of our Chief Executive Officer and Chief Financial Officer, has evaluated the effectiveness of our disclosure controls and procedures (as such term is defined in Rules 13a-15(e) and 15d-15(e) under the Securities Exchange Act of 1934, as amended (the "Exchange Act")) as of the end of the period covered by this report.  Based on such evaluation, ***our Chief Executive Officer and Chief Financial Officer have concluded that, as of the end of such period, our disclosure controls and procedures are effective*** in ensuring that information required to be disclosed by us in the reports we file or submit under the Exchange Act is timely recorded, processed, summarized and reported within the time periods specified in the SEC's rules and forms, and accumulated and communicated to our management, including our principal executive officer and principal financial officer, as appropriate, to allow timely decisions regarding required disclosure.

**Changes in Internal Controls Over Financial Reporting**

***There have not been any changes in our internal control over financial reporting*** (as such term is defined in Rules 13a-15(f) and 15d-15(f) under the Exchange Act) during the fiscal quarter ended December 31, 2015 that have materially affected, or are reasonably likely to materially affect, our internal control over financial reporting.

**Management Report on Internal Control Over Financial Reporting**

We, as management of the Company, are responsible for establishing and maintaining adequate internal control over financial reporting.  Pursuant to the rules and regulations of the SEC, internal

control over financial reporting is a process designed by, or under the supervision of, our principal executive and principal financial officers, or persons performing similar functions, and effected by our Board of Directors, management and other personnel, to ***provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements*** for external purposes in accordance with generally accepted accounting principles and includes those policies and procedures that:

- Pertain to the maintenance of records that in reasonable detail accurately and fairly reflect the transactions and dispositions of the assets of the Company;

- Provide reasonable assurance that transactions are recorded as necessary to permit preparation of financial statements in accordance with generally accepted accounting principles, and that receipts and expenditures of the Company are being made only in accordance with authorizations of management and directors of the Company; and

- Provide reasonable assurance regarding prevention or timely detection of unauthorized acquisition, use or disposition of the Company's assets that could have a material effect on the financial statements.

*        *        *

**Report of Independent Registered Public Accounting Firm**

*        *        *

In our opinion, ***National General Holdings Corp. maintained in all material respects***, effective internal control over financial reporting as of December 31, 2015, based on the COSO criteria.

35.     The 2015 10-K was signed by defendants B. Karfunkel and Weiner and contained the signed certification of defendant Weiner, which stated that the financial information contained in the 2015 10-K was accurate, not misleading, and the product of effective internal controls over financial reporting.

36.     On May 10, 2016, National General filed with the SEC a quarterly report on Form 10-Q announcing the Company's financial and operating results for the quarter ended March 31, 2016 (the "Q1 2016 10-Q").  For the quarter, National General reported gross premium written of $816.2 million, net premium written of $744.6 million, and total revenues of $776 million.

37.     The Q1 2016 10-Q stated that National General "sell[s] insurance products with a focus on underwriting profitability through a combination of [its] customized and predictive analytics and [its] technology driven low cost infrastructure."  It also stated that the Company focused "on niche markets and regions where [it was] able to maintain premium rates at generally consistent levels and *maintain underwriting discipline* throughout these cycles."

38.     The Q1 2016 10-Q contained the signed certifications of defendants B. Karfunkel and Weiner, which stated that the financial information contained in the Q1 2016 10-Q was accurate, not misleading, and the product of effective internal controls over financial reporting.

39.     On August 5, 2016, National General filed with the SEC a quarterly report on Form 10-Q announcing the Company's financial and operating results for the quarter ended June 30, 2016 (the "Q2 2016 10-Q").  For the quarter, National General reported gross premium written of $774 million, net premium written of $698.3 million, and total revenues of $804.6 million.

40.     The Q2 2016 10-Q stated that National General "sell[s] insurance products with a focus on underwriting profitability through a combination of [its] customized and predictive analytics and [its] technology driven low cost infrastructure."  It also stated that the Company focused "on niche markets and

1 | regions where [it was] able to maintain premium rates at generally consistent levels
2 | and ***maintain underwriting discipline*** throughout these cycles."

3 |      41.     The Q2 2016 10-Q contained the signed certifications of defendants B.
4 | Karfunkel and Weiner, which stated that the financial information contained in the Q2
5 | 2016 10-Q was accurate, not misleading, and the product of effective internal controls
6 | over financial reporting.

