UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | | |
|---|---|---|
| CITY OF NORTH MIAMI BEACH POLICE OFFICERS' AND FIREFIGHTERS' RETIREMENT PLAN, Individually and on Behalf of All Others Similarly Situated,<br><br>Plaintiff,<br><br>vs.<br><br>NATIONAL GENERAL HOLDINGS CORP., BARRY KARFUNKEL, MICHAEL WEINER, and ARTHUR CASTNER,<br><br>Defendants. | x<br>:<br>:<br>:<br>:<br>:<br>:<br>:<br>:<br>:<br>:<br>:<br>:<br>:<br>:<br>x | Civil Action No. 1:19-cv-10825-JPO<br><br><u>CLASS ACTION</u><br><br>AMENDED COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS<br><br><br><br><br><br><br><br><u>DEMAND FOR JURY TRIAL</u> |

## TABLE OF CONTENTS

**Page**


NATURE OF THE ACTION AND OVERVIEW ............................................................1

JURISDICTION AND VENUE ..............................................................................7

PARTIES ...........................................................................................................7

FACTUAL ALLEGATIONS .................................................................................10

Overview of National General's Collusion with Wells Fargo in the Unlawful CPI Scheme ..........10

The Class Period Begins: National General Announces the Acquisition of the LPI Business ..........12

After Closing the LPI Acquisition, National General Continues to Conceal from Investors that it is Participating in an Illegal Insurance Scheme ..........15

National General's Deception Continues Despite Wells Fargo's Internal Investigation ..........16

National General's Fraud Is Revealed ..........18

Civil and Regulatory Actions After the Class Period Confirm National General's Knowledge of and Involvement in the CPI Scheme ..........20

Defendants Failed to Disclose The Impact of the Illegal and Unsustainable CPI Scheme on National General's Quarterly Results ..........21

Defendants Failed to Disclose the Likely Impact of the Illegal and Unsustainable CPI Scheme on National General's Future Results ..........24

DEFENDANTS' FALSE AND MISLEADING STATEMENTS AND OMISSIONS DURING THE CLASS PERIOD ..........26

DEFENDANTS' OMISSIONS WERE MATERIAL ..........51

The Omissions Described Above Were Material to National General's Financial Statements ..........51

Omissions Regarding National General's Collusion with Wells Fargo in the CPI Scheme Were *Quantitatively* Material ..........51

Omissions Regarding National General's Collusion with Wells Fargo in the CPI Scheme Were *Qualitatively* Material ..........52




4835-9162-3088.v1

**Page**

ADDITIONAL SCIENTER ALLEGATIONS ....... 53

The Karfunkel Family Profited Enormously While Hiding National General's Collusion in the CPI Scheme ....... 54

Defendants Were Motivated to Conceal and Perpetuate the Illegal CPI Scheme Because the Force-Placed Insurance on Unsuspecting Customers Was Highly Lucrative ....... 55

Defendants' Pre-Acquisition Due Diligence, Followed by Their Integration Processes, Informed Them of the Ongoing CPI Scheme Within the LPI Business ....... 56

Because National General Participated in Meetings with and Provided Meeting Materials to Wells Fargo Regarding the CPI Scheme, Defendants Were Well-Aware of the Scheme ....... 58

National General's Senior Management, Which Operated in a Flat Corporate Structure, Was "on Top of" the Details of the LPI Business, Including the CPI Scheme ....... 59

Defendants' Knowledge of the CPI Scheme Supported by National General's Tracking System ....... 61

National General Acted with Scienter ....... 61

Defendants' Certifications Pursuant to the SOX Demonstrate Scienter ....... 62

LOSS CAUSATION ....... 62

APPLICABILITY OF PRESUMPTION OF RELIANCE: FRAUD-ON-THE-MARKET DOCTRINE ....... 65

CLASS ACTION ALLEGATIONS ....... 66

COUNT I ....... 67

For Violation of §10(b) of the Exchange Act and Rule 10b-5 Against All Defendants ....... 67

COUNT II ....... 68

For Violation of §20(a) of the Exchange Act Against Defendants B. Karfunkel and Weiner ....... 68

**Page**

PRAYER FOR RELIEF ........................................................................................................69

JURY DEMAND ................................................................................................................70

This is a class action on behalf of persons and entities that purchased or otherwise acquired National General Holdings Corp. ("National General" or the "Company") common stock between July 15, 2015 and August 9, 2017, inclusive (the "Class Period"), and were damaged thereby, against: (i) National General; (ii) Chief Executive Officer ("CEO") Barry Karfunkel ("B. Karfunkel"); (iii) Chief Financial Officer ("CFO") Michael Weiner ("Weiner"); and (iv) Arthur Castner ("Castner") (collectively "Defendants"), under the Securities Exchange Act of 1934 (the "Exchange Act").

Lead Plaintiffs Town of Davie Police Officers Retirement System and Massachusetts Laborers' Pension Fund (collectively "Plaintiffs"), by and through their counsel, Robbins Geller Rudman & Dowd LLP ("Counsel"), allege the following upon personal knowledge as to themselves and their own acts, and upon information and belief as to all other matters. Plaintiffs' information and belief are based on, among other things, the independent investigation of Counsel. This investigation includes, but is not limited to, a review and analysis of: (i) public filings with the U.S. Securities and Exchange Commission ("SEC"); (ii) transcripts and audio files of National General senior management's conferences with investors and analysts; (iii) media reports issued about and disseminated by the Company; (iv) judicial, federal, statutory, and state agency filings regarding the Company; (v) a letter addressed to National General from the U.S. Senate Committee on Commerce, Science, and Transportation; (vi) analyst reports issued about National General; and (vii) other public information and data regarding the Company. Plaintiffs believe that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## NATURE OF THE ACTION AND OVERVIEW

1. This securities class action arises from Defendants' concealment from investors that National General and its predecessors had colluded with Wells Fargo Bank, N.A. and Wells Fargo &

Company (together, "Wells Fargo"), in a massive insurance scheme to bilk Wells Fargo auto loan customers out of millions of dollars. National General conspired with Wells Fargo by underwriting a type of auto insurance known as collateral protection insurance ("CPI") that was force-placed on thousands of Wells Fargo's auto loan customers' accounts – even when such insurance was unwanted and unneeded. In fact, borrowers often did not even know that they had such insurance.

2. National General, which was a specialty lines insurance holding company, had stepped into the role of Wells Fargo CPI vendor upon its acquisition of the lender-placed insurance ("LPI") business from QBE North America, a division of QBE Insurance Group Limited (collectively, "QBE") in October 2015. When the Company had announced the acquisition in July 2015, it asserted to investors that the LPI business, including the LPI Auto line that issued CPI policies, would be "immediately accretive to earnings." However, because of the detailed due diligence investigation the Company had undertaken in advance of the announcement, Defendants knew, or were deliberately reckless in not knowing, that a material portion of the acquired LPI business – almost 20% – was involved in underwriting illegal CPI policies on unsuspecting Wells Fargo auto loan customers.

3. From October 2015, when National General's acquisition of the LPI business closed, until the program was discreetly terminated in September 2016, the Company served as Wells Fargo's CPI vendor for all aspects of the CPI program, including, inter alia, underwriting the force-placed CPI, insurance tracking, borrower identification, and policy placement. As the party responsible for tracking customer insurance, National General possessed information showing that many of the Wells Fargo auto loan customers targeted with CPI policies already had their own insurance. Nevertheless, National General subjected them to redundant, unnecessary, and overly expensive CPI policies. Indeed, the rates charged for this insurance were more expensive than the

auto insurance Wells Fargo customers often had already obtained on their own. Moreover, National General was further advantaged by the fact that because these customers often remained unaware that that they were being charged for the CPI policies, the claims reported on them were artificially low.

4. Throughout this period, National General told investors that its LPI business was helping drive the Company's premium growth, and that the Company maintained "underwriting discipline" and was focused on compliance. Yet, Defendants' statements were materially false and misleading, and omitted material facts that would render the statements not misleading. Specifically, Defendants omitted that a material part of their LPI business involved perpetrating a massive illegal insurance scheme with Wells Fargo that affected hundreds of thousands of car loan customers. Force-placing CPI insurance on customers without their needing it or their knowledge of it is not reflective of either disciplined underwriting or a Company focused on compliance.

5. The unlawful nature of the illegal CPI scheme also rendered it and the premiums earned from it unsustainable, especially given the increased regulatory scrutiny that Wells Fargo was under. Thus, Defendants, when touting the accretive performance of the LPI business, omitted telling investors that premiums from the CPI program could not endure, that the CPI business from Wells Fargo contributed a material but unsustainable portion of the Company's consolidated net income and earnings per share ("EPS"), and that the Company's net income and EPS would be materially affected upon the CPI scheme's termination.

6. Wells Fargo, meanwhile, had been embroiled in scandals, including the previous year's stunning revelation that bank employees had opened millions of fake bank and credit card accounts. Now under a regulatory microscope, Wells Fargo initiated an internal investigation in July 2016 to examine the increasing CPI customer complaints. It hired the consulting firm Oliver

Wyman, who, in preparing its report, conducted extensive interviews with Wells Fargo and National General personnel involved in the scheme. Although Wells Fargo's internal investigation could only end in the termination of the unlawful force-placing of CPI on unsuspecting auto loan customers, National General nevertheless continued to tell investors that its LPI business helped drive its premium growth while concealing the illegal and unsustainable CPI scheme responsible for part of that growth.

7. Based on the investigation's initial findings, Wells Fargo terminated the illegal CPI program in September 2016 after Wells Fargo internally recognized that maintaining the CPI scheme "could lead to reputational risk and potential legal exposure." Despite the abrupt shuttering of the CPI scheme, Defendants made no mention of the resulting lost premiums during the very next earnings announcement in November 2016. Instead, Defendants continued to promote the LPI business as a driver of premium growth. Thus, not only did Defendants conceal from investors their involvement in a fraudulent insurance scheme, they also concealed the known fact at this point in time that the Company was no longer writing CPI policies for Wells Fargo, which made up almost 20% of the LPI business.

8. In February 2017, National General disclosed its year-end results for 2016. After a full quarter during which National General had ceased writing policies and collecting new premiums through the illegal CPI scheme with Wells Fargo, National General disclosed that its LPI business had "declined through the loss of an auto collateral protection client." Specifically, Defendant Weiner revealed that the LPI business reported a $79 million decrease in net written premium for the fourth quarter compared to the prior year's fourth quarter. And he admitted that, "the majority of that decline related to the previous-mentioned auto client."

9. However, Defendants neither identified the client nor explained the true reason why the client was no longer purchasing CPI coverage. In fact, Defendants gave investors reason to remain positive toward the LPI business, stating "we have recently signed a few new lender-placed clients which should have a positive impact on the top-line results in the near future."

10. With the CPI scheme still concealed but regulators starting to probe, Defendant B. Karfunkel and his family took action in June 2017 to protect their investment in National General's common stock. Karfunkel family members were also the majority beneficial shareholders and senior executives of National General's sister company, AmTrust Financial Services, Inc. ("AmTrust"). In a single sale, the Karfunkel family divested over 6 million shares of AmTrust's holdings in National General common stock for proceeds of just over $123 million.

11. Then, on July 27, 2017, *The New York Times* published an article exposing for the first time the illegal CPI forced-placed insurance scheme. The article cited the Oliver Wyman report – which had been completed but not disclosed since February 2017. According to the leaked report, more than 800,000 auto loan customers, including active military personnel, had paid for unnecessary CPI, pushing nearly 274,000 of them into delinquency, and resulting in more than 20,000 unlawful vehicle repossessions. The article reported that as a result of the CPI scheme, these customers suffered extensive financial harm, including inflated premiums, delinquency charges, late fees, repossession costs, increased interest rates, overdraft fees, and damage to their credit reports.

12. In the days that followed, attention increasingly turned to National General and its role in the scheme. The Company faced numerous regulatory investigations, congressional scrutiny, and civil lawsuits. Then, on August 7, 2017, in a press release issued after the market closed, Defendants were forced to disclose that the Company's "disappointing" results were in part "due to the poor performance" of the LPI business, while on the earnings conference call held on August 8,

2017, B. Karfunkel admitted that the LPI business's "top line is dropping at a greater-than-expected pace." The same day, the Consumer Federation of California filed a petition to the California Insurance Commissioner to seek a hearing into the rates charged by National General in light of the revelations regarding its involvement in the illegal CPI scheme. Also on August 8, 2017, the Commissioner for the California Department of Insurance ordered an investigation into National General's involvement in the CPI scheme. On this news, the stock price plunged 7% to close at $19.08 per share on August 8, 2017. The next day, the U.S. Senate Committee on Commerce, Science and Transportation initiated an inquiry into National General's involvement in the CPI scheme with a letter addressed to B. Karfunkel. The Company's share price fell another 3.0% to close at $18.51 per share on August 9, 2017. This represented an over 27% drop from the Class Period high on February 23, 2017.






4835-9162-3088.v1

13. As a result of the fraudulent conduct alleged herein, Plaintiffs and other members of the Class (defined below) purchased National General common stock at artificially inflated prices and suffered significant losses and damages.

**JURISDICTION AND VENUE**

14. The claims asserted herein arise under §§10(b) and 20(a) of the Exchange Act, 15 U.S.C. §§78j(b) and 78t(a), and Rule 10b-5, 17 C.F.R. §240.10b-5.

15. This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §1331, and §27 of the Exchange Act (15 U.S.C. §78aa).

16. Venue is proper in this District pursuant to §27 of the Exchange Act and 28 U.S.C. §1391(b). National General is headquartered in this District, Defendants B. Karfunkel and Weiner reside in this District, and, within this District, Defendants prepared and disseminated materially false and misleading information. As such, substantial acts in furtherance of the alleged fraud have occurred in this District. *See also* ECF No. 55 (Order Regarding Motion to Transfer).

17. In connection with the acts and conduct alleged in this complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the mails, interstate wire and telephone communications, and the facilities of the NASDAQ Global Market (the "NASDAQ").

**PARTIES**

18. Lead Plaintiff Town of Davie Police Officers Retirement System ("Retirement System") is a defined-benefit plan that manages approximately $169 million in assets for the benefit of approximately 175 participants. Retirement System purchased National General common stock during the Class Period as set forth in its Certification previously filed (ECF No. 26-2 at 2-3) and incorporated herein, and was damaged thereby.

19. Lead Plaintiff Massachusetts Laborers' Pension Fund ("Pension Fund") is a defined-benefit fund that manages approximately $1.5 billion in assets for the benefit of approximately 21,000 participants. Pension Fund purchased National General common stock during the Class Period as set forth in its Certification attached hereto and incorporated herein, and was damaged thereby.

20. Defendant National General is a specialty lines insurance holding company whose headquarters are located at 59 Maiden Lane, 38th Floor, New York, New York. The Company was formed in 2009 by Michael Karfunkel ("M. Karfunkel") to acquire the private passenger auto business of the U.S. consumer property and casualty insurance segment for General Motors Acceptance Corporation ("GMAC"). During the Class Period, National General managed its business through two business platforms: Property and Casualty ("P&C") and Accident and Health ("A&H"). The vast majority of premiums written by the Company came from its P&C platform, which included its lender-placed insurance segment. Through its wholly owned subsidiaries, including National General Insurance Company, National General Lender Services, Inc., NGLS Insurance Services, Inc., and Integon National Insurance Company, National General served as the CPI vendor for all aspects of the forced-placed insurance scheme. During the Class Period, shares of National General common stock traded on the NASDAQ under the ticker symbol "NGHC."