7 |      42.     On November 8, 2016, National General filed with the SEC a quarterly
8 | report on Form 10-Q announcing the Company's financial and operating results for
9 | the quarter ended September 30, 2016 (the "Q3 2016 10-Q").  For the quarter,
10 | National General reported gross premium written of $851.4 million, net premium
11 | written of $767.3 million, and total revenues of $857.4 million.

12 |      43.     The Q3 2016 10-Q stated that National General "sell[s] insurance
13 | products with a focus on underwriting profitability through a combination of [its]
14 | customized and predictive analytics and [its] technology driven low cost
15 | infrastructure."  It also stated that the Company focused "on niche markets and
16 | regions where [it was] able to maintain premium rates at generally consistent levels
17 | and ***maintain underwriting discipline*** throughout these cycles."

18 |      44.     The Q3 2016 10-Q contained the signed certifications of defendants B.
19 | Karfunkel and Weiner, which stated that the financial information contained in the Q3
20 | 2016 10-Q was accurate, not misleading, and the product of effective internal controls
21 | over financial reporting.

22 |      45.     The statements referenced in ¶¶24-44 were materially false and/or
23 | misleading when made because they misrepresented and failed to disclose the
24 | following adverse facts pertaining to the Company's business, operations, and
25 | financial condition, which were known to defendants or recklessly disregarded by
26 | them:

27 |
28 |

(a)    that National General was perpetrating a massive forced-placed CPI scheme to fraudulently saddle its own customers with unwanted and unneeded automobile insurance policies that it had underwritten;

(b)    that National General's illicit conduct in foisting unwanted and unneeded automobile insurance on its customers had resulted in some of the victims being declared delinquent, suffering adverse impacts to their creditworthiness, and/or having their cars improperly repossessed;

(c)    that National General was exposed to an extreme risk of regulatory scrutiny, legal risks, and reputational harm as a result of its participation in the forced-placed CPI scheme;

(d)    that the Company had failed to maintain effective internal controls over its financial reporting, including by failing to maintain formal documentation sufficient to reasonably ensure the accuracy of internal reporting and accounting procedures across much of its business, including with respect to insurance policy premiums; and

(e)    that the Company's reported quarterly revenues and policy premiums were in part the product of a fraudulent forced-placed insurance scheme and were therefore artificially inflated and unsustainable.

46.    In addition, Item 303 of SEC Regulation S-K, 17 C.F.R. §229.30 ("Item 303"), required the 2015 10-K to "[d]escribe any known trends or uncertainties that have had or that the registrant reasonably expects will have a material favorable or unfavorable impact on net sales or revenues or income from continuing operations." Defendants' failure to disclose their fraudulent scheme to saddle auto loan customers with unwanted and unneeded automobile insurance was a violation of Item 303 because it was a known uncertainty that was likely to, and did, have a material unfavorable impact on the Company once exposed.

47.    On February 27, 2017, National General issued a press release announcing its fourth quarter and fiscal 2016 financial results (the "FY 2016 Press

Release").  For the quarter, National General reported gross premium written of $818.7 million, net premium written of $740.5 million, and total revenues of $985.5 million.  For 2016, National General reported gross premium written of $3.26 billion, net premium written of $2.95 billion, and total revenues of $3.42 billion. The FY 2016 Press Release also announced that the Company would be unable to timely file its annual financial report on Form 10-K and would request an extension from the SEC of the deadline to file because "the Company is still finalizing the Form 10-K and is still preparing analyses and providing documentation requested by its auditors."

48.   That same day, National General hosted an earnings conference call to discuss the Company's fourth quarter and fiscal 2016 financial results in which defendants B. Karfunkel and Weiner participated.  On the call, B. Karfunkel disclosed that fourth quarter results were lower "primarily due to cat activity on our auto and lender-placed insurance lines of business."  He continued in pertinent part:

> Our lender-placed business declined through the loss of an [auto collateral protection client].  We maintain a relationship with a client and are still tracking . . . auto loans.  However, they made a corporate decision to stop placing lender-placed insurance on their auto loans.  In recent months, we have signed on a few new accounts and have other prospects that we expect to convert on in the future.

49.   On this news, the price of National General common stock declined approximately 4% on abnormally high volume over two trading days to close at $24.34 per share on February 28, 2017.  However, the price of National General stock remained artificially inflated because investors did not know the full truth of the Company's participation in a scheme to saddle National General's own customers with unwanted and unneeded auto insurance that had inflated National General's revenues.