21. Defendant Barry Karfunkel was National General's President and CEO. National General's Board of Directors ("Board") appointed him CEO on April 27, 2016, after his father, M. Karfunkel, who had been serving as National General's CEO and Chairman of the Board, passed away. B. Karfunkel was a director on the Company's Board throughout the Class Period, having held that role since 2010. He was appointed National General's President starting on November 2, 2015, a position he had previously held from 2010 through 2013. He was also the Company's

Executive Vice President and Chief Marketing Officer from 2013 to 2015. During the Class Period, he held officer and director roles in many of National General's subsidiaries. This included his role as Director of NGLS Insurance Services, Inc., starting at least as of November 25, 2015.

22. Defendant Michael Weiner was National General's CFO throughout the Class Period and also held officer and director roles in many of its subsidiaries. This included his role as Director and CFO of NGLS Insurance Services, Inc., starting at least as of November 25, 2015. Prior to becoming the Company's CFO in 2010, Weiner was the global CFO of Ally Financial's GMAC Insurance unit and had previously held positions at Cerberus Operations, Citigroup, KPMG LLP, and Bankers Trust Company. He is a Chartered Financial Analyst ("CFA") charterholder. Weiner reported directly to National General's CEOs – M. Karfunkel until he passed away and then to his son, Defendant B. Karfunkel.

23. Defendant Arthur Castner was National General Lending Services's President. He joined National General upon the closing of National General's acquisition of the LPI business from QBE, where he was the Senior Vice President of Operations & Strategic Operations Development for QBE MLS from 2004 to 2015. Upon joining the Company, he also reported directly to National General's CEOs – initially to M. Karfunkel and then to B. Karfunkel.

24. Defendants B. Karfunkel, Weiner, and Castner are referred to herein as the "Individual Defendants." The Individual Defendants made, or caused to be made, false and misleading statements and omissions that caused the price of National General common stock to be artificially inflated during the Class Period.

25. Defendants B. Karfunkel, Weiner, and Castner are referred to herein as the "Individual Defendants." During the Class Period, the Individual Defendants ran the Company as hands-on managers overseeing National General's operations and finances and made the materially

false and misleading statements described herein. The Individual Defendants also had intimate knowledge about core aspects of National General's financial and business operations, including its major contracts and revenue sources. The Individual Defendants made, or caused to be made, false and misleading statements and omissions that caused the price of National General common stock to be artificially inflated during the Class Period in their capacities as executives or officers of National General.

26. Additionally, because of their positions, Defendants B. Karfunkel and Weiner possessed the power and authority to control the contents of the Company's quarterly reports, press releases, and presentations to securities analysts, money and portfolio managers and institutional investors, i.e., the market. They were provided with copies of and/or contributed to the Company's reports and press releases alleged herein to be misleading prior to or shortly after their issuance and had the ability and opportunity to prevent their issuance or cause them to be corrected. Because of their positions, and their access to material non-public information available to them but not to the public, Defendants B. Karfunkel and Weiner knew or recklessly disregarded that the adverse facts and omissions specified herein had not been disclosed to, and were being concealed from, the public, making their positive representations materially false and misleading. Defendants B. Karfunkel and Weiner are liable as control persons for the false and misleading statements and omissions pleaded herein.

## FACTUAL ALLEGATIONS

### Overview of National General's Collusion with Wells Fargo in the Unlawful CPI Scheme

27. From its acquisition of the LPI business until Wells Fargo discreetly terminated the CPI program, National General provided all CPI vendor services in furtherance of the scheme.

These services included, *inter alia*, insurance tracking, borrower identification, policy placement, and underwriting the force-placed CPI.

28. As part of its auto loan contracts Wells Fargo required that its customers maintain comprehensive and collision physical damage insurance to protect the collateral of the loan. Wells Fargo's auto loan contracts further provided that if there was no evidence of insurance to protect the collateral, Wells Fargo would purchase a CPI policy on the customer's behalf. Ordinarily, if proof of auto insurance was not received by National General or Wells Fargo, notices were required to be sent to borrowers to prompt them to obtain the required coverage. However, neither Wells Fargo nor National General checked their internal database to see if their customers had insurance coverage, or if they did, they simply ignored what they learned.

29. Instead, Wells Fargo and National General imposed on thousands of auto loan customers unnecessary, unwanted, and often duplicative auto insurance coverage. In many cases, and without notice to the customer, the cost of the CPI insurance was automatically deducted from the customer's bank account along with the regularly scheduled principal and interest payment for the auto loan. When customers complained, they were told to make the payments anyway. If they refused, they were subject to aggressive repossession and debt collection tactics to force them to pay.

30. The CPI insurance policies that National General underwrote for Wells Fargo customers were generally more expensive than the auto insurance that customers already had obtained or could obtain on their own. They typically cost more than $1,000 per year for damage coverage alone. For National General, underwriting these CPI policies was especially lucrative. Customers who were not even aware they had this coverage and already carried other auto insurance, did not bring their claims to National General, making National General's claims payments unusually low.

31. Throughout the Class Period, the Company tracked customer loans for lenders, including Wells Fargo. As part of its insurance tracking duties for Wells Fargo auto loans, National General loaded, maintained, and monitored insurance information in a proprietary database system called TrackGuard. The tracking system was supposed to identify the car loan customers who did not have car insurance or whose insurance had lapsed. In those cases, National General could underwrite a CPI policy for the lender. However, National General and Wells Fargo often disregarded customers' proof of insurance. The tracking system also monitored CPI-related consumer complaints, which were subsequently reported to Wells Fargo. Through this tracking, National General recognized thousands of consumer complaints regarding the CPI scheme but, along with Wells Fargo, intentionally ignored these complaints and continued to carry out the force-placed CPI scheme.

32. As National General has now admitted, its personnel also participated in monthly telephonic management review meetings with Wells Fargo to discuss details concerning the CPI. In advance of each monthly meeting, National General circulated a "scorecard" of metrics concerning the CPI to Wells Fargo. Quarterly in-person meetings were also held between management members of both National General and Wells Fargo. During these meetings the parties discussed in further detail the CPI scheme. Like the monthly meetings, National General was charged with circulating information prior to the quarterly meetings that contained detailed metrics about the CPI scheme.

**The Class Period Begins: National General Announces the Acquisition of the LPI Business**

33. The Class Period begins on July 15, 2015. On that date, National General filed a Form 8-K announcing that it had entered into a Master Transaction Agreement to acquire QBE's LPI business. The Form 8-K stated that:

> [T]he Company agreed to purchase QBE's lender placed insurance business ("LPI Business"), including (i) acquiring certain of QBE's affiliates engaged in the LPI Business and (ii) entering into a loss portfolio reinsurance agreement and quota share reinsurance agreement with an affiliate of QBE pursuant to which an affiliate of the Company, as reinsurer, will provide loss portfolio and 100% quota share reinsurance coverage with respect to the LPI Business (the "Transaction").

34. As an exhibit to the Form 8-K, National General also filed the Master Transaction Agreement, dated July 15, 2015, which identified Integon National as the Company's affiliate providing loss portfolio and 100% quota share reinsurance coverage with respect to the LPI business.

35. The July 15, 2015 Form 8-K also appended a press release that provided the following details regarding the LPI business's acquisition for "an aggregate cash payment of $90 million":

> The transaction includes the acquisition of certain assets, including loan-tracking systems and technology, client servicing accounts, intellectual property, and vendor relationships, as well as the assumption all related insurance liabilities in a reinsurance transaction through which National General will receive the loss reserves, unearned premium reserves, and invested assets at closing. As of June 30, 2015 these amounts were approximately $92 million, $247 million, and $342 million, respectively.

36. The press release informed investors that QBE's LPI business was "the second largest lender-placed insurance platform in the U.S.," and "produced $576 million of gross written and managed premium in 2014 and tracked 10.7 million home and auto loans as of December 31, 2014." In describing the "full suite" of LPI business segments gained in the acquisition, National General's press release specified the LPI Auto segment, which "offer[ed] collateral protection insurance and guaranteed asset protection products for automobiles" and had written $150 million in gross written premium in 2014:

> QBE LPI offers a full suite of lender-placed insurance products to customers through three business segments: (1) LPI Home offers fire, home, and flood products, wrote $390 million GWP and tracked 7.8 million loans in 2014; (2) ***LPI Auto offers collateral protection insurance and guaranteed asset protection products for automobiles, wrote $150 million GWP and tracked 2.9 million loans in 2014***; and

> (3) Seattle Specialty Insurance Services is an agency and tracking business focused on the smaller niche loan servicing market which wrote $36 million of GWP primarily on behalf of third-parties and tracked 595,000 loans in 2014.

37. The press release informed investors that the acquired LPI business had "an industry leading technology platform supported by comprehensive enterprise risk management capabilities." It also quoted then-CEO M. Karfunkel who explained that "'[w]hile the lender-placed business has had difficulties in the past, we believe it is now an area of great opportunity after numerous changes that have been enacted throughout the industry.'" M. Karfunkel further asserted: "'[w]e expect the transaction to be immediately accretive to earnings.'"

38. Analysts and the market reacted positively to National General's announcement of the acquisition. For example, JMP Securities ("JMP") reported on July 16, 2015:

> We reiterate our Market Outperform rating and $26 price target on National General Holdings following the announcement of the intended acquisition of QBE's lender-placed insurance business. . . . ***The acquisition is expected to be immediately accretive*** to earnings and close at the end of the third quarter. ***We view this acquisition as attractive***, allowing National General to enter into a new, although complementary, market with both an experienced management team and strong platform.

39. The JMP analyst further noted that while LPI businesses tend to be counter-cyclical, the new auto line was "likely to have the greatest opportunity in the more near term." With the news of the acquisition, which was released after the market closed, the share price of National General common stock increased 4.6%, from a closing price of $22.62 on July 15, 2015 to $23.67 at the close on July 16, 2015.

40. However, unbeknownst to investors, months before National General announced the acquisition of the LPI business, National General employees, including its Chief Operating Officer ("COO") Peter Rendall ("Rendall"), who reported directly to National General's CEO M. Karfunkel, had conducted a thorough due diligence investigation of QBE's LPI business. That investigation

entailed meticulously going through hundreds of items on a proprietary due diligence checklist. As Rendall later disclosed, "by the time we announce an acquisition, we have gone through this complete, thorough due diligence process."

41. As a result of the extensive due diligence undertaken in advance of the acquisition, Defendants were aware, or were deliberately reckless in not knowing, that Wells Fargo was more than a mere client of QBE – it was a co-conspirator in a scheme to force-place unwanted, often duplicative and unnecessary insurance on Wells Fargo customers. In fact, the CPI program existed from 2002 to 2016, as National General later admitted in its Answer submitted in the class action consumer litigation brought against Wells Fargo and National General.

42. Defendants' exhaustive due diligence investigation also made them aware or deliberately reckless in not knowing that the Wells Fargo CPI program made up a significant and lucrative portion of the LPI business. The market only later learned that by the time National General acquired the business in October 2015, the Wells Fargo CPI program made up almost 20% of the GWP in the LPI business.

**After Closing the LPI Acquisition, National General Continues to Conceal from Investors that it is Participating in an Illegal Insurance Scheme**

43. On October 1, 2015, the Company announced the closing of the acquisition of the LPI business, which it had branded "National General Lender Services." In the months between the acquisitions announcement and its closing, National General personnel had actively worked to integrate the companies. This process included weekly meetings among upper management to review what needed to get done before closing. When describing the Company's acquisition process, Defendant B. Karfunkel highlighted the "regimented plan" for integration in place by the time the deal is signed. Defendant Weiner likewise emphasized to investors the Company's "very detailed integration process."

44. Such a detailed integration plan could not overlook National General's role as CPI vendor to Wells Fargo in force-placing insurance on auto customers. In truth, National General had every opportunity before the LPI acquisition's signing and closing to demand that Wells Fargo clean up its CPI practices. Instead, National General went forward with the LPI acquisition and profited from the expensive CPI policies, which, because they were often duplicative of insurance Wells Fargo customers already had, guaranteed low claims rates.

45. Thus, when National General announced the LPI acquisition's close, Defendants omitted that they intended to continue the lucrative, but unlawful, CPI scheme with Wells Fargo, whose business by that point accounted for almost 20% of the GWP of the acquired LPI business. The unlawful CPI scheme also served to mask the poor performance of the rest of the LPI business.

46. Every Class Period disclosure thereafter omitted National General's role in the illegal scheme and the material impact it had on National General's net income and EPS. Unbeknownst to investors, during the four quarters in which National General participated in the unlawful CPI scheme, the quarterly impact of the ill-gotten premiums on National General's net income ranged from 5.4% to 20.8%.

**National General's Deception Continues Despite Wells Fargo's Internal Investigation**

47. While Wells Fargo was being investigated in connection with other financial scandals, the bank initiated an internal investigation in July 2016 after receiving increasing complaints from customers with CPI. According to Wells Fargo's former head of the consumer lending division, Wells Fargo "very promptly" told the OCC and two other regulators about the CPI problems. The bank commissioned the consulting firm Oliver Wyman to investigate and report on the practice of foisting, through National General and its predecessors, unwanted and unneeded auto insurance onto its customers. Oliver Wyman's investigation, covering January 2012 – July 2016,

culminated in a 60-page internal report (the "Oliver Wyman Report") confirming the essential facts and the massive scale of the wrongdoing. According to the Oliver Wyman Report, the consultant "'conducted ***extensive interviews with National General*** and the [Wells Fargo] team to understand the CPI process and all potential impacts to the customer.'" Despite the regulators' attention on the CPI scheme and the ongoing internal investigation at Wells Fargo, which included interviews of National General employees, Defendants continued to tell investors that the LPI business was contributing to their premium growth and that they practiced "underwriting discipline" when presenting their 2Q16 results in August 2016. Defendants further omitted their role in the illegal CPI scheme and that the premiums collected as a result of the scheme were at risk once the investigations concluded.

48. Then, in September 2016, Wells Fargo secretly terminated the program and phased out National General's CPI coverage, although it continued to pay National General fees for tracking services. Still, Defendants failed to disclose the truth to investors. When presenting their 3Q16 earnings results in November 2016, the Company made no mention at all that it had lost a significant source of premiums. Instead, Defendants continued to report that the LPI business had helped drive premium growth.

49. Then, in February 2017, Defendants presented their 2016 results. With one full quarter without premiums from the illegal CPI scheme with Wells Fargo, National General disclosed that the LPI business had declined as a result of an unidentified auto CPI client. Defendant Weiner further stated that the Company "reported $47 million in net written premiums from our lender services product, down from $126 million in the fourth quarter of 2015, with the majority of that decline related to the previous-mentioned auto client." Yet, Defendants continued to present to investors an upbeat message about the LPI business, stating that the Company had "signed a few

new lender-placed clients which should have a positive impact on the top-line results in the near future." Thus, with this announcement, Defendants still failed to disclose National General's role in the illegal CPI scheme or that ill-gotten premiums had propped up the LPI business.

**National General's Fraud Is Revealed**

50. On July 27, 2017, *The New York Times* released an article based on the Oliver Wyman Report, and detailed the force-placed insurance scheme:

> Here is how the process worked: When customers financed cars with Wells Fargo, the buyers' information would go to National General, which was supposed to check a database to see if the owner had insurance coverage. If not, the insurer would automatically impose coverage on the customers' accounts, adding an extra layer of premiums and interest to their loans.
>
> When customers who checked their bills saw the charges and notified Wells Fargo that they already had car insurance, the bank was supposed to cancel the insurance and credit the borrower with the amount that had been charged.
>
> The Oliver Wyman report indicated that many customers appear not to have notified Wells Fargo of the redundant insurance. This may have been because their payments were deducted automatically from their bank accounts and they did not spot the charges.
>
> According to documents on a Wells Fargo website titled "understanding your auto loan," the bank had strict rules about the order in which it would apply a customer's car payment to costs associated with the loan: First to be deducted from a payment would be the interest owed on the car loan. Then the bank would deduct interest charged on the lender-placed insurance. The third deduction would be principal on the loan, followed by the amount of premium owed on the insurance.
>
> This payment structure had the effect of increasing the overall interest borrowers paid on their loans, the Oliver Wyman report noted, because fewer dollars went to reducing the principal outstanding.
>
> Wells Fargo was also aggressive in repossessing vehicles: Some customers endured multiple repossessions, the report said.