50.   On March 16, 2017, National General filed with the SEC an amended annual report on Form 10-K for its fiscal year ended December 31, 2015 (the

1    "Amended 2015 10-K").  The Amended 2015 10-K disclosed that the Company had a

2    material weakness in its controls over financial reporting as of December 31, 2015,

3    and that prior representations to the contrary were false when made.  Specifically, the

4    Amended 2015 10-K revealed that the Company had failed to maintain formal

5    documentation sufficient to reasonably ensure the precision, sufficiency,

6    completeness, and accuracy of its internal reporting and accounting procedures across

7    much of its business, including its insurance policy premiums.

8        51.    On this news, the price of National General common stock declined

9    approximately 3% on abnormally high volume to close at $23.35 per share on March

10   17, 2017.  However, the price of National General stock remained artificially inflated

11   because investors did not know the full truth of the Company's participation in a

12   scheme to saddle hundreds of thousands of its customers with unwanted and unneeded

13   auto insurance that had inflated National General's revenues.

14       52.    On March 23, 2017, National General belatedly filed with the SEC an

15   annual report on Form 10-K announcing the Company's financial and operating

16   results for the fiscal fourth quarter and year ended December 31, 2016 (the "2016

17   10-K").

18       53.    The 2016 10-K highlighted National General's purported focus on

19   providing tailor-made insurance products appropriate for its customers' needs that

20   were the product of rigorous underwriting discipline, detailed actuarial analyses, and a

21   customer-centered distribution approach.  For example, the 2016 10-K stated that the

22   "unique" distribution model of the Company allowed it to "***match the consumer to***

23   ***the product that the consumer needs***, whether it's a product underwritten by us or a

24   third party carrier."

25       54.    The 2016 10-K further stated that National General's P&C segment

26   included automobile insurance products that "***protect [its] customers*** against losses

27   due to physical damage to their motor vehicles, bodily injury and liability to others for

28   personal injury or property damage arising out of auto accidents."  The 2016 10-K

also stated that the Company partnered with other organizations to "deliver insurance products *tailored to the needs* of [its] affinity partners' members or customers" in its P&C segment.

55.    With respect to National General's purported focus on underwriting discipline, the 2016 10-K stated that the Company utilized its "technology and extensive database of loss history *in order to appropriately price and structure policies*," and that the Company believed in a "*strong underwriting foundation*," which was "best accomplished through careful risk selection and continuous evaluation of underwriting guidelines relative to loss experience." The 2016 10-K continued in pertinent part:

> **Underwriting, Pricing and Risk Management, and Actuarial Capabilities**
>
> We establish premium rates for insurance products based upon an analysis of expected losses using historical experience and anticipated future trends. Our product team develops the product and manages our underwriting tolerances. ***Our actuarial team uses a detailed actuarial analysis to establish the necessary rate level for a given product*** and territory to achieve our targeted return. For risks which fall within our underwriting tolerances, we establish a price by matching rate to risk at a detailed level of segmentation. We determine the individual risk using predictive modeling developed by our analytics team ***with a level of precision that we believe is superior*** to the traditional loss cost pricing used by many of our competitors. We believe that ***effective collaboration among the product, analytics and actuarial teams enhances our ability to price risks appropriately*** and achieve our targeted rates of return.

56.    With respect to regulations and compliance, the 2016 10-K stated that National General was "subject to extensive regulation in the United States," under

both state and federal laws, which "entails a review and examination of a company's ***compliance with laws governing marketing, underwriting, rating, policy-issuance, claims-handling and other aspects of its insurance business*** during a specified period of time." The 2016 10-K also stated that the Company was barred from "***misrepresenting pertinent facts or insurance policy provisions*** relating to coverages at issue" and other unfair claims practices.

57. The 2016 10-K contained the signed certifications of defendants B. Karfunkel and Weiner, which stated that the financial information contained in the 2016 10-K was accurate, not misleading, and the product of effective internal controls over financial reporting.

58. On May 9, 2017, National General filed with the SEC a quarterly report on Form 10-Q announcing the Company's financial and operating results for the quarter ended March 31, 2017 (the "Q1 2017 10-Q").

59. The Q1 2017 10-Q stated that National General "sell[s] insurance products with a focus on underwriting profitability through a combination of [its] customized and predictive analytics and [its] technology driven low cost infrastructure." It also stated that the Company focused "on niche markets and regions where [it was] able to maintain premium rates at generally consistent levels and ***maintain underwriting discipline*** throughout these cycles."