51. The article emphasized that "Wells Fargo borrowers sustained financial damages beyond the costs of the insurance, the report said. The harm also included repossession costs, late fees, charges for insufficient funds and damage to consumers' credit reports." The article reported

that more than 800,000 auto loan customers paid for unnecessary auto insurance policies, pushing 274,000 of them into delinquency and resulting in more than 20,000 unlawful vehicle repossessions.

52. That same day, Wells Fargo issued a public statement confirming the essential facts of the CPI scheme as reported by *The New York Times* and announcing an $80 million remediation plan. In addition, the statement disclosed:

> Wells Fargo's review determined that certain external vendor processes and internal controls were inadequate. As a result, customers may have been charged premiums for CPI even if they were paying for their own insurance, as required, and in some cases the CPI premiums may have contributed to a default that led to their vehicle's repossession.

53. Multiple civil lawsuits, state and federal regulatory investigations, and a Congressional inquiry ensued. By July 30, 2017, consumers had filed several civil lawsuits implicating the Company in the wrongdoing. Additionally, reports that the New York Department of Financial Services and the New York Attorney General were investigating the CPI scheme soon arose. On August 8, 2017, the California Department of Insurance initiated an investigation of the CPI scheme. On the same day, the market learned from the Company that the LPI business had shown "disappointing results" with its premiums "dropping at a greater-than-expected pace."

54. Then, on August 9, 2017, a bipartisan group of U.S. Senators from the Committee on Commerce, Science, and Transportation sent a list of questions to Defendant B. Karfunkel, the CEO of National General, inquiring about the Company's role in the scandal. The Senators' letter requested responses to seven questions, including details about "the relationship between Wells Fargo and National General, including any commission or revenue sharing agreements with respect to the purchase of insurance coverage for Wells Fargo loan customers," "[h]ow much money" National General paid "to Wells Fargo as part of the revenue sharing agreements," and "National

General's process for determining whether a customer was in compliance with any collateral insurance requirements."

55. These revelations caused National General's stock price to fall dramatically, dropping 7.1% on August 8, 2017, and another 3% on August 9, 2017, with abnormally heavy trading volume. The disclosures regarding National General's fraud caused damage to National General's shareholders.

**Civil and Regulatory Actions After the Class Period Confirm National General's Knowledge of and Involvement in the CPI Scheme**

56. Many of the consumer lawsuits filed immediately after *The New York Times* article was published were later consolidated in the Central District of California where the plaintiffs' claims against the Company of fraud and racketeering were sustained on a motion to dismiss. *See* Minutes, *In re Wells Fargo Collateral Prot. Ins. Litig.*, No. 8:17-ml-02797 AG (KESx) (C.D. Cal. Dec. 14, 2018), ECF No. 203 ("*Wells Fargo CPI Litig.*"). In the order denying National General's motion to dismiss, the court rejected the "notion that National General, QBE, and Balboa Insurance Company were merely providing legitimate business services to Wells Fargo as an outside services provider." Rather, satisfied as to the predicate acts of mail and wire fraud, the court ruled that the consumer plaintiffs had sufficiently alleged National General's role in the RICO enterprise, given the following allegations:

> National General aided in directing the alleged fraud by issuing CPI certificates ***knowing they were redundant, intentionally ignoring borrowers' proof of insurance, misrepresenting its efforts to verify customers' insurance***, authoring and mailing false and misleading letters to borrowers about their coverage, paying undisclosed kickbacks to Wells Fargo in exchange for Wells Fargo force-placing the CPI, and inflating borrowers' premiums to pay for those kickbacks.

57. On April 20, 2018, the Office of the Comptroller of the Currency ("OCC") and the Consumer Financial Protection Board ("CFPB") issued Consent Orders that confirmed National

General's involvement in the CPI scheme. The OCC concluded that Wells Fargo and National General:

> [C]aused the improper placement and/or maintenance of collateral protection insurance ("CPI") policies on automobile loan accounts, and charged premiums, interest, and other fees on borrowers' accounts where the borrowers had demonstrated adequate insurance under the terms of their automobile loan note/contract. The Bank, after appropriately placing CPI policies on some borrowers' accounts, improperly maintained CPI policies on borrowers' accounts after the borrowers had demonstrated that they had obtained adequate insurance on their vehicles.

58. The CFPB Consent Order reached similar conclusions, and further outlined the CPI vendor's role in the force-placed CPI scheme:

> Through quarterly reports from its vendor and its own daily reports, [Wells Fargo] was aware of high rates of Force-Placed Insurance cancellations, and [Wells Fargo] received briefings on the root causes of the cancellations. The high rates of cancellation were also apparent within [Wells Fargo]'s own system of record because it processed the refunds when a Force-Placed Insurance policy was canceled, and it reported that refund information back to the vendor.
>
> The vendor regularly presented to [Wells Fargo]'s management on the Force-Placed Insurance program's performance. These presentations included cancellation rates of Force-Placed Insurance for borrowers who never had a lapse in required insurance coverage, known as "flat cancels," and borrowers who had the required insurance for part of the Force-Placed Insurance policy term, known as "partial cancels."
>
> [Wells Fargo] was informed by its vendor that, since 2005, roughly 28% of [Wells Fargo]'s Force-Placed Insurance policies were canceled because they were duplicative of insurance maintained by borrowers for the entire term of the Force-Placed Insurance policy. The number of cancellations should have raised concerns that [Wells Fargo]'s and its vendor's processes for determining insurance coverage before and after placement of Force-Placed Insurance were insufficient.

**Defendants Failed to Disclose The Impact of the Illegal and Unsustainable CPI Scheme on National General's Quarterly Results**

59. During the Class Period, National General stressed the contribution that the newly acquired LPI business would have and had on its premium growth and earnings. For example:

- July 15, 2015: "'We expect the transaction to be ***immediately accretive*** to earnings.'"

- February 9, 2016: "P&C premium growth was driven by underlying organic growth of approximately 5.0% and the addition of $125.7 million of net written premium from the National General Lender Services acquisition."

- May 10, 2016: The Company stated that the increase of gross premium written was "due to an increase of $93.2 million in premiums received from the P&C segment ***primarily as a result of the acquisition of our LPI Business*** (increase of $112.0 million)."

- November 3, 2016: "$100 million in premium from National General Lender Services" was a driver for the net written premium growth of 52% in the P&C segment.

60. Unbeknownst to investors, a material portion of the LPI business engaged in the unlawful force-placed insurance scheme with Wells Fargo. Analysts and the Company commonly referred to "the book" as the annual gross written premium for a business. In the case of the LPI business, National General disclosed in its quarterly investor presentations that for 2014 "[a]pproximately 42% of LPI Auto GWP comes from Wells Fargo," or 10.9% of the QBE's LPI business. National General never updated investors on how much of the LPI business came from Wells Fargo, and instead repeatedly presented the stale information from 2014 until its 3Q17 investor presentation – four quarters after Wells Fargo terminated the CPI business. However, by the time National General had acquired the LPI business, the portion of the GWP from the Wells Fargo CPI program had almost doubled, as confirmed by Defendant Weiner, who revealed that as much as almost "20% of the ***total*** book" acquired from QBE was lost when the Wells Fargo CPI scheme was terminated. Without the premiums coming in from the unlawful CPI scheme perpetrated with Wells Fargo, National General would have been forced to disclose significantly lower premiums for its LPI business.

61. This had a direct impact on National General's net income attributable to shareholders and EPS. If not for the premiums from the unlawful CPI scheme, net income would have been materially lower, as the table below indicates:

**Impact of Unsustainable Wells Fargo Auto LPI Business on NGHC Quarterly Public Financial Statements**
**(in Thousands, except per share amounts)**

| | Q4 2015 | Q1 2016 | Q2 2016 | Q3 2016 |
|---|---|---|---|---|
| Net Income, as reported | $ 13,719 | $ 52,702 | $ 44,345 | $ 19,922 |
| Net Income attributable to Wells Fargo Auto LPI business | 2,853 | 2,842 | 2,511 | 2,402 |
| Net Income without unsustainable Wells Fargo Auto LPI business | $ 10,866 | $ 49,860 | $ 41,834 | $ 17,520 |
| | | | | |
| Diluted EPS, as reported | $ 0.13 | $ 0.49 | $ 0.41 | $ 0.18 |
| EPS attributable to Wells Fargo Auto LPI business | 0.03 | 0.03 | 0.02 | 0.02 |
| Diluted EPS without unsustainable Wells Fargo Auto LPI business | $ 0.10 | $ 0.46 | $ 0.39 | $ 0.16 |
| **Wells Fargo LPI business as a % of NGHC Net Income and EPS** | **20.80%** | **5.39%** | **5.66%** | **12.06%** |

62. Without identifying Wells Fargo or admitting to the Company's involvement in a scheme to force-place CPI on auto loan customers, National General disclosed on February 27, 2017, that for the first time since the LPI acquisition, net written premiums for the Company and specifically for the P&C segment were "partially offset by a ***decrease in our lender-placed auto premiums***." On the earnings conference call the same day, Defendant Weiner revealed: "We reported $47 million in net written premium from our lender services product, down from $126 million in the fourth quarter of 2015, with the majority of that decline related to the previous-mentioned auto client." Thus, in one quarter, with the loss of one "auto client," National General's LPI business lost $79 million in net written premium.

63. In addition to artificially inflating its quarterly premium results, National General used the steady and lucrative CPI scheme with Wells Fargo during 2016 to conceal weakness in the LPI mortgage business. Without the Wells Fargo CPI premiums to prop up the business, it foundered and remained a struggling business segment for at least the next year. Compared to 2016,

for the year-ended 2017 gross written premium for National General's LPI was 8.2% lower, its net written premium was 14.0% lower, and its net earned premium was 23.8% lower. In 2018, the LPI business was still struggling. Though gross written premium had improved 9.3% from 2017 to 2018, net written premium had fallen 18.9% and net earned premium had fallen 33.5%. Contrary to Defendants' representations emphasizing the accretive nature of the LPI business, Defendants had concealed that a material portion of the LPI business was gained from the CPI scheme with Wells Fargo, and that that scheme further concealed the weakness in the rest of the LPI business.

**Defendants Failed to Disclose the Likely Impact of the Illegal and Unsustainable CPI Scheme on National General's Future Results**

64. The significant financial impact of the force-placed CPI scheme on National General's future financial results is precisely the type of information required to be disclosed under the SEC's Management Discussion and Analysis ("MD&A") rules. Item 303 of SEC Regulation S-K, 17 C.F.R. §229.30 ("Item 303"), required the 2015 10-K to "[d]escribe any known trends or uncertainties that have had or that the registrant reasonably expects will have a material favorable or unfavorable impact on net sales or revenues or income from continuing operations." Defendants' failure to disclose their fraudulent scheme to saddle auto loan customers with unwanted and unneeded automobile insurance was a violation of Item 303 because it was a known uncertainty that was likely to, and did, have a material unfavorable impact on the Company once exposed. More specifically, Item 303 requires disclosure of material uncertainties that could affect a company's future financial condition:

> MD&A must specifically focus on known material events and uncertainties that would cause reported financial information not to be necessarily indicative of future operating performance or of future financial condition.

* * *

> One of the principal objectives of MD&A is to provide information about the quality and potential variability of a company's earnings and cash flow, so that readers can ascertain the likelihood that past performance is indicative of future performance.[1]

65. In acquiring and then engaging in the scheme to force-place unlawful CPI on Wells Fargo customers, National General was aware that its LPI business's premium results, propped up by the scheme, were unsustainable. Specifically, because Wells Fargo was already under intense regulatory oversight and scrutiny due to its other business activities, it was only a matter of time before the illegal CPI scheme would be exposed and its LPI business's premium results would collapse. In fact, Wells Fargo's own Senior Vice President of Consumer Lending admitted: "'***We knew there was going to be a day where we were talking about this in the public domain***.'" Likewise, Defendants could not ignore that their role in the illegal CPI scheme would be talked about in the public domain. Because National General personnel were the target of "extensive interviews" by Oliver Wyman as it investigated the CPI scheme, Defendants were aware that the CPI program with Wells Fargo was unsustainable and would result in legal inquiries and reputational harm. Because it was inevitable that the force-placed CPI scheme would be exposed, National General was certain to face reputational damage, legal fees, and penalties once the facts were laid bare, thereby further impacting the LPI business's future financial performance.

66. Likewise, Defendants failed to disclose "known trends and uncertainties" regarding the size and importance of the terminated Wells Fargo CPI business. The previously concealed concentration of Wells Fargo's business within the LPI business mattered to the market, as was

---

[1] SEC Interpretation: Commission Guidance Regarding Management's Discussion and Analysis of Financial Condition and Results of Operations (Release Nos. 33-8350; 34-48960; FR-72), Effective Date: Dec. 19, 2003.

made evident when an analyst pressed for further explanation of the "customer concentration" on the May 18, 2017 Investor Day presentation:

> I had a lender-placed – a lender services question. There's been a couple of mentions about the auto account that was lost. And now it sort of begs the question about customer concentration in that segment and sort of the meaningfulness of other remaining accounts and the relative sizes of those.

67. As a result, National General was required to warn investors that the reported financial statements, including premiums, net income, and EPS were not indicative of the Company's future financial performance. Furthermore, National General was required to disclose that the unsustainable CPI scheme contributed to a material portion of the Company's net income and EPS. National General failed to make such a disclosure in its publicly filed Forms 10-K for 2015 and 2016, and Forms 10-Q for 1Q16, 2Q16, and 3Q16.

## DEFENDANTS' FALSE AND MISLEADING STATEMENTS AND OMISSIONS DURING THE CLASS PERIOD

68. On July 15, 2015, the start of the Class Period, the Company issued a press release announcing the acquisition of the LPI business from QBE. Defendants' press release told investors that the acquired LPI business had "an industry leading technology platform supported by comprehensive enterprise risk management capabilities, and a seasoned management team with significant operational expertise." It quoted National General's then-CEO, M. Karfunkel, who assured investors that prior "'difficulties'" in the LPI business had been resolved, making the business "'an area of great opportunity'" for National General:

> "This acquisition facilitates National General's entry into the lender-placed insurance segment for auto and homeowners risks with an industry leading platform and management team. While the lender-placed business has had difficulties in the past, we believe it is now an area of great opportunity after numerous changes that have been enacted throughout the industry. . . . We expect the transaction to be ***immediately accretive*** to earnings."

69. On August 3, 2015, National General issued a press release on Form 8-K filed with the SEC to report its 2Q15 results. Former CEO M. Karfunkel was quoted reiterating the Company's expectation that the QBE LPI acquisition would be "'***immediately accretive*** to earnings and will greatly enhance the value of our franchise.'" The press release also stated that the acquired LPI Auto business offered collateral protection insurance, and in 2014 "wrote $150 million GWP and tracked 2.9 million loans in 2014."

70. The next day, on August 4, 2015, Defendants held an earnings conference call for analysts, media, and investors, during which Defendants highlighted the new LPI acquisition. Speaking for National General, CEO M. Karfunkel touted that "QBE Lender-Placed Insurance brings a profitable books of approximately $500 million in a niche premium with a low loss ratio business and a potential to grow this business very meaningfully."

71. On August 6, 2015, National General filed with the SEC a quarterly report on Form 10-Q providing the Company's financial and operating results for 2Q15. The Form 10-Q stated that National General focused "on niche markets and regions where [it was] able to maintain premium rates at generally consistent levels and ***maintain underwriting discipline*** throughout these cycles."