60. The Q1 2017 10-Q contained the signed certifications of defendants B. Karfunkel and Weiner, which stated that the financial information contained in the Q1 2017 10-Q was accurate, not misleading, and the product of effective internal controls over financial reporting.

61. The statements referenced in ¶¶47-48 and 53-60 were materially false and/or misleading when made because they misrepresented and failed to disclose the following adverse facts pertaining to the Company's business, operations, and financial condition, which were known to defendants or recklessly disregarded by them:

(a)     that National General had in fact lost substantial business with Wells Fargo because Wells Fargo had terminated the forced-placed CPI scheme after concluding that it posed excessive reputational risk and legal exposure;

(b)     that National General had perpetrated a massive forced-placed CPI scheme to fraudulently saddle its own customers with unwanted and unneeded automobile insurance policies that it had underwritten;

(c)     that National General's illicit conduct in foisting unwanted and unneeded automobile insurance on its customers had resulted in some of the victims being declared delinquent, suffering adverse impacts to their creditworthiness, and/or having their cars improperly repossessed;

(d)     that National General was exposed to an extreme risk of regulatory scrutiny, legal risks, and reputational harm as a result of its participation in the forced-placed CPI scheme; and

(e)     that the Company's historical reported quarterly revenues and policy premiums were in part the product of a fraudulent forced-placed insurance scheme and were therefore artificially inflated and unsustainable.

62.     In addition, Item 303 required the 2015 10-K to "[d]escribe any known trends or uncertainties that have had or that the registrant reasonably expects will have a material favorable or unfavorable impact on net sales or revenues or income from continuing operations."  Defendants' failure to disclose their fraudulent scheme to saddle auto loan customers with unwanted and unneeded automobile insurance was a violation of Item 303 because it was a known uncertainty that was likely to, and did, have a material unfavorable impact on the Company once exposed.

63.     Then, on July 27, 2017, *The New York Times* published an explosive article, entitled "Wells Fargo Forced Unwanted Auto Insurance on Borrowers," revealing how Wells Fargo and National General had foisted unwanted and unneeded automobile insurance underwritten by National General on thousands of auto loan customers.  The article stated in pertinent part:

1      More than 800,000 people who took out car loans from Wells
2    Fargo were charged for auto insurance they did not need, and some of
3    them are still paying for it, according to an internal report prepared for
4    the bank's executives.

5      The expense of the unneeded insurance, which covered collision
6    damage, pushed roughly 274,000 Wells Fargo customers into
7    delinquency and resulted in almost 25,000 wrongful vehicle
8    repossessions, according to the 60-page report, which was obtained by
9    *The New York Times*.  Among the Wells Fargo customers hurt by the
10   practice were military service members on active duty.

*    *    *

12     Asked about the findings on auto insurance, Wells Fargo officials
13   confirmed that the improper insurance practices took place and said the
14   bank was determined to make customers whole.

*    *    *

16     The report, which was prepared by the consulting firm Oliver
17   Wyman, looked at insurance policies sold to Wells customers from
18   January 2012 through July 2016.  The insurance, which the bank
19   required, was more expensive than auto insurance that customers often
20   already had obtained on their own.

21     National General Insurance underwrote the policies for Wells
22   Fargo, which began to require the insurance on auto loans as early as
23   2006.  The practice continued until the end of September.

24     Christine Worley, a spokeswoman for National General, declined
25   to comment.

26     For borrowers, delinquencies arose quickly because of the way the
27   bank charged for the insurance.  Say, for example, that a customer
28   agreed to a monthly payment of $275 in principal and interest on her car

loan, and arranged for the amount to be deducted from her bank account automatically. If she were not advised about the insurance and it increased her monthly payment to, say, $325, her account could become overdrawn as soon as Wells Fargo added the coverage.

The report tried to determine how many Wells Fargo customers were hurt and how much they should be compensated. It estimated that the bank owed $73 million to wronged customers.

State insurance regulations required Wells Fargo to notify customers of the insurance before it was imposed. But the bank did not always do so, the report said. And almost 100,000 of the policies violated the disclosure requirements of five states – Arkansas, Michigan, Mississippi, Tennessee and Washington.

Wells Fargo took issue with some of the figures in its own report. In a statement, Jennifer A. Temple, a bank spokeswoman, said the bank determined only 570,000 of its customers may qualify for a refund and that just 60,000 customers in the five states had not received complete disclosures before the insurance placement. Finally, she said, the bank estimated the insurance may have contributed to 20,000 wrongful repossessions, not 25,000.