72. Defendant Weiner signed the 2Q15 Form 10-Q containing these statements. In addition, Defendant Weiner signed Certifications pursuant to the Sarbanes-Oxley Act of 2002 ("SOX") in which Weiner attested that the quarterly report on the Form 10-Q for 2Q15 "does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report." Defendant Weiner also attested that he had designed disclosure controls to ensure that material information relating to the Company was made known to him.

73. However, unbeknownst to analysts and investors, Defendants knew or recklessly disregarded that the statements set forth in ¶¶68-72 were false and misleading or omitted material information necessary to make the statements not misleading, as described above in ¶¶27-67, and for the following reasons:

(a) Defendants, having completed extensive due diligence prior to agreeing to acquire the LPI business, knew about the force-placed CPI scheme conducted with Wells Fargo and were not planning to "maintain underwriting discipline," on those policies;

(b) Defendants omitted the fact that almost 20% of the acquired LPI business underwrote CPI policies for Wells Fargo with whom National General colluded in an unlawful CPI scheme; and

(c) that National General intended to participate in and profit from a massive forced-placed CPI scheme with Wells Fargo to fraudulently saddle auto loan customers with unwanted and unneeded automobile insurance policies that it had underwritten.

74. On October 1, 2015, National General announced they had closed on the acquisition of QBE North America's LPI business, which the Company had branded "National General Lender Services." National General reiterated that of the $576 million in gross written and managed premium produced in 2014 by the LPI business, the auto segment, which contained its CPI products "wrote $150 million GWP and tracked 2.9 million loans in 2014." The Company further reiterated the acquired business's "industry leading technology platform supported by comprehensive enterprise risk management capabilities, and a seasoned management team with significant operational expertise."

75. On November 2, 2015, National General filed with the SEC a Form 8-K attaching a press release announcing its results of operations for the third quarter ended September 30, 2015

("3Q15"). Quoted in the press release on behalf of the Company, M. Karfunkel remarked that the acquisition of QBE's LPI business, along with the Assurant Health deal and the closing of the Company's $100 million private debt issuance "'strengthened our capital position and added two attractive businesses to our growing personal lines insurance franchise, which we expect will lead to enhanced shareholder value going forward.'" Specifically regarding National General Lender Services, the press release reported that "[t]he transaction include[s] the acquisition of certain assets, including loan-tracking systems and technology, client servicing accounts, intellectual property, and vendor relationships, as well as the assumption of the related insurance liabilities in a reinsurance transaction through which [National General] received the loss reserves, unearned premium reserves, and invested assets."

76. The next day, on November 3, 2015, National General held a conference call for analysts, media, and investors to discuss the Company's 3Q15 earnings and operations. On behalf of National General, M. Karfunkel highlighted the LPI acquisition:

> This acquisition marks our entry into niche business with low loss ratio in auto and homeowners with an industry-leading platform and a management team. We expect that this transaction will be ***immediately accretive*** to earnings. The business has been re-branded as National General Lender Services and integration is currently underway.

77. On November 9, 2015, National General filed with the SEC a quarterly report on Form 10-Q announcing the Company's financial and operating results for 3Q15.

78. The 3Q15 Form 10-Q stated that the Company was focused "on niche markets and regions where [it was] able to maintain premium rates at generally consistent levels and ***maintain underwriting discipline*** throughout these cycles." Regarding National General Lender Services, the Form 10-Q repeated that "[t]he transaction includes the acquisition of certain assets, including loan-tracking systems and technology, client servicing accounts, intellectual property, and vendor

relationships, as well as the assumption of the related insurance liabilities in a reinsurance transaction through which [National General] received the loss reserves, unearned premium reserves, and invested assets."

79. Defendant Weiner signed the 3Q15 Form 10-Q containing these statements. In addition Defendant Weiner signed the SOX Certifications in which he attested that the quarterly report on the Form 10-Q "does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report." Defendant Weiner also attested that he had designed disclosure controls to ensure that material information relating to the Company was made known to him.

80. However, unbeknownst to analysts and investors, Defendants knew or recklessly disregarded that the statements set forth in ¶¶74-79 were false and misleading or omitted material information necessary to make the statements not misleading, as described above in ¶¶27-67, and for the following reasons:

(a) Defendants, having done weekly pre-closing meetings and hired subject matter experts in advance of closing on their acquisition of the LPI business, knew about the force-placed CPI scheme conducted with Wells Fargo and were not planning to "maintain underwriting discipline," on those policies;

(b) that Defendants omitted the fact that almost 20% of the acquired LPI business underwrote CPI policies for Wells Fargo with whom National General colluded in an unlawful CPI scheme; and

(c) that National General intended to participate in and profit from a massive forced-placed CPI scheme with Wells Fargo to fraudulently saddle auto loan customers with unwanted and unneeded automobile insurance policies that it had underwritten.

81. On February 1, 2016, Housingwire.com published an article titled "National General Lender Services adapts to a changing marketplace." It quoted National General Lender Services President and Defendant Castner, who asserted: "'National General Lender Services is uniquely suited to provide the best tailored, ***compliant insurance solutions*** to the industry, as we have the people, the systems, and the balance sheet to make it happen.'" He also misrepresented the Company's ability to use its tracking solutions to provide compliant insurance solutions when he was quoted saying: "'We have a wide range of capabilities ranging from "just insurance" to ***comprehensive insurance tracking solutions, which automatically comply with the regulations*** governing a business.'"

82. On February 9, 2016, National General filed with the SEC a Form 8-K attaching a press release announcing its results of operations for the fourth quarter ended December 31, 2015 ("4Q15"). The press release reported: "Net income was $13.7 million or $0.13 per diluted share, compared to $11.2 million or $0.12 per diluted share in the fourth quarter of 2014." For the LPI business, the Company reported that GWP was $126.6 million; net written premium ("NWP") was $125.7 million; and net earned premium ("NEP") was $123.3 million.[2]

[2] The Company provided the following definitions: Gross premium written "represents premium from each insurance policy that we write, including as a servicing carrier for assigned risk plans, during a reporting period based on the effective date of the individual policy, prior to ceding reinsurance to third parties." Net premium written "is gross premium written less that portion of premium that we cede to third-party reinsurers under reinsurance agreements. The amount ceded under these reinsurance agreements is based on a contractual formula contained in the individual reinsurance agreement." New earned premium "is the earned portion of our net premium written. We generally earn insurance premium on a pro rata basis over the term of the policy."

83. M. Karfunkel was quoted on behalf of the Company highlighting that the Company expected that the acquisition of the LPI business "'will be accretive to our personal lines franchise and our earnings power going forward.'"

84. National General also reported in its February 9, 2016 press release that its Company-wide premium growth for the quarter was driven in part from "additional premiums" from the National General Lender Services (formerly QBE Lender-Placed Insurance) acquisition. Regarding its larger P&C segment, the Company stated: "P&C premium growth was driven by underlying organic growth of approximately 5.0% and the addition of $125.7 million of net written premium from the National General Lender Services acquisition, which closed on October 1, 2015."

85. The next day, on February 10, 2016, National General held a conference call for analysts, media, and investors to discuss the Company's 4Q15 earnings and operations. Speaking on behalf of the Company, M. Karfunkel stated:

> Net written premium grew by 52%, driven by organic growth from our P&C and A&H segments and the addition of the premiums from the QBE Lender Service and Assurant Health acquisitions. . . .
>
> . . . The QBE acquisition gives us a platform to write approximately $475 million of relatively lower-loss ratio home and auto business.

86. Defendant Weiner later stated that "the lender placed business ***was very accretive to us in the quarter***."

87. On February 29, 2016, National General filed with the SEC its annual report on Form 10-K for 2015. The Form 10-K highlighted its new LPI business, stating: "We added lender-placed insurance to our P&C platform in 2015 through the acquisition of QBE's lender-placed insurance business to offer a full suite of lender-placed insurance products, including fire, home and flood products, as well as collateral protection insurance and guaranteed asset protection products for automobiles, to our customers."

88. The 2015 Form 10-K also underscored National General's purported focus on using technology to tailor its products to the insureds' needs. For example, the Company represented that it partnered with other organizations to "deliver insurance products ***tailored to the needs*** of [its] affinity partners' members or customers" in its P&C segment. With respect to National General's purported focus on underwriting discipline, the 2015 Form 10-K stated that the Company utilized its "technology and extensive database of loss history ***in order to appropriately price and structure policies***," and that the Company believed in a "strong underwriting foundation," which was "best accomplished through careful risk selection and continuous evaluation of underwriting guidelines relative to loss experience." National General's 2015 Form 10-K continued in pertinent part:

> **Underwriting, Pricing and Risk Management, and Actuarial Capabilities**
>
> We establish premium rates for insurance products based upon an analysis of expected losses using historical experience and anticipated future trends. Our product team develops the product and manages our underwriting tolerances. ***Our actuarial team uses a detailed actuarial analysis to establish the necessary rate level for a given product*** and territory to achieve our targeted return. For risks which fall within our underwriting tolerances, we establish a price by matching rate to risk at a detailed level of segmentation. We determine the individual risk using predictive modeling developed by our analytics team ***with a level of precision that we believe is superior*** to the traditional loss cost pricing used by many of our competitors. We believe that ***effective collaboration among the product, analytics and actuarial teams enhances our ability to price risks appropriately*** and achieve our targeted rates of return.

89. With respect to regulations and compliance, the 2015 10-K stated that National General was "subject to extensive regulation in the United States," under both state and federal laws, which "entails a review and examination of a company's ***compliance with laws governing marketing, underwriting, rating, policy-issuance, claims-handling and other aspects of its insurance business*** during a specified period of time." The 2015 10-K also stated that the Company was barred from "***misrepresenting pertinent facts or insurance policy provisions*** relating to coverages at issue" and other unfair claims practices.

90. The 2015 Form 10-K was signed by Defendants B. Karfunkel and Weiner. Defendant Weiner also signed the SOX certification in which he attested that the Annual Report on Form 10-K "does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report" and that based on his knowledge, "the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report."

91. Unbeknownst to analysts and investors, Defendants knew or recklessly disregarded that the statements set forth in ¶¶81-90 were false and misleading or omitted material information necessary to make the statements not misleading, as described above in ¶¶27-67, and for the following reasons:

(a) that Defendants, having assumed the role of CPI vendor for Wells Fargo, were not "maintain[ing] underwriting discipline" by participating in the force-placed CPI scheme;

(b) that Defendants omitted the fact that almost 20% of the acquired LPI business underwrote CPI policies for Wells Fargo with whom National General colluded in an unlawful CPI scheme;

(c) that National General was perpetrating a massive forced-placed CPI scheme with Wells Fargo to fraudulently saddle auto loan customers with unwanted and unneeded automobile insurance policies that it had underwritten;

(d) that National General's illicit conduct in foisting unwanted and unneeded automobile insurance on its customers resulted in some of the victims being declared delinquent, suffering adverse impacts to their creditworthiness, and/or having their cars improperly repossessed;

(e) that National General was exposed to an extreme risk of regulatory scrutiny, legal risks, and reputational harm as a result of its participation in the forced-placed CPI scheme;

(f) that the Company's reported quarterly policy premiums were in part the product of a fraudulent forced-placed insurance scheme and were therefore artificially inflated and unsustainable; and

(g) that the Wells Fargo CPI portion of the LPI business contributed a material 20.8% of National General's reported 4Q15 consolidated net income and EPS and, as such the 4Q15 financial results were not indicative of the Company's future financial performance.

92. On May 2, 2016, National General filed with the SEC a Form 8-K attaching a press release announcing its results of operations for the first quarter ended March 31, 2016 ("1Q16"). The Company reported: "Net income was $52.7 million or $0.49 per diluted share, compared to $41.7 million or $0.43 per diluted share in the first quarter of 2015." For the LPI business, the Company reported for 1Q16 that GWP was $112.0; NWP was $112.0; and NEP was $122.8.

93. National General reported that its LPI business contributed to its premium growth while concealing the CPI scheme perpetrated with Wells Fargo, which made up almost 20% of the business:

> Net written premium grew $233.2 million or 45.6% to $744.6 million, ***driven by added premiums from the National General Lender Services (formerly QBE Lender-Placed Insurance)*** and Assurant Health transactions which closed on October 1, 2015, the addition of ARS premium volume which is now written on National General paper beginning this quarter, underlying organic growth within our P&C business, and continued expansion of our A&H segment.

94. The next day, on May 3, 2016, National General held a conference call for analysts, media, and investors to discuss the Company's 1Q16 earnings and operations. Defendant Weiner reiterated the contribution of the LPI business, stating that for the Company's P&C segment, "net

written premium grew 35% to $600.8 million" driven in part by "[t]he addition of $112 million of net written premium from National General Lender Services acquisition."

95. On May 10, 2016, National General filed with the SEC a quarterly report on Form 10-Q providing the Company's financial and operating results for 1Q16. National General's 1Q16 Form 10-Q reported the premium growth caused from the acquisition of the LPI business: "As a result of this acquisition, the Company recorded $111,997 of gross premium written and $8,243 of service and fee income related to the LPI Business for the three months ended March 31, 2016." The Company further stated that the increase of gross premium written was "due to an increase of $93.2 million in premiums received from the P&C segment ***primarily as a result of the acquisition of our LPI Business (increase of $112.0 million)***." Likewise, increases seen during the quarter for net premium written and net earned premium were "primarily as a result of the acquisition of our LPI Business."

96. The 1Q16 Form 10-Q further reiterated that National General focused "on niche markets and regions where [it was] able to maintain premium rates at generally consistent levels and ***maintain underwriting discipline*** throughout these cycles."

97. The 1Q16 Form 10-Q contained signed SOX certifications in which Defendants B. Karfunkel and Weiner attested that the Form 10-Q "does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report" and that based on their knowledge, "the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report."

98. Unbeknownst to analysts and investors, Defendants knew or recklessly disregarded that the statements set forth in ¶¶92-97 were false and misleading or omitted material information necessary to make the statements not misleading, as described above in ¶¶27-67, and for the following reasons:

(a) that Defendants, continuing as CPI vendor for Wells Fargo, were not "maintain[ing] underwriting discipline" by participating in the force-placed CPI scheme;

(b) that Defendants omitted the fact that almost 20% of the acquired LPI business underwrote CPI policies for Wells Fargo with whom National General colluded in an unlawful CPI scheme;

(c) that National General was perpetrating a massive forced-placed CPI scheme with Wells Fargo to fraudulently saddle auto loan customers with unwanted and unneeded automobile insurance policies that it had underwritten;

(d) that National General's illicit conduct in foisting unwanted and unneeded automobile insurance on its customers resulted in some of the victims being declared delinquent, suffering adverse impacts to their creditworthiness, and/or having their cars improperly repossessed;

(e) that National General was exposed to an extreme risk of regulatory scrutiny, legal risks, and reputational harm as a result of its participation in the forced-placed CPI scheme;

(f) that the Company's reported quarterly policy premiums were in part the product of a fraudulent forced-placed insurance scheme and were therefore artificially inflated and unsustainable; and

(g) that the Wells Fargo CPI portion of the LPI business contributed a material 5.4% of National General's reported 1Q16 consolidated net income and EPS and, as such the 1Q16 financial results were not indicative of the Company's future financial performance.

99. On August 1, 2016, National General filed with the SEC a Form 8-K attaching a press release announcing its results of operations for the second quarter ended June 30, 2016 ("2Q16"). The Company' press release reported: "National General Holdings Corp. (NASDAQ:NGHC) today reported second quarter 2016 net income of $44.3 million or $0.41 per diluted share, compared to $33.8 million or $0.35 per diluted share in the second quarter of 201[6]." The Company reported 55.7% growth in net written premium, partially "driven by" the LPI business. For the LPI business, the Company reported for 1Q16 that GWP was $112.0 million; NWP was $112.0 million; and NEP was $122.8 million.