*     *     *

In the Wells Fargo arrangement, National General receives all of the commissions on the insurance it sold to the bank's borrowers. But for a time the bank shared in those revenues. Wells stopped sharing in the commissions in February 2013, according to the report.

*     *     *

Wells Fargo borrowers sustained financial damages beyond the costs of the insurance, the report said. The harm also included

1   repossession costs, late fees, charges for insufficient funds and damage
2   to consumers' credit reports.

3       In recent years, consumers have complained to federal regulators
4   about lender-placed insurance on auto loans, the Consumer Financial
5   Protection Bureau's database shows.  Many complaints identified Wells
6   Fargo.  In one example, an unidentified Wells Fargo customer reported
7   providing proof to the bank on three occasions that the car was already
8   insured and the new insurance was unnecessary, only to continue
9   receiving calls from bank employees demanding payment of insurance
10  charges.

11      Wells Fargo automatically imposed the insurance through its
12  Dealer Services unit. Its website says it has more than four million
13  customers and provides a variety of banking services to 14,000 auto
14  dealers around the nation.  It says the company's lender-placed auto
15  insurance "may be considerably more expensive than insurance you can
16  obtain on your own."

17      Such policies typically cost more than $1,000 a year, not counting
18  interest. (Customers could pay them in full or finance them over time.)
19  If a car was repossessed, the bank might charge a reinstatement fee of as
20  much as $500, so a borrower could face $1,500 in charges.

21      Here is how the process worked: When customers financed cars
22  with Wells Fargo, the buyers' information would go to National General,
23  which was supposed to check a database to see if the owner had
24  insurance coverage.  If not, the insurer would automatically impose
25  coverage on the customers' accounts, adding an extra layer of premiums
26  and interest to their loans.

27      When customers who checked their bills saw the charges and
28  notified Wells Fargo that they already had car insurance, the bank was

supposed to cancel the insurance and credit the borrower with the amount that had been charged.

The Oliver Wyman report indicated that many customers appear not to have notified Wells Fargo of the redundant insurance. This may have been because their payments were deducted automatically from their bank accounts and they did not spot the charges.

According to documents on a Wells Fargo website titled "understanding your auto loan," the bank had strict rules about the order in which it would apply a customer's car payment to costs associated with the loan: First to be deducted from a payment would be the interest owed on the car loan. Then the bank would deduct interest charged on the lender-placed insurance. The third deduction would be principal on the loan, followed by the amount of premium owed on the insurance.

This payment structure had the effect of increasing the overall interest borrowers paid on their loans, the Oliver Wyman report noted, because fewer dollars went to reducing the principal outstanding.

Wells Fargo was also aggressive in repossessing vehicles: Some customers endured multiple repossessions, the report said.

64.    That same day, Wells Fargo issued a public statement admitting the essential facts of the scheme as reported by *The New York Times* and announcing an $80 million remediation plan.

65.    Whereas the focus of *The New York Times* article was on Wells Fargo, in the days that followed the article's publication, scrutiny on National General and its role in the scandal intensified. Several civil lawsuits were filed by consumers implicating the Company in the wrongdoing.[2] In addition, investigations were

---

[2]    Many of these lawsuits would later be consolidated in the Central District of California and the plaintiffs' claims of fraud and racketeering against the Company sustained on a motion to dismiss. *See In re Wells Fargo Collateral Prot. Ins. Litig.*, No. 8:17-ml-02797 AG (KESx), ECF No. 203 (C.D. Cal. Dec. 14, 2018).

1   launched into National General's misconduct by the California Insurance

2   Commissioner, the New York Department of Financial Services, and the U.S. Senate.

3         66.    On August 9, 2017, a bipartisan group of senators sent a list of questions

4   to defendant B. Karfunkel, the CEO of National General, inquiring about the

5   Company's role in the scandal. By the next day, August 10, 2017, the price of

6   National General stock closed at $18.00 per share, more than 15% below its closing

7   price prior to *The New York Times* story.

8         67.    Ultimately, Wells Fargo was forced to pay $1 billion to the Consumer

9   Financial Protection Bureau and reached a $575 million settlement with state

10   regulators over its home and auto loan abuses, which included the forced-place CPI

11   scheme National General helped orchestrate. In June 2019, Wells Fargo and National

12   General agreed to resolve a consumer class action related to the scandal for $430

13   million (including attorneys' fees). The Company's most recent Form 10-K, filed on

14   February 25, 2019, stated that it was still "subject to inquiries by regulatory and

15   government agencies" over its role in the scheme.