100. The next day, on August 2, 2016, National General held a conference call for analysts, media, and investors to discuss the Company's 2Q16 earnings and operations. Defendant Weiner stated on the call that "[n]et written premium grew 43.8% to $607 million" was driven in part by "$105.4 million of net written premium from the National General's lender services acquisitions."

101. On August 5, 2016, National General filed with the SEC a quarterly report on Form 10-Q announcing the Company's financial and operating results for 2Q16.

102. The 2Q16 Form 10-Q stated that the Company was focused "on niche markets and regions where [it was] able to maintain premium rates at generally consistent levels and ***maintain underwriting discipline*** throughout these cycles." Regarding National General Lender Services, the Form 10-Q repeated that "[t]he transaction includes the acquisition of certain assets, including loan-tracking systems and technology, client servicing accounts, intellectual property, and vendor relationships, as well as the assumption of the related insurance liabilities in a reinsurance transaction through which [National General] received the loss reserves, unearned premium reserves, and invested assets."

103. The 2Q16 Form 10-Q contained the signed SOX certifications in which Defendants B. Karfunkel and Weiner attested that the Form 10-Q "does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report" and that based on their knowledge, "the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report."

104. However, unbeknownst to analysts and investors, Defendants knew or recklessly disregarded that the statements set forth in ¶¶99-103 were false and misleading or omitted material information necessary to make the statements not misleading, as described above in ¶¶27-67, and for the following reasons:

(a) that Defendants had been interviewed in Oliver Wyman's investigation, which Wells Fargo initiated in July 2016 after receiving customer complaints about the CPI program and that Wells Fargo had promptly told its regulators about the issue, and therefore given the heavy scrutiny, the illegal CPI scheme would be exposed;

(b) that Defendants, continuing as CPI vendor for Wells Fargo, were not "maintain[ing] underwriting discipline" by participating in the force-placed CPI scheme;

(c) that Defendants omitted the fact that almost 20% of the acquired LPI business underwrote CPI policies for Wells Fargo with whom National General colluded in an unlawful CPI scheme;

(d) that National General was perpetrating a massive forced-placed CPI scheme with Wells Fargo to fraudulently saddle auto loan customers with unwanted and unneeded automobile insurance policies that it had underwritten;

(e) that National General's illicit conduct in foisting unwanted and unneeded automobile insurance on its customers resulted in some of the victims being declared delinquent, suffering adverse impacts to their creditworthiness, and/or having their cars improperly repossessed;

(f) that National General was exposed to an extreme risk of regulatory scrutiny, legal risks, and reputational harm as a result of its participation in the forced-placed CPI scheme;

(g) that the Company's reported quarterly policy premiums were in part the product of a fraudulent forced-placed insurance scheme and were therefore artificially inflated and unsustainable; and

(h) that the portion the Wells Fargo CPI of the LPI business contributed a material 5.7% of National Generals' reported 2Q16 consolidated net income and EPS and, as such, the 2Q16 financial results were not indicative of the Company's future financial performance.

105. On November 2, 2016, National General filed with the SEC a Form 8-K attaching a press release announcing its results of operations for the second quarter ended September 30, 2016 ("3Q16"). The Company's press release "reported third quarter 2016 net income of $19.9 million or $0.18 per diluted share, compared to $39.0 million or $0.38 per diluted share in the third quarter of 2015." For the LPI business, the Company reported for 3Q16 that GWP was $105.2 million; NWP was $99.8.0 million; and NEP was $103.8.8 million.

106. The Company also reported that its "[n]et written premium grew $285.3 million or 59.2% to $767.3 million," were driven in part by added premiums from National General Lender Services. The Company further represented that "P&C net written premium growth was driven by

several key factors," including "the addition of $99.8 million from the National General Lender Services transaction."

107. The next day, on November 3, 2016, National General held a conference call for analysts, media, and investors to discuss the Company's 3Q16 earnings and operations. Defendant Weiner noted that the "$100 million in premium from National General Lender Services" was a driver for the net written premium growth of 52% in the P&C segment.

108. On November 8, 2016, National General filed with the SEC a quarterly report on Form 10-Q announcing the Company's financial and operating results for 3Q16.

109. The 3Q16 Form 10-Q detailed that for the P&C segment, "[n]et premium written increased by $227.2 million from $491.8 million for the three months ended September 30, 2015 to $719.0 million for the three months ended September 30, 2016, as a result of the acquisitions of Century-National ($61.2 million) and LPI Business ($99.8 million), and organic growth ($66.2 million)."

110. The 3Q16 Form 10-Q stated that the Company was focused "on niche markets and regions where [it was] able to maintain premium rates at generally consistent levels and ***maintain underwriting discipline*** throughout these cycles." Regarding National General Lender Services, the Form 10-Q repeated that "[t]he transaction includes the acquisition of certain assets, including loan-tracking systems and technology, client servicing accounts, intellectual property, and vendor relationships, as well as the assumption of the related insurance liabilities in a reinsurance transaction through which [National General] received the loss reserves, unearned premium reserves, and invested assets."

111. The 3Q16 Form 10-Q contained signed SOX certifications in which Defendants B. Karfunkel and Weiner attested that the Form 10-Q "does not contain any untrue statement of a

material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report" and that based on their knowledge, "the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report."

112. However, unbeknownst to analysts and investors, Defendants knew or recklessly disregarded that the statements set forth in ¶¶105-111 were false and misleading or omitted material information necessary to make the statements not misleading, as described above in ¶¶27-67, and for the following reasons:

(a) Defendants knew that as a result of Oliver Wyman's initial findings, Wells Fargo had terminated the illegal CPI scheme and had escalated the findings to federal regulators, including the OCC, CFPB, and the Federal Reserve, and that therefore, National General's involvement would be exposed;

(b) Defendants omitted the fact that almost 20% of the acquired LPI business underwrote CPI policies for Wells Fargo with whom National General colluded in an unlawful CPI scheme;

(c) that National General was perpetrating a massive forced-placed CPI scheme with Wells Fargo to fraudulently saddle auto loan customers with unwanted and unneeded automobile insurance policies that it had underwritten;

(d) that National General's illicit conduct in foisting unwanted and unneeded automobile insurance on its customers resulted in some of the victims being declared delinquent, suffering adverse impacts to their creditworthiness, and/or having their cars improperly repossessed;

(e) that National General was exposed to an extreme risk of regulatory scrutiny, legal risks, and reputational harm as a result of its participation in the forced-placed CPI scheme;

(f) that the Company's reported quarterly policy premiums were in part the product of a fraudulent forced-placed insurance scheme and were therefore artificially inflated and unsustainable; and

(g) that the Wells Fargo Auto CPI portion of the LPI business contributed a material 12.1% of National General's reported Q3 2016 consolidated net income and EPS and, as such, the Q3 2016 financial results were not indicative of the Company's future financial performance.

113. On February 9, 2017, Housingwire.com published online an interview with Defendant Castner titled "Executive Conversation: Art Castner on robust, dynamic property insurance solutions." Castner stated:

> Our high rates of automation and automated data exchange with insurance carriers allows us to deliver outstanding quality at a competitive price. Importantly, our processes and teams are fully integrated so that customer service, operations, training, compliance and quality assurance are all in sync to deliver compliant and proactive solutions. The ability to protect our clients' brand – keeping them out of the headlines and off the non-compliant lists of regulators – underpins the daily approach to our efforts.

114. He also explained the LPI business's focus on compliance using technology, representing specifically:

> NatGen employs innovative quality solutions within our technology and processes to ensure successful regulator examinations. Our refund timeliness oversight is unmatched. Our independent, centralized quality team ensures objectivity and that testing is tied to key risks related to client objectives, regulatory/compliance matters and customer experience. Our processes are also built to safeguard our client's funds as evidenced by never having a Reg. AB finding.
>
> We maintain a robust Compliance Management System (CMS) to ensure compliance with the CFPB requirements. Our system includes a database for the

> logging and tracking of complaints, along with robust reporting and root cause analysis for continuous improvement.
>
> Most importantly, we act as a partner to our clients. We have an incredibly dedicated team who considers the best interests of our clients and their customers as they approach the service relationship each day.

115. On February 27, 2017, National General issued a press release announcing its fourth quarter and fiscal 2016 financial results (the "FY 2016 Press Release"). For the quarter, National General reported gross premium written of $818.7 million, net premium written of $740.5 million, and total revenues of $985.5 million. For 2016, National General reported gross premium written of $3.26 billion, net premium written of $2.95 billion, and total revenues of $3.42 billion. Regarding its P&C segment, the Company reported:

> P&C net written premium growth was driven by several key factors: underlying organic growth of $66.9 million or a 16.6% increase, the addition of $58.5 million from the Direct General acquisition, the addition of $12.2 million from the Standard Property and Casualty Insurance Company acquisition, the addition of $43.0 million from the Century-National acquisition, and the addition of $12.9 million from ARS, which we began writing on National General paper during the first quarter of 2016, ***partially offset by a decrease in our lender-placed auto premiums***.

116. That same day, National General hosted an earnings conference call to discuss the Company's fourth quarter and fiscal 2016 financial results in which Defendants B. Karfunkel and Weiner participated. On the call, B. Karfunkel disclosed that 4Q16 results were lower "primarily due to cat activity on our auto and lender-placed insurance lines of business." He continued in pertinent part:

> Our lender-placed business declined through the loss of an [auto collateral protection client]. We maintain a relationship with a client and are still tracking . . . auto loans. However, they made a corporate decision to stop placing lender-placed insurance on their auto loans. In recent months, we have signed on a few new accounts and have other prospects that we expect to convert on in the future.

B. Karfunkel did not disclose which client ended their CPI program, nor the reason for that client's "corporate decision."

117. Later in the call, Weiner gave further details regarding the impact of the loss of the LPI client, though still without identifying the client or the reason the client stopped the business:

> We reported $47 million in net written premium from our lender services product, down from $126 million in the fourth quarter of 2015, with the majority of that decline related to the previous-mentioned auto client.

118. On March 23, 2017, National General filed with the SEC an annual report on Form 10-K announcing the Company's financial and operating results for the fiscal fourth quarter and year ended December 31, 2016. The 2016 Form 10-K highlighted National General's purported focus on providing tailor-made insurance products appropriate for its customers' needs that were the product of rigorous underwriting discipline, detailed actuarial analyses, and a customer-centered distribution approach. It stated that the Company partnered with other organizations to "deliver insurance products ***tailored to the needs*** of [its] affinity partners' members or customers" in its P&C segment. With respect to National General's purported focus on underwriting discipline, the 2016 Form 10-K stated that the Company utilized its "technology and extensive database of loss history ***in order to appropriately price and structure policies***," and that the Company believed in a "strong underwriting foundation," which was "best accomplished through careful risk selection and continuous evaluation of underwriting guidelines relative to loss experience." National General's 2016 Form 10-K continued in pertinent part:

> **Underwriting, Pricing and Risk Management, and Actuarial Capabilities**
>
> We establish premium rates for insurance products based upon an analysis of expected losses using historical experience and anticipated future trends. Our product team develops the product and manages our underwriting tolerances. ***Our actuarial team uses a detailed actuarial analysis to establish the necessary rate level for a given product*** and territory to achieve our targeted return. For risks which fall within our underwriting tolerances, we establish a price by matching rate to risk at a detailed level of segmentation. We determine the individual risk using predictive modeling developed by our analytics team ***with a level of precision that we believe is superior*** to the traditional loss cost pricing used by many of our competitors. We believe that ***effective collaboration among the product, analytics and actuarial***

***teams enhances our ability to price risks appropriately*** and achieve our targeted rates of return.

119. With respect to regulations and compliance, the 2016 Form 10-K stated that National General was "subject to extensive regulation in the United States," under both state and federal laws, which "entails a review and examination of a company's ***compliance with laws governing marketing, underwriting, rating, policy-issuance, claims-handling and other aspects of its insurance business*** during a specified period of time." The 2016 10-K also stated that the Company was barred from "***misrepresenting pertinent facts or insurance policy provisions*** relating to coverages at issue" and other unfair claims practices.

120. The 2016 Form 10-K was signed by Defendants B. Karfunkel and Weiner. B. Karfunkel and Weiner also signed the SOX certifications in which they attested that the Annual Report on Form 10-K "does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report" and that based on their knowledge, "the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report."

121. However, unbeknownst to analysts and investors, Defendants knew or recklessly disregarded that the statements set forth in ¶¶113-120 were false and misleading or omitted material information necessary to make the statements not misleading, as described above in ¶¶27-67, and for the following reasons:

(a) Defendants knew that Oliver Wyman had concluded its investigation; that Wells Fargo had terminated the illegal CPI scheme and had escalated the findings to federal

regulators, including the OCC, CFPB, and the Federal Reserve; and that the Company's involvement would be exposed;

(b) Defendants omitted the fact that almost 20% of the acquired LPI business underwrote CPI policies for Wells Fargo with whom National General colluded with in an unlawful CPI scheme;

(c) that National General was perpetrating a massive forced-placed CPI scheme to fraudulently saddle its own customers with unwanted and unneeded automobile insurance policies that it had underwritten;

(d) that National General's illicit conduct in foisting unwanted and unneeded automobile insurance on its customers had resulted in some of the victims being declared delinquent, suffering adverse impacts to their creditworthiness, and/or having their cars improperly repossessed; and

(e) that National General was exposed to an extreme risk of regulatory scrutiny, legal risks, and reputational harm as a result of its participation in the forced-placed CPI scheme.

122. On May 8, 2017, National General filed with the SEC a Form 8-K attaching a press release announcing its results of operations for the first quarter ended March 31, 2017 ("1Q17"). Disclosing no further information regarding the lost business from the LPI Auto client, National General detailed the results of its P&C segment, which were negatively affected by its LPI business:

> P&C net written premium growth was driven by several key factors: organic growth of ***13.1%, or 24.1% excluding the decline in lender-placed premiums***, the addition of $160.9 million from the Direct General acquisition, the addition of $10.9 million from the Standard Property and Casualty Insurance Company acquisition and the addition of $52.8 million from the Century-National acquisition, ***partially offset by a decrease in our lender-placed auto premiums***.

123. On May 9, 2017, National General filed with the SEC a quarterly report on Form 10-Q announcing the Company's financial and operating results for 1Q17. National General's 1Q17 Form 10-Q reported the offset caused by declines in LPI premiums:

> *Net premium written*. Net premium written increased by $344.9 million, or 57.4%, from $600.8 million for the three months ended March 31, 2016 to $945.6 million for the three months ended March 31, 2017, primarily as a result of the acquisitions of Direct General ($160.9 million), SPCIC ($10.9 million) and Century-National ($52.8 million), the consolidation of the Reciprocal Exchanges ($41.7 million), and additional premiums related to organic growth ($117.7 million), ***partially offset by the decline in lender-placed premiums ($39.2 million)***.

124. The 1Q17 Form 10-Q further reiterated that the Company focused "on niche markets and regions where [it was] able to maintain premium rates at generally consistent levels and ***maintain underwriting discipline*** throughout these cycles."

125. The 1Q17 Form 10-Q contained the signed SOX certifications in which Defendants B. Karfunkel and Weiner attested that the Form 10-Q "does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report" and that based on their knowledge, "the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report."

126. On May 18, 2017, National General hosted an Investor Day presentation in which Defendants B. Karfunkel, M. Weiner, and other senior executives participated. While Defendants continued to note that the LPI business had lost a large auto client, explanation about the unlawful conduct that had occurred and ultimately led the client – Wells Fargo – to terminate the program was omitted from their disclosures. Specifically, Weiner stated:

> Unfortunately, we've had a large loss of an auto client, which has impacted the operating leverage of the business. Then you compound that with lower lender-placed penetration rates reflecting the countercyclical nature of the offering, right? The home market's strong, delinquencies are low. This manifests itself in our book [sic] to a breakeven combined ratio in the short term.