16         68.    As a result of defendants' wrongful acts and omissions, plaintiff and the

17   Class purchased National General common stock at artificially inflated prices,

18   suffered significant losses, and were damaged thereby.

19                   **NO SAFE HARBOR**

20         69.    Defendants' "Safe Harbor" warnings accompanying National General's

21   reportedly forward-looking statements ("FLS") issued during the Class Period were

22   ineffective to shield those statements from liability. Because most of the false and

23   misleading statements related to existing facts or conditions, the Safe Harbor has no

24   applicability. To the extent that known trends should have been included in the

25   Company's financial reports prepared in accordance with Generally Accepted

26   Accounting Principles ("GAAP"), they are excluded from the protection of the

27   statutory Safe Harbor. 15 U.S.C. §78u-5(b)(2)(A).

28

70. The defendants are also liable for any false or misleading FLS pleaded because, at the time each FLS was made, the speaker knew the FLS was false or misleading and the FLS was authorized and/or approved by an executive officer and/or director of National General who knew that the FLS was false. In addition, the FLS were contradicted by existing, undisclosed material facts that were required to be disclosed so that the FLS would not be misleading. Finally, most of the purported "Safe Harbor" warnings were themselves misleading because they warned of "risks" that had already materialized or failed to provide any meaningful disclosures of the relevant risks.

## ADDITIONAL SCIENTER ALLEGATIONS

71. As alleged herein, defendants acted with scienter in that they knew that the public documents and statements issued or disseminated in the name of the Company were materially false and misleading; knew that such statements or documents would be issued or disseminated to the investing public; and knowingly and substantially participated or acquiesced in the issuance or dissemination of such statements or documents and actions intended to manipulate the market price of National General common stock as primary violations of the federal securities laws. As set forth elsewhere herein in detail, defendants, by virtue of their receipt of information reflecting the true facts regarding National General, their control over, and/or receipt or modification of National General's allegedly materially misleading misstatements, and/or their associations with the Company which made them privy to confidential proprietary information concerning National General, participated in the fraudulent scheme alleged herein.

## LOSS CAUSATION

72. During the Class Period, as detailed herein, defendants engaged in a scheme to deceive the market and a course of conduct that artificially inflated the price of National General common stock and operated as a fraud or deceit on purchasers of National General common stock. As detailed above, when the truth

about National General's misconduct was revealed over time, the value of the Company's stock declined precipitously as the prior artificial inflation no longer propped up the stock's price. The declines in the price of National General stock were the direct result of the nature and extent of defendants' fraud finally being revealed to investors and the market. The timing and magnitude of the share price declines negate any inference that the losses suffered by plaintiff and other members of the Class were caused by changed market conditions, macroeconomic or industry factors, or company-specific facts unrelated to defendants' fraudulent conduct. The economic loss, *i.e.*, damages, suffered by plaintiff and other Class members, was a direct result of defendants' fraudulent scheme to artificially inflate the price of the Company's stock and the subsequent significant decline in the value of the Company's stock when defendants' prior misrepresentations and other fraudulent conduct were revealed.

73. At all relevant times, defendants' materially false and misleading statements or omissions alleged herein directly or proximately caused the damages suffered by plaintiff and the other Class members. Those statements were materially false and misleading through their failure to disclose a true and accurate picture of National General's business, operations, and financial condition, as alleged herein. Throughout the Class Period, defendants issued materially false and misleading statements and omitted material facts necessary to make defendants' statements not false or misleading, causing the price of National General's common stock to be artificially inflated. Plaintiff and other Class members purchased National General stock at artificially inflated prices, causing them to suffer damages as complained of herein.

## APPLICABILITY OF PRESUMPTION OF RELIANCE: FRAUD-ON-THE-MARKET DOCTRINE

74. At all relevant times, the market for National General common stock was an efficient market for the following reasons, among others:

(a)    National General stock met the requirements for listing, and was listed and actively traded on the NASDAQ, a highly efficient and automated market;

(b)    according to the Company's quarterly report on Form 10-Q filed on August 8, 2017, the Company had approximately 106.6 million basic weighted average common shares outstanding, demonstrating a very active and broad market for National General common stock;

(c)    as a regulated issuer, National General filed periodic public reports with the SEC;

(d)    National General regularly communicated with public investors via established market communication mechanisms, including the regular disseminations of press releases on national circuits of major newswire services, the Internet, and other wide-ranging public disclosures; and

(e)    unexpected material news about National General was rapidly reflected in and incorporated into the Company's stock price during and after the Class Period.