127. Later during the presentation, an unidentified analyst, concerned about "customer concentration" in the LPI segment, specifically asked the Company to "talk a little bit about the profile, the circumstances that led to that loss." Rick Pedack ("Pedack"), the Company's LPI representative and speaking on behalf of the Company failed to disclose the truth:

> I'm not going to identify the client. However, they're a very large client. They decided to self-insure, if you will, because they had a sufficient balance sheet to look at their business and say, "All right, do we need to do a lender-placed program?" With respect to that, it was not a measure of what our service capabilities or our products because – so it was not losing a client because we did poor service.

128. When the same analyst pressed to know "how big was the auto loss relative to your total bookings?," Weiner partially disclosed: "Well, first of all, the auto loss, I think, in totality, it was a little bit less than 20% of the total book from when we acquired – it was a large piece of it."

129. Pedack also spoke regarding the business's attention to borrowers. He represented that when it came to working with financial institutions, National General was "engaging with their borrowers on an individual basis, either through correspondence, calling agents and brokers to help fulfill the insurance requirements, but also engaging directly with that customer, that is looking to fill – fulfill the insurance requirements."

130. On behalf of the Company, Pedack further misrepresented the importance of compliance to the Company. He represented that for the LPI business, "[one] of the critical things that's a deliverable on today's environment is compliance." He also represented that "compliance focus is a big part of our business." He continued:

> So we have to deliver the same level of compliance, confidentiality that a bank has to deliver to their own shop, to their own customer. So compliance is a critical part of

our business, but in terms of providing those services, we have a state-of-the-art technology insurance tracking system that we deliver our complete suite of insurance products. So that would be auto that will also be mortgage, flood and leases.

131. Later in the Investor Day presentation, Defendant Weiner similarly touted the LPI business's focus on compliance. He represented that "under Barry [Karfunkel's] leadership," they were doing "really [two] things. Continue the marketing effort on it, right? ***Continuing about the value-add that we can add in terms of compliance and tracking, right***."

132. However, unbeknownst to analysts and investors, Defendants knew or recklessly disregarded that the statements set forth in ¶¶122-131 were false and misleading or omitted material information necessary to make the statements not misleading, as described above in ¶¶27-67, and for the following reasons:

(a) Defendants knew that Oliver Wyman had concluded its investigation; that Wells Fargo had terminated the illegal CPI scheme and had escalated the findings to federal regulators, including the OCC, CFPB, and the Federal Reserve; and that the Company's involvement would be exposed;

(b) Defendants omitted the fact that almost 20% of the acquired LPI business underwrote CPI policies for Wells Fargo with whom National General colluded with in an unlawful CPI scheme;

(c) that National General was perpetrating a massive forced-placed CPI scheme to fraudulently saddle its own customers with unwanted and unneeded automobile insurance policies that it had underwritten;

(d) that National General's illicit conduct in foisting unwanted and unneeded automobile insurance on its customers had resulted in some of the victims being declared delinquent,

suffering adverse impacts to their creditworthiness, and/or having their cars improperly repossessed; and

(e) that National General was exposed to an extreme risk of regulatory scrutiny, legal risks, and reputational harm as a result of its participation in the forced-placed CPI scheme.

## DEFENDANTS' OMISSIONS WERE MATERIAL

### The Omissions Described Above Were Material to National General's Financial Statements

133. SEC Staff Accounting Bulletin No. 99, Materiality ("SAB 99") sets forth the generally accepted methods to evaluate materiality as it relates to the financial statements and disclosures of SEC registrants. SAB 99 specifies numerous factors that clearly indicate National General's omissions regarding the unlawful CPI scheme were material to the Company's Class Period financial statements and MD&A disclosures. SAB 99 states that "The omission . . . of an item in a financial report is material if, in the light of surrounding circumstances, the magnitude of the item is such that it is probable that the judgment of a reasonable person relying upon the report would have been changed or influenced by the inclusion . . . of the item." SAB 99 also states that in addition to considering "'quantitative'" factors, "'qualitative'" factors must also be considered in assessing materiality as "the staff believes that there are numerous circumstances in which misstatements below 5% could well be material." National General's lack of disclosure concerning its involvement in the unlawful CPI scheme and the impact of the Wells Fargo LPI Auto business on the Company's financial statements were both quantitatively and qualitatively material.

### Omissions Regarding National General's Collusion with Wells Fargo in the CPI Scheme Were *Quantitatively* Material

134. As illustrated in the table at ¶61 above, the Wells Fargo CPI portion of the LPI business was quantitatively material to National General's Class Period financial statements as it represented at least 5.4% to as much as 20.8% of National General's consolidated net income and



4835-9162-3088.v1

EPS during the four quarters following National General's acquisition of the LPI business from QBE.

135. Net income and EPS are crucial investment metrics that securities analysts and investors pay close attention to as these metrics paint a clear picture of where a company stands in terms of growth and profitability, and can ultimately drive the stock price. Because the Wells Fargo CPI business contributed as much as 20.8% to National General's consolidated net income and EPS, important information or developments concerning the Wells Fargo LPI customer were clearly material to investors on a quantitative basis alone.

**Omissions Regarding National General's Collusion with Wells Fargo in the CPI Scheme Were *Qualitatively* Material**

136. While the table in ¶61 above illustrates that the unsustainable Wells Fargo LPI business alone often far exceeded 5% of National General's consolidated quarterly net income and EPS following the acquisition of QBE, the SEC's SAB 99 also makes clear that the SEC "staff believes that there are numerous circumstances in which misstatements below 5% could well be material," and provides criteria to assist in determining if even relatively small amounts of accounting or disclosure misstatements or omissions are ***qualitatively*** material. While not an exhaustive list of criteria that the SEC believes may cause a quantitatively small misstatement to be qualitatively material, National General's failure to disclose its collusion in the illegal CPI scheme and the resulting improper premiums written met at least the following SEC qualitative materiality criteria listed in SAB 99:

**The Misstatement Concerns a Segment or Other Portion of the Registrant's Business that Has Been Identified as Playing a Significant Role in the Registrant's Operations or Profitability**

137. The chart in ¶61 demonstrates that the Wells Fargo LPI Auto business played an important role in the Company's profitability because the Wells Fargo business alone contributed a

material portion of the Company's reported net income and EPS in the quarters following the QBE acquisition. Additionally, during the Class Period, Defendants repeatedly remarked on the current and future profitability and prospects of the LPI business. For example, M. Karfunkel, speaking on behalf of the Company, explained during a November 3, 2015 conference call that the LPI business line would be "immediately accretive" and enjoy a future profit margin "much, much better" than the rest of the P&C segment that housed the LPI business line. Notably, and as detailed at ¶60, Wells Fargo was also the largest customer in the LPI Auto business, and upon acquisition, accounted for almost 20% of the entire LPI business's GWP.

**The Misstatement Affects the Registrant's Compliance with Regulatory Requirements**

138. Despite National General's repeated assurances that the Company and its LPI business focused on compliance with regulations and laws governing the insurance business during the Class Period, the unfair and improper business practices within the Wells Fargo CPI business were clearly at odds with good faith compliance with insurance industry regulatory standards.

**The Misstatements Involve Concealment of an Unlawful Transaction**

139. As alleged herein, National General concealed both the unlawful and improper business practices used to generate premium revenue and fees, and concealed the fact that the unsustainable CPI scheme with Wells Fargo contributed a quantitatively material portion of National General's consolidated net income and earnings during 1Q15, and 1Q16 through 3Q16.

## ADDITIONAL SCIENTER ALLEGATIONS

140. As alleged herein, Defendants acted with scienter in that they knew that the public documents and statements issued or disseminated in the name of the Company were materially false and misleading; knew that such statements or documents would be issued or disseminated to the investing public; and knowingly and substantially participated or acquiesced in the issuance or

dissemination of such statements or documents and actions intended to manipulate the market price of National General common stock as primary violations of the federal securities laws. As set forth elsewhere herein in detail, Defendants, by virtue of their receipt of information reflecting the true facts regarding National General, their control over, and/or receipt or modification of National General's allegedly materially misleading misstatements, and/or their associations with the Company which made them privy to confidential proprietary information concerning National General, participated in the fraudulent scheme alleged herein.

141. As outlined below, numerous additional facts demonstrate that Defendants acted knowingly in their failure to disclose the truth concerning National General's participation in the CPI scheme.

**The Karfunkel Family Profited Enormously While Hiding National General's Collusion in the CPI Scheme**

142. Members of the Karfunkel family founded and led both National General and AmTrust Financial Services, Inc. ("AmTrust"). AmTrust's headquarters were located five floors above National General's, at 59 Maiden Lane, 43rd Floor, New York, New York, 10038. AmTrust is a multinational special property and casualty insurer founded in 1998 by M. Karfunkel and his brother, George Karfunkel ("G. Karfunkel"). Since 1998 until his passing, M. Karfunkel was AmTrust's Chairman of the Board.

143. M. Karfunkel's son-in-law, Barry D. Zyskind ("Zyskind"), was a founding stockholder of AmTrust, as well as AmTrust's President and CEO. Zyskind served as a director on AmTrust's Board of Directors since 1998 and became its Chairman in May 2016. In addition, throughout the Class Period, Zyskind served as a director on National General's Board.

144. Throughout the Class Period, members of the Karfunkel family – specifically, Zyskind, G. Karfunkel, M. Karfunkel, and Leah Karfunkal ("L. Karfunkel"), who was M.

Karfunkel's wife – were beneficial owners of over half of AmTrust's common stock. The shares held by L. Karfunkel were held in The Michael Karfunkel 2005 Grantor Retained Annuity Trust ("Trust"), of which L. Karfunkel was a co-trustee with Zyskind. As of November 4, 2015, these four Karfunkel family members beneficially owned 55.9% of AmTrust's common stock. The next year, these same family members beneficially owned 52.5%. After M. Karfunkel passed away, his shares were transferred to the Trust. As of April 11, 2017, Zyskind, G. Karfunkel, and L. Karfunkel beneficially owned 58.2%.

145. From the beginning of the Class Period, AmTrust had held approximately 12-13% of National General's common stock. Then, on June 7, 2017, after Oliver Wyman had extensively interviewed National General personnel and regulators were in the midst of investigating the CPI scheme, AmTrust, through its wholly-owned, Bermuda-based subsidiary, AmTrust International Insurance, Ltd., made its first ever sale of National General shares. In a windfall transaction, AmTrust sold 6,153,928 shares at $20 per share for proceeds of $123.1 million. Less than two months later, *The New York Times* exposed National General's participation in the CPI scheme.

**Defendants Were Motivated to Conceal and Perpetuate the Illegal CPI Scheme Because the Force-Placed Insurance on Unsuspecting Customers Was Highly Lucrative**

146. The CPI policies National General underwrote for Wells Fargo Auto customers were considerably more expensive than insurance auto loan customers could obtain on their own. For coverage solely of damage to the vehicle, policies typically cost more than $1,000 a year, not counting interest. And because customers often did not know they were being billed for CPI policies, interest charges compounded. Moreover, because in numerous instances customers already had auto insurance and customers did not know that CPI insurance had been added to their account, National General CPI policies had very few claims made and, accordingly, very low in losses. A petition filed by the Consumer Federation of California with the Insurance Commissioner of the

State of California explained that "it is likely that these policies would have very low or no losses, as the customers would turn to their selected insurance carrier to cover any claims." A press release announcing their petition gave further detail:

> National General reported that in 2016 its California automobile insurance loss ratio was 36%. This stands in contrast with the total California industry-wide 2016 auto loss ratio of 73%.
>
> "This outrageously low rate of claims payments suggests that few California motorists knew they had been issued a National General policy. We allege that Wells Fargo colluded with National General, and received kickbacks for issuing secret policies to borrowers that were already insured with another carrier. If these borrowers were in an accident, they filed their claim with their chosen insurer. They wouldn't have known to file with National General, who profited excessively from its arrangement with Wells Fargo to secretly double-cover and collect premiums from insured motorists," stated Richard Holober, Executive Director of the Consumer Federation of California.

**Defendants' Pre-Acquisition Due Diligence, Followed by Their Integration Processes, Informed Them of the Ongoing CPI Scheme Within the LPI Business**

147. Defendants repeatedly underscored their detailed due diligence and integration processes undertaken when acquiring companies, including their acquisition of QBE's LPI business. As a result of these activities, even before the acquisition's announcement, Defendants had access to information detailing – and were aware of, or recklessly indifferent to – the CPI scheme that QBE engaged in with LPI Auto's biggest client, Wells Fargo.

148. Defendants' due diligence process for the LPI business began well before the transaction was announced in July 2015. According to Defendant Weiner, Rendall, who was National General's COO, Executive Vice President, and Treasurer and reported directly to National General's CEOs, ran the "very detailed" integration process for acquisitions. Speaking specifically about that process during the Company's May 18, 2017 Investor Day, Rendall highlighted that "***by the time we announce an acquisition***, we have gone through this ***complete, thorough due diligence process***." The accompanying slideshow presentation likewise reiterated: "By the time we announce

an acquisition, we have completed a thorough due diligence process using our proprietary process with hundreds of items reviewed over all relevant departments." Explaining further during the presentation, Rendall detailed the Company's due diligence process before announcing an acquisition: "We've actually, over the years, developed a, what I'll call, ***proprietary acquisition due diligence checklist with literally hundreds of items*** from every conceivable issue or question or department that you could think of and we have assigned ***subject matter experts to each of those areas***."

149. After undertaking an exacting due diligence process before announcing the LPI acquisition, the Company embarked on integrating the business even before closing. The detailed due diligence prior to signing the deal meant that, according to Defendant B. Karfunkel on a November 3, 2016 conference call, "***at the signing of the deal***," the Company already had in place "a very regimented plan on integrating these acquisitions." As Defendant B. Karfunkel elaborated further on the same call, "By the time the deal has closed we've made very significant progress, and that really enables – that regimented plan really enables us to take a very strong approach and integrate these acquisitions while really leveraging the many strengths that we bring to bear."

150. Rendall, at the May 18, 2017 Investor Day Conference, provided further details: "So pre-closing, we have ***meetings weekly***, where we review things we need to get done before closing, and that's also the time where we've identified issues that we need to transform after closing." The accompanying slideshow presentation also noted that National General used "the period between signing and closing to develop the integration checklist."

151. Likewise, Defendant Weiner emphasized during a November 3, 2015 conference call that "[e]very one of the acquisitions we do has a ***very detailed integration process*** that goes through, both from a technology, a human resource side, and whatnot." Responding to an analyst question



4835-9162-3088.v1

regarding expenses associated with integrating the LPI business, Weiner affirmed the business's early integration, stating that "***we actually started working on this before we close[d] the transaction***, so we had a running start to get this done and get those expenses out as quickly as possible."

152. The statements above by National General's management, including statements from Defendants B. Karfunkel and Weiner, reveal that National General had an extensive and in-depth due diligence and integration process. The Company's detailed due diligence investigation prior to its acquisition of the LPI business and its early planning in integration meant Defendants knew of the CPI scheme at the beginning of the Class Period, if not before.

**Because National General Participated in Meetings with and Provided Meeting Materials to Wells Fargo Regarding the CPI Scheme, Defendants Were Well-Aware of the Scheme**

153. While National General colluded with Wells Fargo in perpetrating the CPI scheme, the two companies were in constant contact with each other. In fact, National General, in its Answer filed in the *Wells Fargo CPI Litigation*, ***admitted*** that the Company and Wells Fargo "held monthly management review meetings by telephone" to discuss its CPI program with Wells Fargo. *See Wells Fargo CPI Litig.*, ECF Nos. 182, 208. These meetings discussed performance, metrics regarding borrower telephone calls, claims made against CPI, dollar amounts of claims, and other action items. In advance of each meeting with Wells Fargo, National General circulated to the meeting participants a "scorecard" of metrics concerning the CPI scheme.