75.    As a result of the foregoing, the market for National General common stock promptly digested current information regarding National General from publicly available sources and reflected such information in National General's stock price. Under these circumstances, all purchasers of National General common stock during the Class Period suffered similar injury through their purchase of National General common stock at artificially inflated prices, and a presumption of reliance applies.

**CLASS ACTION ALLEGATIONS**

76.    This is a class action on behalf of all purchasers of National General common stock during the Class Period who were damaged thereby (the "Class"). Excluded from the Class are defendants and their families, the officers and directors of the Company, at all relevant times, members of their immediate families and their legal representatives, heirs, successors or assigns, and any entity in which defendants have or had a controlling interest.

77.     Common questions of law and fact predominate and include: (a) whether defendants violated the Exchange Act; (b) whether defendants omitted and/or misrepresented material facts; (c) whether defendants knew or recklessly disregarded that their statements were false; (d) whether the price of National General common stock was artificially inflated during the Class Period; and (e) the extent of and appropriate measure of damages.

78.     The members of the Class are so numerous that joinder of all members is impracticable.  Throughout the Class Period, shares of National General common stock were actively traded on the NASDAQ.  Upon information and belief, these shares are held by hundreds or thousands of individuals located geographically throughout the country.

79.     Plaintiff's claims are typical of those of the Class.  Prosecution of individual actions would create a risk of inconsistent adjudications.  Plaintiff will adequately protect the interests of the Class.  A class action is superior to other available methods for the fair and efficient adjudication of this controversy.

## COUNT I

### For Violation of §10(b) of the Exchange Act and Rule 10b-5
### Against All Defendants

80.     Plaintiff incorporates ¶¶1-79 by reference.

81.     During the Class Period, defendants disseminated or approved the false or misleading statements specified above, which they knew or recklessly disregarded were misleading in that they contained misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

82.     Defendants violated §10(b) of the Exchange Act and Rule 10b-5 in that they, directly and indirectly, by the use of the means or instrumentality of interstate commerce, or the mails or facility of a national securities exchange:

(a)     employed devices, schemes, and artifices to defraud;

(b)     made untrue statements of material fact or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; or

(c)     engaged in acts, practices, and a course of business that operated as a fraud or deceit upon plaintiff and others similarly situated in connection with their purchases of National General common stock during the Class Period.

83.     Plaintiff and the Class have suffered damages in that, in reliance on the integrity of the market, they paid artificially inflated prices for National General common stock.  Plaintiff and the Class would not have purchased National General common stock at the prices they paid, or at all, if they had been aware that the market price had been artificially and falsely inflated by defendants' misleading statements.

84.     By virtue of the foregoing, defendants have violated §10(b) of the Exchange Act, and Rule 10b-5 promulgated thereunder.

85.     As a direct and proximate result of defendants' wrongful conduct, plaintiff and the other members of the Class suffered damages in connection with their purchases of National General common stock during the Class Period.

## COUNT II

### For Violation of §20(a) of the Exchange Act
### Against the Individual Defendants

86.     Plaintiff incorporates ¶¶1-85 by reference.

87.     During the Class Period, the Individual Defendants acted as controlling persons of National General within the meaning of §20(a) of the Exchange Act.  By virtue of their share ownership, executive and Board positions, and their culpable participation, as alleged above, the Individual Defendants had the power to influence and control and did, directly or indirectly, influence and control the decision-making of the Company, including the content and dissemination of the various statements that plaintiff contends were false and misleading as detailed herein.

88.   The Individual Defendants were provided with or had unlimited access to the Company's internal reports, press releases, public filings, and other statements alleged by plaintiff to be misleading prior to or shortly after these statements were issued, and had the ability to prevent the issuance of the statements or cause them to be corrected.  In particular, the Individual Defendants had direct involvement in and responsibility over the day-to-day operations of the Company and, therefore, are presumed to have had the power to control or influence the particular transactions giving rise to the securities violations as alleged herein.

89.   As a direct and proximate result of these defendants' wrongful conduct, plaintiff and the other members of the Class suffered damages in connection with their purchases of the Company's common stock during the Class Period.  By reason of such wrongful conduct, these defendants are liable pursuant to §20(a) of the Exchange Act.