154. In addition to the monthly telephonic meetings, National General personnel met two to four times per year at either Wells Fargo or National General's office to have in-person "business review meetings." These meetings covered the CPI program in much more detail. As National General ***admitted***, in advance of the meetings, the Company "prepared a business review deck which it circulated to Wells Fargo, generally by electronic mail." As National General further ***admitted***,

these decks contained a plethora of information regarding the CPI program conducted with Wells Fargo, including:

> [D]etailed data about the CPI Program including loan volume and CPI penetration; gross and net written premium; average premium per loan; CPI premium and commission trends; CPI distribution by state; borrower account balances and premium rate percentages; CPI letter volume; CPI cancel percentages; CPI loss experience and trends including by month and policy year; CPI financial results; year-over-year comparisons; CPI claims experience and performance; CPI claim severity, frequency, and payments; and other operational statistics and results.

155. The information National General admitted to gathering and presenting at the regular meetings with Wells Fargo demonstrates Defendants' knowledge of their participation in the CPI scheme to force-place unnecessary and unwanted CPI policies on Wells Fargo customers.

**National General's Senior Management, Which Operated in a Flat Corporate Structure, Was "on Top of" the Details of the LPI Business, Including the CPI Scheme**

156. The Individual Defendants and others in National General's senior management emphasized their hands-on involvement in the details of every aspect of their business, including the LPI business. Because of the flat organizational structure and the Individual Defendants' active oversight of their businesses, Defendants knew, or were at least reckless in not knowing, that Wells Fargo, a client providing almost 20% of the gross written premiums for the LPI business, was engaged with National General to issue unwanted and unnecessary CPI policies to the bank's car loan customers.

157. During the Investor Day presentation on May 18, 2017, Robert Karfunkel, National General's Executive Vice President of Strategy and Development and Chief Marketing Officer and also Defendant B. Karfunkel's brother, explained the Company's "flat" corporate structure that permitted open information flow: "At National General, we have a very flat organizational structure, which enables all levels of management to have an open-door, open-line policy with all our key agency relationships."

158. This active oversight went all the way to the top – to Defendant B. Karfunkel. During the same Investor Day presentation, Pedack, speaking on behalf of the Company regarding the LPI business, stated: "We're still providing tracking services, I was just reminded by Barry. ***See? Barry is on top of what goes on in the lender division, I can tell you***."

159. Other members of management were also deeply involved in the LPI business, and overseeing the premiums and profits it generated, including as a result of the CPI scheme with Wells Fargo. Because the Wells Fargo CPI business made up almost 20% of the gross premium written for the LPI business, and made up a material amount of the net income attributable to common stockholders – ranging from 5.4% to 20.8% – Defendant Weiner, as CFO, knew, or was reckless in not knowing how this profitable business was generating premiums. At the Investor Day Conference, Rendall elaborated on scrutinizing expenses during National General's acquisition process: "We sat through some very, very painful meetings week after week, month after month, year after year, and we're still doing that today, where ***we review every expense over $1,000***." Similarly, Defendant Castner, having joined the Company through its acquisition of QBE, where he had served as Senior Vice President of Operations & Strategic Operations Development for 11 years, was positioned both to have historical knowledge regarding QBE's relationship with Wells Fargo and to have day-to-day to have access to information regarding National General's involvement in the CPI scheme.

160. Thus, through their active involvement in transitioning the business from QBE to National General and overseeing its integration, operations, and financial performance, these members of National General's senior management knew, or were reckless in not knowing, about the CPI scheme.

**Defendants' Knowledge of the CPI Scheme Supported by National General's Tracking System**

161. Defendants repeatedly touted the sophistication of it technology, and more specifically, their tracking system, which allowed National General to monitor millions of their customers' loans. For example, at the Investor Day Conference, Pedack, National General's speaker regarding the LPI business, repeatedly emphasized National General's technology: "We have advanced technology and award-winning capabilities to ensure outstanding customer experience . . . we believe we have leading-edge technology to support our business" and "we have a state-of-the-art technology insurance tracking system that we deliver our complete suite of insurance products."

162. As CPI vendor, National General tracked Wells Fargo auto loan customers' insurance, which was maintained in an extensive database. In 2015, National General's tracking system began tracking customer complaints regarding the CPI, which National General in turn reported to Wells Fargo. In so doing, National General recognized thousands of consumer complaints regarding the CPI scheme, to which both Wells Fargo and National General continued to ignore. National General's tracking system is yet another indication that Defendants were well aware of or recklessly disregarded, the CPI scheme given how closely the Company monitored its customers' loans and how thousands of specific customer complaints regarding the CPI scheme were brought to National General's attention.

**National General Acted with Scienter**

163. The allegations above establish a strong inference that National General, as an entity, acted with corporate scienter throughout the Class Period, as its officers, management and agents had actual knowledge of the misrepresentations and omissions of material facts set forth herein, or acted with reckless disregard for the truth, because they concealed the illegal force-placed CPI scheme.

**Defendants' Certifications Pursuant to the SOX Demonstrate Scienter**

164. In connection with National General's public financial statements filed with the SEC during the Class Period, Defendants B. Karfunkel and Weiner issued certifications pursuant to §302 of the SOX, attesting that they each personal supervised and participated in the evaluation of National's General's financial statements and that the Company's financial disclosures fairly and accurately presented its financial condition.

## LOSS CAUSATION

165. Defendants' wrongful conduct, as alleged herein, directly and proximately caused Plaintiffs' and the other Class members' economic loss. The markets for National General's common stock were open, well-developed and efficient at all relevant times. Throughout the Class Period, National General's common stock traded at artificially inflated prices as a direct result of Defendants' materially misleading statements and omissions of material fact, which were widely disseminated to the securities market, investment analysts, and investing public. Plaintiffs and other members of the Class purchased or otherwise acquired National General common stock relying upon the integrity of the market price for National General's common stock and market information relating to National General, and have been damaged thereby.

166. The Class Period inflation in National General's stock price was removed when information concealed by Defendants' misrepresentations and omissions was revealed to the market. The information was disseminated through several partial disclosures that slowly revealed the true nature and extent of National General's collusion with Wells Fargo to force-place unlawful CPI insurance on unsuspecting Wells Fargo customers. These disclosures, as more particularly described below, removed artificial inflation from National General common stock, causing economic injury to Plaintiffs and other members of the Class.

167. On July 27, 2017, *The New York Times* published the exposé titled "Wells Fargo Forced Unwanted Auto Insurance on Borrowers." The spotlight of the July 27, 2017 *New York Times* article was on Wells Fargo, which had recently been embroiled in several investigations of its illegal conduct, including a scandal in which bank employees had opened millions of fake bank accounts. Under this reputational shadow and increased regulatory scrutiny, Wells Fargo hired the consulting firm, Oliver Wyman, to conduct an internal investigation of the CPI insurance issued to Wells Fargo customers from January 2012 through July 2016. *The New York Times* reported that, according to the leaked 60-page report prepared by Oliver Wyman, the unlawful CPI "pushed roughly 274,000 Wells Fargo customers into delinquency and resulted in almost 25,000 wrongful vehicle repossessions."

168. Meanwhile, hiding under cover of Wells Fargo's notoriety and bad publicity, National General implemented a strategy of denial and refusal to discuss the illegal insurance scheme revealed in the initial *New York Times* article. For example, National General's investor relations director, Christine Worley ("Worley"), refused to provide comment for the July 27, 2017 *New York Times* article. For *The Wall Street Journal's* story on July 29, 2017, Worley was quoted saying that National General "feels confident with its compliance in this highly regulated industry" and "[w]e have always refunded premiums directly to our financial institution customers in a timely manner and provided all necessary notification in compliance with law and industry practice."

169. However, as more information came into the market regarding National General's involvement in the CPI scheme and the market learned how the loss of the unlawful CPI business affected the Company's financial performance, National General's common stock price dramatically decreased.

170. After the market closed on August 7, 2017, National General issued a press release announcing its 2Q17 results. The Company reported a net loss of $5.1 million or $0.05 per diluted share, compared to net income of $44.3 million or $0.41 per diluted share in 2Q16. It also reported that its EPS for 2Q17 had fallen to $0.11 from $0.43 in 2Q16. Defendant B. Karfunkel was quoted in the press release admitting that "[t]he results this quarter were ***disappointing due to the poor performance from National General Lender Services*** and weather losses impacting our home product." The press release also disclosed that for the LPI business, GWP decreased 16.5% from $108.2 million in 2Q16 to $90.4 million in 2Q17; NWP decreased 17.9% from $105.4 million in 2Q16 to $86.5 million in 2Q17; and NEP fell 27% from $108.5 million to $79.2 million.

171. During the Company's 2Q17 earnings conference call the next day, August 8, 2017, Defendants revealed that the LPI business's "top line is dropping at a greater-than-expected pace." Defendant B. Karfunkel described the Company as "a tale of 2 cities, where we have strong performance in most areas, and unfortunately, margin pressures in our Lender Services business."

172. In addition, on August 8, 2017, the CFC petitioned the California Department of Insurance to hear evidence regarding National General's rate increases in light of the revelation of the CPI scheme. The same day, the Commissioner for the California Department of Insurance announced it was ordering an investigation into National General's participation in the scheme to force-place illegal CPI on consumers.

173. As a result of these disclosures regarding National General's involvement in the CPI scheme and the revelation of the financial and legal repercussions arising from that involvement, the price of National General's common stock dropped precipitously from its closing price on August 7, 2017 of $20.54 per share, down 7.1% on particularly heavy volume to $19.08 per share.

174. The growing attention on National General's involvement in the CPI scheme culminated in the U.S. Senate's Commerce Committee opening an inquiry as to the Company. On August 9, 2017, a bipartisan group of Senators sent a letter to B. Karfunkel requesting the details of National General's role and profits from the CPI scheme. With this news, the stock continued to fall, closing at $18.51 per share, a 3.0% decline.

175. Each disclosure of adverse facts that removed inflation from National General's stock price was connected to Defendants' materially false and misleading statements and omissions and the fraudulent conduct alleged herein. The timing and magnitude of National General's price declines negate any inference that the loss suffered by Plaintiffs and other Class members was caused by changed market conditions, macroeconomic or industry factors, or Company-specific facts unrelated to Defendants' fraudulent conduct. As a direct result of Defendants' wrongful acts and omissions, and the precipitous decline in the market value of National General, Plaintiffs and the Class have suffered significant losses and damages.

## APPLICABILITY OF PRESUMPTION OF RELIANCE: FRAUD-ON-THE-MARKET DOCTRINE

176. At all relevant times, the market for National General common stock was an efficient market for the following reasons, among others:

(a) National General stock met the requirements for listing, and was listed and actively traded on the NASDAQ, a highly efficient and automated market;

(b) according to the Company's quarterly report on Form 10-Q filed on August 8, 2017, the Company had approximately 106.6 million basic weighted average common shares outstanding, demonstrating a very active and broad market for National General common stock;

(c) as a regulated issuer, National General filed periodic public reports with the SEC and the NASDAQ;

(d) National General regularly communicated with public investors via established market communication mechanisms, including the regular disseminations of press releases on national circuits of major newswire services, the Internet, and other wide-ranging public disclosures;

(e) National General was followed by several securities analysts employed by major brokerage firms who wrote publicly available reports that were distributed to the sales force and certain customers of their respective brokerage firms, thereby entering the public marketplace; and

(f) unexpected material news about National General was rapidly reflected in and incorporated into the Company's stock price during and after the Class Period.

177. As a result of the foregoing, the market for National General common stock promptly digested current information regarding National General from publicly available sources and reflected such information in National General's stock price. Under these circumstances, all purchasers of National General common stock during the Class Period suffered similar injury through their purchase of National General common stock at artificially inflated prices, and a presumption of reliance applies.

**CLASS ACTION ALLEGATIONS**

178. This is a class action on behalf of all persons and entities that purchased or otherwise acquired National General common stock during the Class Period and were damaged thereby (the "Class"). Excluded from the Class are Defendants and their families, the officers and directors of the Company at all relevant times, members of their immediate families and their legal representatives, heirs, successors or assigns, and any entity in which Defendants have or had a controlling interest.

179. Common questions of law and fact predominate and include: (a) whether Defendants violated the Exchange Act; (b) whether Defendants omitted and/or misrepresented material facts; (c) whether Defendants knew or recklessly disregarded that their statements were false; (d) whether the price of National General common stock was artificially inflated during the Class Period; and (e) the extent of and appropriate measure of damages.

180. The members of the Class are so numerous that joinder of all members is impracticable. Throughout the Class Period, shares of National General common stock were actively traded on the NASDAQ. Upon information and belief, these shares are held by hundreds or thousands of individuals located geographically throughout the country.

181. Plaintiffs' claims are typical of those of the Class. Prosecution of individual actions would create a risk of inconsistent adjudications. Plaintiffs will adequately protect the interests of the Class. A class action is superior to other available methods for the fair and efficient adjudication of this controversy.

## COUNT I

### For Violation of §10(b) of the Exchange Act and Rule 10b-5 Against All Defendants

182. Plaintiffs incorporate ¶¶1-181 by reference.

183. During the Class Period, Defendants disseminated or approved the false or misleading statements specified above, which they knew or recklessly disregarded were misleading in that they contained misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

184. Defendants violated §10(b) of the Exchange Act and Rule 10b-5 in that they, directly and indirectly, by the use of the means or instrumentality of interstate commerce, or the mails or facility of a national securities exchange:

(a) employed devices, schemes, and artifices to defraud;

(b) made untrue statements of material fact or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; or

(c) engaged in acts, practices, and a course of business that operated as a fraud or deceit upon Plaintiffs and others similarly situated in connection with their purchases of National General common stock during the Class Period.

185. Plaintiffs and the Class have suffered damages in that, in reliance on the integrity of the market, they paid artificially inflated prices for National General common stock. Plaintiffs and the Class would not have purchased National General common stock at the prices they paid, or at all, if they had been aware that the market price had been artificially and falsely inflated by Defendants' misleading statements.

186. By virtue of the foregoing, Defendants have violated §10(b) of the Exchange Act, and Rule 10b-5 promulgated thereunder.

187. As a direct and proximate result of Defendants' wrongful conduct, Plaintiffs and the other members of the Class suffered damages in connection with their purchases of National General common stock during the Class Period.

## COUNT II

## For Violation of §20(a) of the Exchange Act Against Defendants B. Karfunkel and Weiner

188. Plaintiffs incorporate ¶¶1-187 by reference.

189. During the Class Period, Defendants B. Karfunkel and Weiner acted as controlling persons of National General within the meaning of §20(a) of the Exchange Act. By virtue of their share ownership, executive and Board positions, and their culpable participation, as alleged above,

the Individual Defendants had the power to influence and control and did, directly or indirectly, influence and control the decision-making of the Company, including the content and dissemination of the various statements that Plaintiffs contend were false and misleading as detailed herein.

190. The Individual Defendants were provided with or had unlimited access to the Company's internal reports, press releases, public filings, and other statements alleged by Plaintiffs to be misleading prior to or shortly after these statements were issued, and had the ability to prevent the issuance of the statements or cause them to be corrected. In particular, the Individual Defendants had direct involvement in and responsibility over the day-to-day operations of the Company and, therefore, are presumed to have had the power to control or influence the particular transactions giving rise to the securities violations as alleged herein.