## PRAYER FOR RELIEF

WHEREFORE, plaintiff prays for judgment as follows:

A.   Determining that this action is a proper class action, designating plaintiff as Lead Plaintiff, and certifying plaintiff as a Class representative under Rule 23 of the Federal Rules of Civil Procedure and plaintiff's counsel as Lead Counsel;

B.   Awarding compensatory damages in favor of plaintiff and the other Class members against all defendants, jointly and severally, for all damages sustained as a result of defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

C.   Awarding plaintiff and the Class their reasonable costs and expenses incurred in this action, including counsel fees and expert fees; and

D.   Awarding such other and further relief as the Court may deem just and proper.

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

# JURY DEMAND

Plaintiff demands a trial by jury.

DATED: July 25, 2019

ROBBINS GELLER RUDMAN
 & DOWD LLP
DAVID C. WALTON
BRIAN E. COCHRAN

*s/ Brian E. Cochran*
BRIAN E. COCHRAN

655 West Broadway, Suite 1900
San Diego, CA  92101
Telephone:  619/231-1058
619/231-7423 (fax)

SUGARMAN & SUSSKIND, P.A.
ROBERT A. SUGARMAN
PEDRO A. HERRERA
100 Miracle Mile, Suite 300
Coral Gables, FL  33134
Telephone:  305/529-2801
305/447-8115 (fax)

Attorneys for Plaintiff

I:\Admin\CptDraft\Securities\Cpt National General.docx

## CERTIFICATION OF NAMED PLAINTIFF
## PURSUANT TO FEDERAL SECURITIES LAWS

CITY OF NORTH MIAMI BEACH POLICE OFFICERS' AND FIREFIGHTERS' RETIREMENT PLAN ("Plaintiff") declares:

1.     Plaintiff has reviewed a complaint and authorized its filing.

2.     Plaintiff did not acquire the security that is the subject of this action at the direction of plaintiff's counsel or in order to participate in this private action or any other litigation under the federal securities laws.

3.     Plaintiff is willing to serve as a representative party on behalf of the class, including providing testimony at deposition and trial, if necessary.

4.     Plaintiff has made the following transaction(s) during the Class Period in the securities that are the subject of this action:

| Security | Transaction | Date | Price Per Share |
|---|---|---|---|

*See* attached Schedule A.

5.     Plaintiff has not sought to serve or served as a representative party in a class action that was filed under the federal securities laws within the three-year period prior to the date of this Certification except as detailed below:

*Public Employees' Retirement System of Mississippi v. TreeHouse Foods, et al.*, No. 1:16-cv-10632 (N.D. Ill.)

6.     Plaintiff will not accept any payment for serving as a representative party on behalf of the class beyond the Plaintiff's pro rata share of any recovery,

NATIONAL GENERAL

except such reasonable costs and expenses (including lost wages) directly relating to the representation of the class as ordered or approved by the court.

     I declare under penalty of perjury that the foregoing is true and correct. Executed this 24 day of July, 2019.

                                CITY OF NORTH MIAMI BEACH
                                POLICE OFFICERS' AND
                                FIREFIGHTERS' RETIREMENT PLAN

                                By: _____
                                      Mohammad Asim, Chairman

NATIONAL GENERAL

## SCHEDULE A

## SECURITIES TRANSACTIONS

Stock

| Date Acquired | Amount of Shares Acquired | Price |
|---|---|---|
| 03/17/2017 | 111 | $23.22 |
| 03/20/2017 | 52 | $23.22 |
| 03/20/2017 | 53 | $23.13 |
| 03/20/2017 | 278 | $23.29 |
| 03/21/2017 | 25 | $22.90 |
| 03/21/2017 | 91 | $22.67 |
| 03/22/2017 | 95 | $22.34 |
| 03/22/2017 | 137 | $22.36 |
| 03/23/2017 | 52 | $23.30 |
| 03/27/2017 | 38 | $22.90 |
| 03/28/2017 | 33 | $22.98 |
| 03/28/2017 | 50 | $22.93 |
| 03/29/2017 | 26 | $22.99 |
| 03/29/2017 | 32 | $23.17 |

| Date Sold | Amount of Shares Sold | Price |
|---|---|---|
| 05/16/2017 | 25 | $21.78 |
| 06/27/2017 | 23 | $21.27 |