191. As a direct and proximate result of these Defendants' wrongful conduct, Plaintiffs and the other members of the Class suffered damages in connection with their purchases of the Company's common stock during the Class Period. By reason of such wrongful conduct, these Defendants are liable pursuant to §20(a) of the Exchange Act.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs pray for judgment as follows:

A. Determining that this action is a proper class action and certifying Plaintiffs as Class Representatives under Rule 23 of the Federal Rules of Civil Procedure and Plaintiffs' counsel as Class Counsel;

B. Awarding compensatory damages in favor of Plaintiffs and the other Class members against all Defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

C. Awarding Plaintiffs and the Class their reasonable costs and expenses incurred in this action, including counsel fees and expert fees; and

D. Awarding such other and further relief as the Court may deem just and proper.

**JURY DEMAND**

Plaintiffs demand a trial by jury.

DATED: January 10, 2020

ROBBINS GELLER RUDMAN
& DOWD LLP
SPENCER A. BURKHOLZ
ASHLEY M. PRICE
JENNIFER N. CARINGAL

s/ Ashley M. Price
ASHLEY M. PRICE

655 West Broadway, Suite 1900
San Diego, CA 92101
Telephone: 619/231-1058
619/231-7423 (fax)
spenceb@rgrdlaw.com
aprice@rgrdlaw.com
jcaringal@rgrdlaw.com

ROBBINS GELLER RUDMAN
& DOWD LLP
DAVID A. ROSENFELD
58 South Service Road, Suite 200
Melville, NY 11747
Telephone: 631/367-7100
631/367-1173 (fax)
drosenfeld@rgrdlaw.com

Lead Counsel for Lead Plaintiff

CORRENTE LAW CORP.
DARREN F. CORRENTE
226 South Main Street, Suite 300
Providence, RI 02903
Telephone: 401/331-7720
401/453-2549 (fax)

KLAUSNER, KAUFMAN, JENSEN
& LEVINSON
STUART A. KAUFMAN
7080 NW 4th Street
Plantation, FL 33317
Telephone: 954/916-1202
954/916-1232 (fax)
stu@robertdklausner.com

Additional Counsel for Lead Plaintiff

CERTIFICATE OF SERVICE

I hereby certify under penalty of perjury that on January 10, 2020, I authorized the electronic filing of the foregoing with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the e-mail addresses on the attached Electronic Mail Notice List, and I hereby certify that I caused the mailing of the foregoing via the United States Postal Service to the non-CM/ECF participants indicated on the attached Manual Notice List.

s/ Ashley M. Price
ASHLEY M. PRICE

ROBBINS GELLER RUDMAN
& DOWD LLP
655 West Broadway, Suite 1900
San Diego, CA 92101-8498
Telephone: 619/231-1058
619/231-7423 (fax)

E-mail: aprice@rgrdlaw.com

# Mailing Information for a Case 1:19-cv-10825-JPO City of North Miami Beach Police Officers' and Firefighters' Retirement Plan v. National General Holdings Corp. et al

## Electronic Mail Notice List

The following are those who are currently on the list to receive e-mail notices for this case.

- **Jesse Bernstein**
  jessebernstein@quinnemanuel.com,jesse-bernstein-1162@ecf.pacerpro.com
- **Spencer A. Burkholz**
  spenceb@rgrdlaw.com,e_file_sd@rgrdlaw.com
- **Jane M. Byrne**
  janebyrne@quinnemanuel.com,jane-byrne-8968@ecf.pacerpro.com
- **Jennifer N Caringal**
  jcaringal@rgrdlaw.com
- **Jennifer Nunez Caringal**
  jcaringal@rgrdlaw.com,JCaringal@ecf.courtdrive.com
- **Michael Barry Carlinsky**
  michaelcarlinsky@quinnemanuel.com,michael-carlinsky-9816@ecf.pacerpro.com
- **Brian Edward Cochran**
  bcochran@rgrdlaw.com
- **Leigha E Empson**
  leighaempson@quinnemanuel.com
- **Tricia L McCormick**
  tmccormick@rgrdlaw.com
- **Ashley M. Price**
  APrice@rgrdlaw.com,aprice@ecf.courtdrive.com,e_file_sd@rgrdlaw.com,nhorstman@rgrdlaw.com
- **David Avi Rosenfeld**
  drosenfeld@rgrdlaw.com,e_file_ny@rgrdlaw.com,e_file_sd@rgrdlaw.com,drosenfeld@ecf.courtdrive.com
- **Renita N Sharma**
  renitasharma@quinnemanuel.com
- **Robert Patrick Vance , Jr**
  bobbyvance@quinnemanuel.com
- **David C. Walton**
  davew@rgrdlaw.com
- **Richard Corey Worcester**
  coreyworcester@quinnemanuel.com,corey-worcester-4758@ecf.pacerpro.com

## Manual Notice List

The following is the list of attorneys who are **not** on the list to receive e-mail notices for this case (who therefore require manual noticing). You may wish to use your mouse to select and copy this list into your word processing program in order to create notices or labels for these recipients.

- (No manual recipients)

# CERTIFICATION PURSUANT TO FEDERAL SECURITIES LAWS

MASSACHUSETTS LABORERS' PENSION FUND ("Plaintiff") declares:

1. Plaintiff has reviewed a complaint and authorized its filing. Plaintiff has authorized the filing of a motion for appointment as lead plaintiff.

2. Plaintiff did not acquire the security that is the subject of this action at the direction of plaintiff's counsel or in order to participate in this private action or any other litigation under the federal securities laws.

3. Plaintiff is willing to serve as a representative party on behalf of the class, including providing testimony at deposition and trial, if necessary.

4. Plaintiff has made the following transaction(s) during the Class Period in the securities that are the subject of this action:

| Security | Transaction | Date | Price Per Share |
|---|---|---|---|

*See* attached Schedule A.

5. Plaintiff has not sought to serve or served as a representative party in a class action that was filed under the federal securities laws within the three-year period prior to the date of this Certification except as detailed below:

None.

6. Plaintiff will not accept any payment for serving as a representative party on behalf of the class beyond the Plaintiff's pro rata share of any recovery, except such reasonable costs and expenses (including lost wages) directly relating to the representation of the class as ordered or approved by the court.

I declare under penalty of perjury that the foregoing is true and correct. Executed this 7 day of January, 2020.

MASSACHUSETTS LABORERS' PENSION FUND

By: Louis A. Mandarini III

Louis A. Mandarini, III, Executive Director

**SCHEDULE A**

**SECURITIES TRANSACTIONS**

**Stock**

| Date Acquired | Amount of Shares Acquired | Price |
|---|---|---|
| 08/11/2015 | 1,250 | $19.98 |
| 08/12/2015 | 2,500 | $19.05 |
| 08/12/2015 | 5,308 | $19.00 |
| 08/13/2015 | 1,692 | $18.93 |
| 08/14/2015 | 600 | $19.23 |
| 08/19/2015 | 1,200 | $19.59 |
| 08/28/2015 | 1,000 | $18.69 |
| 09/01/2015 | 750 | $18.18 |
| 10/02/2015 | 600 | $18.74 |
| 02/01/2016 | 282 | $19.63 |
| 02/10/2016 | 36 | $19.99 |
| 02/11/2016 | 764 | $19.50 |
| 02/17/2016 | 197 | $19.34 |
| 02/18/2016 | 37 | $19.28 |
| 02/29/2016 | 500 | $19.95 |
| 03/01/2016 | 117 | $19.99 |
| 03/02/2016 | 219 | $19.98 |
| 03/03/2016 | 85 | $19.99 |
| 03/08/2016 | 210 | $20.03 |
| 03/09/2016 | 165 | $20.48 |
| 03/15/2016 | 9 | $20.85 |
| 03/16/2016 | 133 | $20.84 |
| 03/17/2016 | 11 | $20.85 |
| 04/28/2016 | 700 | $21.25 |
| 04/28/2016 | 1,500 | $21.34 |
| 04/29/2016 | 1,300 | $20.44 |
| 04/29/2016 | 1,400 | $20.20 |
| 05/24/2016 | 1,300 | $20.79 |
| 05/26/2016 | 1,850 | $20.75 |
| 05/31/2016 | 2,300 | $20.69 |
| 06/06/2016 | 210 | $21.22 |
| 06/06/2016 | 890 | $21.19 |
| 06/07/2016 | 144 | $21.01 |
| 06/14/2016 | 97 | $21.03 |
| 06/15/2016 | 1,259 | $21.03 |
| 06/15/2016 | 2,100 | $20.96 |
| 07/06/2016 | 1,900 | $20.75 |
| 07/07/2016 | 1,500 | $20.48 |
| 07/15/2016 | 1,600 | $21.34 |
| 07/20/2016 | 1,800 | $21.46 |
| 07/21/2016 | 600 | $21.42 |
| 07/21/2016 | 1,000 | $21.39 |
| 07/22/2016 | 1,079 | $21.59 |
| 07/25/2016 | 121 | $21.51 |
| 07/25/2016 | 800 | $21.07 |
| 07/25/2016 | 1,280 | $21.33 |

| | | |
|---|---|---|
| 07/26/2016 | 303 | $20.74 |
| 07/26/2016 | 2,300 | $20.93 |
| 07/27/2016 | 365 | $20.70 |
| 07/28/2016 | 332 | $21.13 |
| 07/29/2016 | 1,715 | $20.55 |
| 08/01/2016 | 201 | $20.62 |
| 08/02/2016 | 290 | $21.74 |
| 08/02/2016 | 750 | $21.18 |
| 08/02/2016 | 1,000 | $21.70 |
| 08/02/2016 | 1,450 | $21.53 |
| 08/02/2016 | 1,500 | $21.26 |
| 08/04/2016 | 970 | $21.24 |
| 09/30/2016 | 800 | $22.27 |
| 09/30/2016 | 1,000 | $22.26 |
| 09/30/2016 | 4,200 | $22.31 |
| 10/03/2016 | 510 | $21.72 |
| 10/06/2016 | 550 | $21.62 |
| 10/20/2016 | 800 | $21.84 |
| 10/20/2016 | 920 | $21.58 |
| 10/20/2016 | 940 | $21.60 |
| 10/27/2016 | 144 | $20.37 |
| 10/28/2016 | 171 | $20.48 |
| 11/01/2016 | 445 | $20.48 |
| 11/01/2016 | 590 | $20.49 |
| 11/02/2016 | 598 | $20.39 |
| 03/29/2017 | 7 | $22.87 |
| 03/29/2017 | 189 | $22.89 |
| 03/29/2017 | 462 | $22.96 |
| 03/30/2017 | 143 | $22.98 |
| 03/30/2017 | 406 | $22.98 |
| 03/30/2017 | 414 | $23.44 |
| 03/31/2017 | 663 | $23.48 |
| 04/03/2017 | 44 | $23.50 |
| 04/03/2017 | 58 | $23.50 |
| 04/03/2017 | 1,476 | $23.48 |
| 04/04/2017 | 171 | $23.55 |
| 04/05/2017 | 679 | $23.55 |
| 04/07/2017 | 321 | $23.29 |
| 04/07/2017 | 400 | $23.28 |
| 04/10/2017 | 940 | $23.21 |
| 04/11/2017 | 1,570 | $21.89 |
| 04/11/2017 | 1,940 | $22.38 |
| 04/11/2017 | 1,971 | $21.51 |
| 04/12/2017 | 247 | $21.99 |
| 04/12/2017 | 712 | $22.01 |
| 04/12/2017 | 760 | $21.83 |
| 04/13/2017 | 340 | $21.54 |
| 04/13/2017 | 1,290 | $21.65 |
| 04/18/2017 | 72 | $21.84 |
| 04/18/2017 | 95 | $21.84 |
| 04/19/2017 | 433 | $21.94 |
| 04/19/2017 | 510 | $21.95 |
| 04/20/2017 | 38 | $21.85 |
| 04/21/2017 | 14 | $22.25 |
| 04/28/2017 | 14 | $22.75 |

| | | |
|---|---|---|
| 04/28/2017 | 184 | $22.75 |
| 05/03/2017 | 100 | $22.49 |
| 05/03/2017 | 900 | $22.61 |
| 05/08/2017 | 780 | $21.99 |
| 05/09/2017 | 118 | $21.85 |
| 05/09/2017 | 470 | $21.65 |
| 05/09/2017 | 2,370 | $21.75 |
| 05/10/2017 | 130 | $21.75 |
| 05/10/2017 | 252 | $21.75 |
| 05/15/2017 | 67 | $21.75 |
| 05/16/2017 | 178 | $21.75 |
| 05/16/2017 | 373 | $21.73 |
| 05/17/2017 | 162 | $21.69 |
| 05/17/2017 | 406 | $21.59 |
| 05/22/2017 | 37 | $21.39 |
| 05/23/2017 | 4 | $21.39 |
| 05/30/2017 | 1,200 | $21.83 |
| 05/31/2017 | 25 | $21.75 |
| 06/05/2017 | 1,000 | $21.63 |
| 06/06/2017 | 31 | $21.60 |
| 06/07/2017 | 97 | $21.59 |
| 06/08/2017 | 1 | $21.60 |
| 06/21/2017 | 769 | $21.65 |
| 06/22/2017 | 551 | $21.64 |
| 06/23/2017 | 900 | $21.50 |
| 06/23/2017 | 1,300 | $21.44 |
| 06/26/2017 | 210 | $21.13 |
| 06/26/2017 | 810 | $21.14 |
| 06/28/2017 | 740 | $21.30 |
| 07/11/2017 | 105 | $20.49 |
| 07/13/2017 | 537 | $20.54 |
| 07/14/2017 | 1,508 | $20.79 |
| 07/17/2017 | 800 | $20.70 |
| 07/27/2017 | 70 | $21.24 |
| 07/27/2017 | 120 | $21.24 |
| 07/27/2017 | 200 | $21.24 |
| 07/28/2017 | 93 | $21.24 |
| 08/02/2017 | 240 | $21.17 |
| 08/03/2017 | 60 | $20.97 |
| 08/03/2017 | 530 | $20.92 |

| Date Sold | Amount of Shares Sold | Price |
|---|---|---|
| 07/16/2015 | 900 | $23.65 |
| 07/16/2015 | 1,500 | $23.34 |
| 08/04/2015 | 2,359 | $21.65 |
| 08/10/2015 | 337 | $21.51 |
| 12/07/2015 | 950 | $22.12 |
| 11/03/2016 | 1,750 | $19.95 |
| 11/09/2016 | 1,610 | $21.55 |
| 11/14/2016 | 1,030 | $22.90 |
| 11/21/2016 | 1,290 | $22.53 |
| 11/22/2016 | 810 | $22.62 |
| 12/08/2016 | 1,700 | $24.23 |

| | | |
|---|---|---|
| 12/09/2016 | 620 | $24.22 |
| 12/09/2016 | 920 | $24.52 |
| 12/12/2016 | 420 | $24.73 |
| 12/19/2016 | 774 | $25.03 |
| 12/20/2016 | 530 | $25.17 |
| 12/20/2016 | 686 | $25.19 |
| 12/21/2016 | 47 | $25.08 |
| 01/05/2017 | 54 | $25.05 |
| 01/13/2017 | 46 | $25.17 |
| 01/18/2017 | 2,820 | $25.01 |
| 01/18/2017 | 3,818 | $25.16 |
| 01/19/2017 | 63 | $25.15 |
| 01/20/2017 | 1,200 | $24.81 |
| 01/23/2017 | 576 | $24.80 |
| 01/24/2017 | 124 | $24.81 |
| 01/24/2017 | 247 | $24.83 |
| 01/24/2017 | 3,440 | $24.76 |
| 01/25/2017 | 502 | $24.88 |
| 01/26/2017 | 32 | $24.80 |
| 01/27/2017 | 105 | $24.80 |
| 02/08/2017 | 358 | $24.13 |
| 02/08/2017 | 2,152 | $24.10 |
| 02/10/2017 | 2,000 | $24.77 |
| 02/10/2017 | 2,040 | $24.89 |

Prices listed are rounded up to two decimal places.

*Opening position of 31,000 shares.