UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| CITY OF NORTH MIAMI BEACH POLICE OFFICERS' AND FIREFIGHTERS' RETIREMENT PLAN, Individually and on Behalf of All Others Similarly Situated,<br><br>                                    Plaintiff,<br><br>                    -v-<br><br>NATIONAL GENERAL HOLDINGS CORP., BARRY KARFUNKEL, MICHAEL WEINER, and ARTHUR CASTNER,<br><br>                                    Defendants. | 19-CV-10825 (JPO)<br><br>OPINION AND ORDER |

J. PAUL OETKEN, District Judge:

Plaintiffs Town of Davie Police Officers Retirement System and Massachusetts Laborers'
Pension Fund (collectively, "Plaintiffs") bring suit on behalf of those who purchased National
General Holdings Corporation ("National General") common stock between July 15, 2015 and
August 9, 2017 ("Class Period").  Plaintiffs sue National General, Barry Karfunkel, Michael
Weiner, and Arthur Castner (collectively, "Defendants") for violations of Sections 10(b) and
20(a) of the Securities Exchange Act of 1934 ("Exchange Act"), 15 U.S.C. §§ 78j(b), 78t(a), and
Rule 10b-5 promulgated under the Exchange Act, 17 C.F.R. § 240.10b-5.  Defendants move to
dismiss the complaint pursuant to Federal Rule of Civil Procedure 12(b)(6).  For the reasons that
follow, Defendants' motion is granted.

## I.      Background

### A.      Factual Background

The following facts are taken from the operative complaint (Dkt. No. 73 ("Compl.")) and
are assumed true for the purposes of this motion to dismiss.  *Ashcroft v. Iqbal*, 556 U.S. 662,

678–79 (2009).

### 1.     Defendants

National General is an insurance company with Barry Karfunkel as its Chief Executive Officer.  (Compl. ¶¶ 2, 20–21.)  Karfunkel was a National General board director throughout the Class Period, was named company president in November 2015, and became CEO in April 2016 upon the death of his father, Michael Karfunkel.  (Compl. ¶¶ 20–21.)  Michael Weiner served as the company's Chief Financial Officer throughout the Class Period, and Arthur Castner was president of National General Lender Services, a wholly owned subsidiary of National General which housed the insurance program at issue.  (Compl. ¶¶ 20, 22–23, 43.)

### 2.     CPI Program

National General worked with Wells Fargo Bank, N.A. and Wells Fargo & Company (collectively, "Wells Fargo") by underwriting a type of auto insurance known as collateral protection insurance ("CPI") that was nonconsensually and unnecessarily added to thousands of Wells Fargo's auto loan customers' accounts.  (Compl. ¶ 1.)  National General took over the CPI program when it acquired the lender-placed insurance ("LPI") business from QBE Insurance Group Limited in October 2015.  (Compl. ¶ 2.)  QBE's LPI business became National General Lender Services upon acquisition, and the CPI program amounted to roughly 20 percent of the gross written premium in the newly acquired LPI business.[1]  (Compl. ¶¶ 42–43, 45.)  Upon announcing the LPI acquisition on July 15, 2015, Defendants praised the LPI business's "industry leading technology platform supported by comprehensive enterprise risk management

---

[1] National General defined gross written premium as "premium from each insurance policy that we write, including as a service carrier for assigned risk plans, during a reporting period based on the effective date of the individual policy, prior to ceding reinsurance to third parties."  (Compl. ¶ 82 n.2.)

capabilities, and a seasoned management team with significant operational expertise." (Compl. ¶ 68; *see also* Compl. ¶ 74.) And on several occasions — in press releases and earnings calls — Michael Karfunkel expressed optimism that the LPI deal would be "immediately accretive" to National General and that the LPI business had a "potential to grow . . . very meaningfully." (Compl. ¶¶ 68–70, 76, 83.)

Defendants' acquisitions — including the purchase of the CPI program via QBE's LPI business — involve a meticulous due diligence process to ensure that the company's concerns are addressed. (Compl. ¶¶ 147–48.) At a May 2017 Investor Day presentation, National General Chief Operating Officer Peter Rendall described the company's use of a "proprietary acquisition due diligence checklist with literally hundreds of items from every conceivable issue or question or department that you could think of and we have assigned subject matter experts to each of those areas," characterizing the company's due diligence process as "complete [and] thorough." (Compl. ¶¶ 40, 148.) In tandem with their due diligence process, Defendants run an exhaustive pre-closing integration process. At the same 2017 Investor Day presentation, Rendall commended National General's "pre-closing . . . meetings weekly, where we review things we need to get done before closing," a sentiment echoed by Defendant Weiner on a November 2015 conference call in which he discussed the QBE acquisition's "very detailed integration process" which began before National General closed the transaction. (Compl. ¶¶ 150–51.)

In its CPI program, Wells Fargo required its auto loan customers to have car collision insurance "to protect the collateral of the loan"; if Wells Fargo did not find evidence of such insurance, it purchased a policy underwritten by National General for customers. (Compl. ¶¶ 28–30.) CPI was often deducted automatically from Wells Fargo's customers' accounts without their knowledge and at greater expense than similar insurance from other plans. (Compl.

¶¶ 29–30.)  The CPI program was lucrative for National General — the insurance policies National General underwrote were more expensive than those on the rest of the market, led to higher interest charges, and resulted in fewer claims brought because many Wells Fargo customers were unaware that the policies had been purchased in their names.  (Compl. ¶¶ 30, 146.)  National General "often disregarded customers' proof of insurance" and customer complaints about being saddled with unnecessary CPI, although such proof and complaints were collected and monitored in a proprietary tracking program known as TrackGuard.  (Compl. ¶¶ 31, 162.)  Many of the press releases and earnings calls discussing the company's financial performance reported the effect the LPI acquisition had on premium growth.  (*E.g.*, Compl. ¶ 84.)  For instance, National General's May 10, 2016 Form 10-Q explained that premium growth was "primarily as a result of the acquisition of our LPI business."  (Compl. ¶ 95.)

National General held monthly phone meetings with Wells Fargo to discuss the CPI program.  (Compl. ¶ 153.)  During these meetings the companies discussed CPI performance and metrics, and ahead of the meetings National General circulated a "scorecard" of CPI details. (*Id.*)  National General employees also met in person with Wells Fargo two to four times per year, where National General distributed a business deck.  (Compl. ¶ 154.)  The contents of the deck included:

> [D]etailed data about the CPI Program including loan volume and CPI penetration; gross and net written premium; average premium per loan; CPI premium and commission trends; CPI distribution by state; borrower account balances and premium rate percentages; CPI letter volume; CPI cancel percentages; CPI loss experience and trends including by month and policy year; CPI financial results; year-over-year comparisons; CPI claims experience and performance; CPI claim severity, frequency, and payments; and other operational statistics and results.

(*Id.*)

Defendants continually praised the LPI business throughout the CPI program's lifecycle.

4

In February 2016, for example, Defendant Castner said that the acquired LPI business had "comprehensive insurance tracking solutions, which automatically comply with the regulations governing a business."  (Compl. ¶ 81; *see also* Compl. ¶¶ 113–14, 130–31.)  Defendants also praised National General's "underwriting discipline" and the company's advantageous risk analysis on several occasions.  (*E.g.*, Compl. ¶¶ 71, 88.)

All the while, Barry Karfunkel and Weiner signed certificates pursuant to the Sarbanes-Oxley Act ("SOX"), in which they "attest[ed] that they each personal [sic] supervised and participated in the evaluation of National General's financial statements and that the Company's financial disclosure fairly and accurately presented its financial condition."  (Compl. ¶ 164.)

Moreover, Defendants' flat organizational structure meant they were involved in all aspects of their business.  (Compl. ¶ 156.)  At the aforementioned May 2017 Investor Day presentation, Robert Karfunkel, National General's Chief Marketing Officer, lauded the company's "very flat organizational structure, which enables all levels of management to have an open-door, open-line policy with all our key agency relationships."  (Compl. ¶ 157.)  At that same presentation, Rick Pedack, a National General LPI representative, remarked that Defendant "Barry [Karfunkel] is on top of what goes on in the lender division . . . ."  (Compl. ¶¶ 127, 158.)

### 3. Oliver Wyman Report

In July 2016, Wells Fargo — amidst increasing CPI customer complaints and scrutiny for other potential misconduct — commissioned an investigation by Oliver Wyman into the CPI program which included interviews with National General.  (Compl. ¶ 47.)  In September 2016, Wells Fargo discontinued the CPI program but maintained National General's tracking services.  (Compl. ¶ 48.)  In several press releases and SEC filings, National General reported that its net written premium growth was "partially offset by a decrease in our lender-placed auto premiums."

(Compl. ¶¶ 115, 122–23.)  On a February 2017 earnings call, Barry Karfunkel acknowledged the loss of a client, and at the May 2017 Investor Day presentation Pedack, without naming Wells Fargo as the terminated client, explained that the CPI program was terminated because the client "had a sufficient balance sheet" such that lender-placed insurance was redundant and that National General did not "los[e] a client because we did poor service."  (Compl. ¶¶ 116, 127.)

Oliver Wyman's findings were eventually compiled into a February 2017 report, which was the basis of a July 27, 2017 *New York Times* article exposing Wells Fargo's role in the CPI program.  (Compl. ¶¶ 11, 47, 50–51.)  That article reported that over 800,000 auto loan customers paid for unnecessary policies, leading 274,000 of them into delinquency and causing upwards of 20,000 vehicle repossessions.  (Compl. ¶¶ 11, 51.)  The *New York Times* article led the California Department of Insurance to launch an investigation into National General on August 8, 2017 and sparked an August 9, 2017 inquiry from the United States Senate Committee on Commerce, Science, and Transportation regarding National General's involvement in the CPI program.  (Compl. ¶¶ 53–54).

Such developments caused National General's stock price to drop 7.1% on August 8, 2017 and 3% on August 9, 2017, with "abnormally heavy trading volume."  (Compl. ¶ 55.)

On June 7, 2017, less than two months before the *New York Times* story's publication, AmTrust Financial Services, Inc. ("AmTrust"), another insurance company of which members of the extended Karfunkel family owned a majority stake and which held roughly 12 percent of National General common stock, sold its National General stock for the first time.[2]  (Compl.

---

[2] The three Karfunkel family members who owned AmTrust stock at the time of the National General sale were Barry Zyskind, the late Michael Karfunkel's son-in-law and AmTrust's president and CEO; George Karfunkel, Michael Karfunkel's brother; and Leah Karfunkel, Michael Karfunkel's wife.  (Compl. ¶¶ 142–44.)

¶¶ 142–45.)  Amtrust sold over 6 million shares at $20 per share for proceeds of $123.1 million.

(Compl. ¶ 145.)

>### B.      Procedural Background

This suit was originally filed by the City of North Miami Beach Police Officers' and

Firefighters' Retirement Plan in the Central District of California in July 2019.  (*See* Dkt. No. 1.)

The Town of Davie Police Officers Retirement System and Massachusetts Laborers' Pension

Fund were named lead plaintiffs in October 2019, shortly before the case was transferred to this

Court in November 2019.  (*See* Dkt. No. 49, 56.)  Plaintiffs filed the operative complaint on

January 14, 2020 (*see* Dkt. No. 73), and Defendants moved to dismiss the case pursuant to

Federal Rule of Civil Procedure 12(b)(6) on March 10, 2020 (*see* Dkt. No. 84).

## II.      Legal Standard

To overcome a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6), a

plaintiff must plead "enough facts to state a claim to relief that is plausible on its face."  *Bell Atl.*

*Corp. v. Twombly*, 550 U.S. 544, 570 (2007).  "A claim has facial plausibility when the plaintiff

pleads factual content that allows the court to draw the reasonable inference that the defendant is

liable for the misconduct alleged."  *Iqbal*, 556 U.S. at 678 (citing *Twombly*, 550 U.S. at 556).

Securities fraud claims, however, demand more — to survive the motion to dismiss,

plaintiffs must satisfy "heightened pleading requirements."  *ATSI Commc'ns, Inc. v. Shaar Fund,*

*Ltd.*, 493 F.3d 87, 99 (2d Cir. 2007).  "[A] party must state with particularity the circumstances

constituting fraud . . . ."  Fed. R. Civ. P. 9(b).  Similarly, the Private Securities Litigation Reform

Act ("PSLRA") sets forth that when a plaintiff alleges securities fraud for an untrue statement or

omission of a material fact, "the complaint shall specify each statement alleged to have been

misleading, the reason or reasons why the statement is misleading, and, if an allegation regarding

the statement or omission is made on information and belief, the complaint shall state with

particularity all facts on which that belief is formed."  15 U.S.C. § 78u-4(b)(1); *see also Novak v.*

*Kasaks*, 216 F.3d 300, 306 (2d Cir. 2000) (explaining similar requirements under Federal Rule of

Civil Procedure 9(b)).  Moreover, the plaintiff must "state with particularity facts giving rise to a

strong inference that the defendant acted with the required state of mind."  § 78u-4(b)(2)(A).

"To qualify as 'strong' . . . an inference of scienter must be more than merely plausible or

reasonable — it must be cogent and at least as compelling as any opposing inference of

nonfraudulent intent."  *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 314 (2007).

## III.    Discussion

Plaintiffs allege violations of Section 10(b) of the Exchange Act, Rule 10b-5, and Section

20(a) of the Act.  (Compl. ¶ 14.)

### A.    Claims Under Section 10(b) and Rule 10b-5

Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder prohibit

"mak[ing] any untrue statement of a material fact or . . . omit[ting] to state a material fact

necessary in order to make the statements made, in light of the circumstances under which they

were made, not misleading . . . in connection with the purchase or sale of any security."  17

C.F.R. § 240.10b-5.  A claim made under these provisions must establish "(1) a material

misrepresentation or omission by the defendant; (2) scienter; (3) a connection between the

misrepresentation or omission and the purchase or a sale of a security; (4) reliance upon the

misrepresentation or omission; (5) economic loss; and (6) loss causation."  *Stoneridge Inv.*

*Partners, LLC v. Sci.-Atlanta*, 552 U.S. 148, 157 (2008).  In addition, "when a complaint claims

that statements were rendered false or misleading through the nondisclosure of illegal activity,

the facts of those underlying illegal acts must also be pleaded with particularity."  *Gamm v.*

*Sanderson Farms, Inc.*, 944 F.3d 455, 458 (2d Cir. 2019).

Defendants move to dismiss the Section 10(b) and Rule 10b-5 claims on four grounds, arguing that Plaintiffs have failed to plead (1) the purportedly illegal CPI program with particularity; (2) a strong inference of scienter; (3) an actionable omission or misstatement; and (4) loss causation.  (*See* Dkt. No. 85 at 1–2.)  The Court first considers whether Plaintiffs have sufficiently pleaded the illegal CPI program and then considers whether Plaintiffs have sufficiently pleaded scienter.  Because Plaintiffs fail to sufficiently plead scienter, the Court need not proceed further.  *See, e.g.*, *Tung v. Bristol-Myers Squibb Co.*, 412 F. Supp. 3d 453, 461–62 (S.D.N.Y. 2019) (dismissing Section 10(b) and Rule 10b-5 claims upon holding that scienter requirement had not been met).

### 1.    Illegal Activity

As an initial matter, plaintiffs alleging false or misleading statements based on the nondisclosure of illegal activity must also plead the facts of the underlying illegal activity with particularity.  *See Gamm*, 944 F.3d at 458.  Here, Defendants challenge Plaintiffs' use of information taken from consent orders issued against Wells Fargo and from "unadjudicated allegations" in a consumer multidistrict litigation against Wells Fargo and National General.  (*See* Dkt. No. 85 at 7–9 (citing Compl. ¶¶ 56–58).)  As Plaintiffs correctly point out, Defendants do not dispute the underlying illegality of the CPI program (*see* Dkt. No. 88 at 11); they object only to Plaintiffs' use of consent orders and outside complaints in pleading the underlying illegality of the CPI scheme with particularity (*see* Dkt. No. 85 at 9 ("Stripped of the allegations based on the Consumer MDL Action and the Wells Fargo consent orders, Plaintiffs fail to identify *any* particularized allegations that National General engaged in illegal conduct related to the CPI Program.")).

However, the consent orders and outside complaints were fair game for Plaintiffs to use in fashioning their complaint.  Defendants' citation to *Lipsky v. Commonwealth United Corp.*, 551 F.2d 887 (2d Cir. 1976), in arguing that Plaintiffs cannot draw from the Wells Fargo consent order (*see* Dkt. No. 85 at 8–9), is inapposite.  The *Lipsky* court cautioned that its holding was limited to "the facts of [that] case," namely, "a consent judgment between a federal agency and a private corporation which is not the result of an actual adjudication of any of the issues" and thus could "not be used as evidence in subsequent litigation between *that corporation* and another party."  551 F.2d at 893 (emphasis added) (citing Fed. R. Evid. 410).[3]  In other words, the *Lipsky* rule is founded on an evidentiary premise and should not be seen as a blanket rule established by some courts in this Circuit "that paragraphs in a complaint that are either based on, or rely on, complaints in other actions that have been dismissed, settled, or otherwise not resolved, are, as a matter of law, immaterial within the meaning of Fed. R. Civ. P. 12(f)," *RSM Prod. Corp. v. Fridman*, 643 F. Supp. 2d 382, 403 (S.D.N.Y. 2009).  *See In re Fannie Mae 2008 Sec. Litig.*, 891 F. Supp. 2d 458, 471 (S.D.N.Y. 2012) (explaining the proper reading of *Lipsky*).  Here, the consent orders used by Plaintiffs involved Wells Fargo, not National General, so the evidentiary concerns governing the fact-specific decision in *Lipsky* do not apply[4] — the allegations derived

---

[3] As an academic matter, the Second Circuit has since clarified that consent orders are inadmissible to prove the facts of liability under Federal Rule of Evidence 408.  *See United States v. Gilbert*, 668 F.2d 94, 97 (2d Cir. 1981) ("[A] civil consent decree, as the settlement of a civil suit, is governed by Fed. R. Evid. 408.").  *See generally Loreley Fin. (Jersey) No. 3 Ltd. v. Wells Fargo Sec., LLC*, 797 F.3d 160, 179 n.11 (2d Cir. 2015) (discussing the Second Circuit's different approaches to this question).

[4] The cases cited by Defendants regarding the inadmissibility of consent orders (*see* Dkt. No. 85 at 9 n.4) involved consent orders between a government agency and a party to the *current* action. *See In re Platinum & Palladium Commodities Litig.*, 828 F. Supp. 2d 588, 594 (S.D.N.Y. 2011) ("Although the CFTC Order included certain factual findings, it nevertheless was the product of a settlement between the CFTC and the [defendants], not an adjudication of the underlying issues in the CFTC proceeding. Plaintiffs are therefore prohibited from relying on the CFTC Order to plead the 'underlying facts of liability.'" (quoting *Gilbert*, 668 F.2d at 97)); *Sec. Inv'r Prot.*

from the consent orders are thus akin to those taken from "news clipping[s] or public testimony," which other courts have persuasively explained are valid sources to draw from.  *In re Bear Stearns Mortg. Pass-Through Certificates Litig.*, 851 F. Supp. 2d 746, 768 n.24 (S.D.N.Y. 2012).

Likewise, Defendants are incorrect to assert that Plaintiffs may not rely on facts pleaded in outside litigation.  (*See* Dkt. No. 85 at 8.)  This Court has declared that "the weight of authority holds that plaintiffs may base factual allegations on complaints from other proceedings because 'neither Circuit precedent nor logic supports . . . an absolute rule' against doing so."  *In re Mylan N.V. Sec. Litig.*, 379 F. Supp. 3d 198, 214 (S.D.N.Y. 2019) (alteration in original) (quoting *Youngers v. Virtus Inv. Partners Inc.*, 195 F. Supp. 3d 499, 516 n.10 (S.D.N.Y. 2016)).

What is more, "nothing rides on how much weight the Court gives the sections of the [complaint] that rely on the other parties' pleadings.  Even if the Court struck every such paragraph, the [complaint] would still contain sufficient factual allegations to plead" the underlying illegal CPI program with particularity.  *Bear Stearns*, 851 F. Supp. 2d at 768 n.24. Only three paragraphs in the complaint explicitly draw information from consent orders with Wells Fargo or the consumer multidistrict litigation against National General and Wells Fargo (Compl. ¶¶ 56–58), and most of the allegations contained therein are pleaded elsewhere in the complaint drawing from other sources (*see, e.g.*, Compl. ¶ 50 (reproducing, in relevant part, the *New York Times* article describing the CPI program)).

Since Defendants do not challenge the underlying illegality of the CPI program, arguing that Plaintiffs have failed to plead the underlying CPI program with particularity only because

---

*Corp. v. Stratton Oakmont, Inc.* 234 B.R. 293, 336 (S.D.N.Y. 1999) (striking allegations drawn from a consent order between SEC and defendants in adversarial bankruptcy proceeding). Defendants cite no cases prohibiting the consideration of facts alleged in a consent order between a government agency and a non-party to the current action.

they drew from consent decrees and outside complaints, the Court holds that Plaintiffs have pleaded the underlying illegal CPI program with particularity.[5]

### 2.    Scienter

The Court turns to whether Plaintiffs have adequately alleged facts supporting a "strong inference" of scienter.  *See Tellabs*, 551 U.S. at 321 (quoting 15 U.S.C. § 78u-4(b)(2)).  Scienter — the "requisite state of mind" that Plaintiffs must plead under Section 10(b) — is "an intent to deceive, manipulate, or defraud."  *Kalnit v. Eichler*, 264 F.3d 131, 138 (2d Cir. 2001) (internal quotations and citation omitted).  In the Second Circuit, scienter may be established by facts showing "either (1) that defendants had the motive and opportunity to commit fraud, or (2) strong circumstantial evidence of conscious misbehavior or recklessness."  *ECA, Local 134 IBEW Joint Pension Tr. of Chi. v. JP Morgan Chase Co.*, 553 F.3d 187, 198 (2d Cir. 2009) (citations omitted).  Without a showing of motive and opportunity, "the strength of the circumstantial allegations must be correspondingly greater."  *Id.* at 198–99 (quoting *Kalnit*, 264 F.3d at 142).

### a.    Fraudulent Motive and Opportunity

To satisfy the motive and opportunity prong of scienter, Plaintiffs must allege that Defendants "benefitted in some concrete and personal way from the purported fraud."  *Novak*, 216 F.3d at 307–08.  "Motives that are common to most corporate officers, such as the desire for the corporation to appear profitable and the desire to keep stock prices high to increase officer compensation, do not constitute 'motive' for purposes of this inquiry."  *ECA*, 553 F.3d at 198.

---

[5] This conclusion is in accord with that reached by the Central District of California in the consumer multidistrict litigation.  *See In re Wells Fargo Ins. Mktg. & Sales Practices Litig.*, No. SAML 17-02797 AG, 2018 WL 9536803, at *10–11 (C.D. Cal. Dec. 14, 2018) ("Plaintiffs allege National General engaged in a pattern of racketeering activity with the particularity required by Rule 9(b).").

(citations omitted).  Instead, motive is usually sufficiently pleaded "when corporate insiders allegedly make a misrepresentation in order to sell their own shares at a profit." *Id.* (citation omitted).  Such stock sales must be "unusual" for courts to find a fraudulent motive. *Acito v. IMCERA Grp., Inc.*, 47 F.3d 47, 54 (2d Cir. 1995).

Plaintiffs' main allegation of motive is that AmTrust, owned by members of the extended Karfunkel family, sold 6,153,928 National General shares for proceeds of $123.1 million. (Compl. ¶ 145.)  The sale — Amtrust's first ever offloading of National General shares — occurred on June 7, 2017, mere weeks before the *New York Times* published its story about the CPI program.  (*Id.*)  Plaintiffs do not allege that Barry Karfunkel, or any of the other individual Defendants, sold National General shares during the Class Period, and the Second Circuit has previously found that "the fact that other defendants did not sell their shares during the relevant class period sufficiently undermines plaintiffs' claim regarding motive." *See San Leandro Emergency Med. Grp. Profit Sharing Plan v. Philip Morris Cos., Inc.*, 75 F.3d 801, 814 (2d Cir. 1996).  However, the Second Circuit has cautioned that there is no "*per se* rule" regarding unusual trading, *see In re Scholastic Corp. Sec. Litig.*, 252 F.3d 63, 75 (2d Cir. 2001), so the Court must consider the context of the Karfunkel family's sale.

Plaintiffs start behind the eight ball.  The Court is unaware of any decision finding sufficient motive and opportunity to commit securities fraud when family members of an individual defendant sold shares without any individual defendant also selling shares, nor do Plaintiffs point to any decisions so holding.  *See Jackson Inv. Grp., LLC v. Thomas*, 325 F. Supp. 3d 1334, 1350–51 (N.D. Ga. 2017) (holding that even though plaintiffs suggested a fraudulent motive because defendants' "family members owned shares that were registered for sale," the fact that neither named defendant was alleged to have sold any stock "negates an inference of

scienter"); *cf. Snellink v. Gulf Resources, Inc.*, 870 F. Supp. 2d 930, 940–41 (C.D. Cal. 2012)

(finding a strong inference of scienter on other facts without resolving whether there was motive

to commit fraud stemming from one defendant's wife selling a significant amount of stock while

all of the defendants bought stock); *Herzog v. GT Interactive Software Corp.*, No. 98-CV-0085,

1999 WL 1072500, at *8–9 (S.D.N.Y. Nov. 29, 1999) (finding insufficient motive and

opportunity even when individual defendant and his family sold shares because such sales were

not unusual), *rev'd on other grounds sub nom. Rothman v. Gregor*, 220 F.3d 81 (2d Cir. 2000).

*SEC v. China Northeast Petroleum Holdings Ltd.*, 27 F. Supp. 3d 379 (S.D.N.Y. 2014), cited by

Plaintiffs (*see* Dkt. No. 88 at 22 n.21), is not to the contrary.  There, the individual defendants

directly transferred company funds to their relatives, a marked difference from family members

profiting from unusual trading without the individual defendants having sold any stock during

the class period. *China Ne. Petroleum*, 27 F. Supp. 3d at 385, 389–90.  Since "Plaintiffs make no

allegation that any Defendant sold shares during the Class Period[,]" they "fail to allege that

Defendants received a 'concrete and personal' benefit from the alleged scheme, and certainly do

not allege that *each* Defendant received such a benefit."  *Cortina v. Anavex Life Sciences Corp.*,

No. 15-CV-10162, 2016 WL 7480415, at *6 (S.D.N.Y. Dec. 29, 2016) (citing *ECA*, 553 F.3d at

198).[6]

      Moreover, when alleging unusual trading, "[p]laintiffs must allege not only the insider

---

[6] Defendants assert that Barry Karfunkel purchased National General stock during the Class Period.  (*See* Dkt. No. 85 at 23 n.18.)  The parties disagree on whether that fact should be considered by the Court and what weight the Court should put on that fact.  (*See* Dkt. No. 88 at 23 n.22; Dkt. No. 89 at 9 n.19.)  While it is generally true that purchasing shares during the Class Period would "serve[] to further undermine any plausible allegation of scienter," *Cortina*, 2016 WL 7480415, at *6 n.3 (collecting cases), the Court need not decide this particular set of arguments.  For the reasons discussed above, the Karfunkel family sale of National General stock is insufficient to allege motive and opportunity without considering whether Karfunkel purchased shares during the Class Period.

defendants' selling activity during the relevant period, but also those defendants' *net profits* as opposed to *gross proceeds*, as well as overall percentage changes in defendant's holdings." *Glaser v. The9, Ltd.*, 772 F. Supp. 2d 573, 587 (S.D.N.Y. 2011).  Here, Plaintiffs allege the Karfunkel family's *proceeds* from the sales, rather than profit (Compl. ¶ 145), and "proceeds alone say nothing about a seller's motive," *Glaser*, 772 F. Supp. 2d at 592; *see also City of Birmingham Firemen's & Policemen's Supplemental Pension Sys. v. Ryanair Holdings PLC*, No. 18-CV-10330, 2020 WL 2834857, at *3 (S.D.N.Y. June 1, 2020) (noting that gross proceeds are insufficient for scienter calculation).  Without alleging the Karfunkel family's profits from the sale — and considering the fact that the other individual defendants' not selling shares during the Class Period "substantially undermines Plaintiffs' claim that Defendants were motivated by an intent to engage in insider trading" — Plaintiffs have not adequately alleged a fraudulent motive from the AmTrust stock sale.  *Tung*, 412 F. Supp. 3d at 459–60.

Plaintiffs also argue that Defendants had the motive and opportunity to commit securities fraud because the CPI program involved more expensive policies, higher interest rates, and lower losses from fewer insurance claims.  (Compl. ¶ 146.)  The Court fails to see how this is any different from "the desire to maximize the corporation's profits" held to be insufficient in *ECA*. 553 F.3d at 200 (charging higher interest rates and "earning 'excessive' fees in a competitive marketplace (for as long as it lasts) — far from defrauding the shareholders — actually benefit[] the shareholders").  The facts of *Sharette v. Credit Suisse International*, 127 F. Supp. 3d 60 (S.D.N.Y. 2015), cited by Plaintiffs (*see* Dkt. No. 88 at 22), are far afield.  There, defendants employed an allegedly fraudulent short-selling scheme for "larger and longer-term financial ends[,]" *i.e.*, "improv[ing] their ability to access a specific and extremely profitable market, potentially worth billions of dollars."  *Sharette*, 127 F. Supp. 3d at 96.  Plaintiffs themselves

frame the CPI scheme as "illegal and account[ing] for a material portion of the LPI business, allowing Defendants to mask the rest of the newly acquired LPI business's poor performance." (Dkt. No. 88 at 22.)  That is more akin to "the desire for the corporation to appear profitable," which does not suffice to show motive, *ECA*, 553 F.3d at 198, than the "larger and longer-term financial" goal to tap into a billion-dollar market in *Sharette*, 127 F. Supp. 3d at 96.

At bottom, Plaintiffs have failed to allege that Defendants "benefitted in some concrete and personal way from the purported fraud," and thus have not pleaded that Defendants had the motive and opportunity to commit fraud.  *See Novak*, 216 F.3d at 307–08.

### b.      Conscious Misbehavior or Recklessness

Scienter can also be pleaded by alleging "strong circumstantial evidence of conscious misbehavior or recklessness." *ECA*, 553 F.3d at 198.  While "the absence of a motive allegation is not fatal," *Tellabs*, 551 U.S. at 325, it remains the case that "'the strength of the circumstantial allegations must be correspondingly greater' if there is no motive" to commit fraud, *ECA*, 553 F.3d at 199 (quoting *Kalnit*, 264 F.3d at 142).  Reckless conduct is that "which is highly unreasonable" and amounts to "an extreme departure from the standards of ordinary care." *Kalnit*, 264 F.3d at 142 (internal quotations and citation omitted).  "[S]ecurities fraud claims typically have sufficed to state a claim based on recklessness when they have specifically alleged defendants' knowledge of facts or access to information contradicting their public statements." *Novak*, 216 F.3d at 308.  Plaintiffs "must *specifically identify* the reports or statements" when alleging that defendants had access to contrary information.  *Id.* at 309 (emphasis added) (citing *San Leandro*, 75 F.3d at 812).

Plaintiffs first allege that Defendants' due diligence and pre-closing integration process supports a finding of conscious misbehavior or recklessness.  (See Compl. ¶¶ 148–51.)  At the

May 18, 2017 Investor Day presentation, COO Rendall described the due diligence process as "complete [and] thorough" and involving a "proprietary acquisition due diligence checklist with hundreds of items." (Compl. ¶ 148.)  At that same presentation, Rendall mentioned the integration process's "weekly" meetings, "where we review things we need to get done before closing, and . . . where we've identified issues that we need to transform after closing." (Compl. ¶ 150.)  Defendant Weiner also described the LPI acquisition's integration process as "very detailed." (Compl. ¶ 151.)  None of these statements specifically identifies any due diligence reports or statements that would demonstrate Defendants' knowledge or recklessness vis-à-vis the CPI scheme.  *See Deutsche Zentral-Genossenschaftsbank AG v. HSBC N. Am. Holdings, Inc.*, No. 12-CV-4025, 2013 WL 6667601, at *19–20 (S.D.N.Y. Dec. 17, 2013) (holding that "vague allegations of the HSBC Defendants' due diligence reviews or reports" were insufficient to establish scienter); *cf. Galestan v. OneMain Holdings, Inc.*, 348 F. Supp. 3d 282, 300–01 (S.D.N.Y. 2018) (holding that scienter was sufficiently pleaded where plaintiffs "identified specific reports that were circulated during the Class Period," including monthly emails describing productivity losses, and "establish[ed] that the Individual Defendants participated in numerous meetings and conference calls during which the negative effects of integration-related activities were discussed").

To rebut this conclusion, Plaintiffs cite *In re Ambac Financial Group, Inc. Securities Litigation*, 693 F. Supp. 2d 241, 269 (S.D.N.Y. 2010), where the court held that documents "identified in the defendants' own words" eliminated the need for "plaintiffs to provide additional detail about where defendants learned of facts contradicting their statements." (*See* Dkt. No. 88 at 20 n.16.)  But in *Ambac*, the defendants' Form 10-K specifically described an "adversely classified credit listing that is reported to management and Ambac's Board of

Directors and reviewed with senior management in regular adversely classified credit meetings." *Ambac*, 693 F. Supp. 2d at 269 (internal quotations omitted).  Such reports were sufficient to show that the *Ambac* defendants had information about their portfolio's deterioration contravening their public statements about the safety of the portfolio.  *Id.* at 268–69.  An "adversely classified credit listing" bore directly on whether defendants had access to contrary information about Ambac's portfolio and was an order of magnitude more specific than the "due diligence checklist" or "very detailed" integration process described by Defendants, generalized descriptors which do not indicate Defendants' knowledge of the CPI program's alleged misdeeds.

Plaintiffs further contend that National General's monthly phone calls and two to four in-person meetings per year with Wells Fargo to discuss the CPI program amount to a strong circumstantial inference of conscious misbehavior or recklessness.  (*See* Dkt. No. 88 at 20; Compl. ¶¶ 153–54.)  The telephone meetings "discussed performance, metrics regarding borrower telephone calls, claims made against CPI, dollar amounts of claims, and other action items," and meeting participants received a "scorecard" of CPI metrics.  (Compl. ¶ 153.)  In advance of the in-person meetings, National General employees distributed a "business review deck" with extensive details about the CPI program.  (Compl. ¶ 154.)  These meetings and materials regarding the CPI program are obviously more specific than the allegations regarding National General's due diligence and integration processes and raise the closest question of scienter.  However, Plaintiffs have still not "specifically identif[ied] the reports or statements" containing incriminating information about the CPI program.  *See Novak*, 216 F.3d at 309.  Additionally, and crucially, Plaintiffs have not alleged that any of the individual Defendants attended these meetings or accessed these documents.  *See Jackson v. Halyard Health, Inc.*, No.

16-CV 05093, 2018 WL 1621539, at*8-9 (S.D.N.Y. Mar. 30, 2018) (noting that plaintiffs failed to allege either that defendants "*personally* received" a damaging report about a subpar product or that confidential witnesses "attended meetings with any of the Individual Defendants where the alleged issues were discussed" in holding there was insufficient circumstantial evidence of scienter); *cf. Galestan*, 348 F. Supp. 3d at 301 ("[Plaintiffs] described the Individual Defendants' attendance at meetings and on conference calls during which integration-related issues were discussed.").  Moreover, Plaintiffs have not alleged that the CPI scorecard or business review decks included any specific information detailing, for example, an unusually high number of customer complaints or an abnormally low number of claims payments.  *Cf. Okla. Firefighters Pension & Retirement Sys. v. Lexmark Intern., Inc.*, 367 F. Supp. 3d 16, 37 (S.D.N.Y. 2019) ("Plaintiffs have pointed to specific [contradictory inventory] numbers in CEO Call slide decks throughout the Class Period and alleged that Defendants reviewed them."); *Scholastic*, 252 F.3d at 73, 76 (holding that plaintiffs adequately "specifi[ied] who prepared internal company reports, how frequently the reports were prepared and who reviewed them[,]" and that "the complaint [gave] additional indications as to the nature of the reports, because the allegations [were] immediately preceded and followed by figures from retailers to show sales were declining").  Simply pleading that unnamed National General employees attended meetings and prepared reports involving the CPI program does not meet the level of specificity required in this Circuit.

Next, Plaintiffs posit that the individual Defendants' executive positions, self-described "flat organizational structure," and hands-on management approach supports a showing of conscious misbehavior or recklessness.  (*See* Dkt. No. 88 at 21 (citing Compl. ¶¶ 156–59).)  But "bare assertions that the defendants, due to their high-level positions in the Company, had access to adverse undisclosed financial information through internal corporate documents, meetings,

and reports, without further facts or details will not suffice to create a strong inference of

scienter." *Lexmark*, 367 F. Supp. 3d at 37 (internal quotations and brackets omitted) (quoting *In*

*re PXRE Grp., Ltd., Sec. Litig.*, 600 F. Supp. 2d 510, 538 (S.D.N.Y. 2009)); *see also In re*

*Rockwell Med., Inc. Sec. Litig.*, No. 16-CV-1691, 2018 WL 1725553, at *14 (S.D.N.Y. Mar. 30,

2018) (noting that "it is practically hornbook law" that allegations of knowledge based on

corporate position are worthless for establishing conscious misbehavior or recklessness).

Moreover, simply alleging that executive defendants are "closely involved" in running their

business is not enough to show that they had access to contrary information.  *See City of*

*Brockton Ret. Sys. v. Shaw Grp. Inc.*, 540 F. Supp. 2d 464, 473 (S.D.N.Y. 2008).  Since Plaintiffs

do not allege that Barry Karfunkel, Weiner, or Castner were exposed to specific information

demonstrating how problematic the CPI program had become, the mere fact that they operated

with a "very flat organizational structure" and an "open-door, open-line policy" does not create

an inference of scienter.  (Compl. ¶ 157.)  *See PXRE*, 600 F. Supp. 2d at 537–38 (holding that

allegations based on executive position and "intimate corporate culture" were insufficient to

support a finding of conscious misbehavior or recklessness when there was nothing indicating

that defendants were "*directly informed*" of contrary information (emphasis in original)).

Plaintiffs also argue that "National General's tracking system is yet another indication

that Defendants were well aware of or recklessly disregarded . . . the CPI scheme given how

closely the Company monitored its customers' loans and how thousands of specific customer

complaints regarding the CPI scheme were brought to National General's attention."  (Compl.

¶ 162; *see also* Dkt. No. 88 at 20.)  However, the tracking system — and the customer

complaints collected therein — amount to a quintessential example of "raw data" that the Second

Circuit held to be insufficient to raise an inference of scienter in *Teamsters Local 445 Freight*

*Division Pension Fund v. Dynex Capital Inc.*, 531 F.3d 190, 196 (2d Cir. 2008).  There, the plaintiffs alleged that "senior executives such as [individual defendants] had access to 'collection data' which 'reflected the high percentage of . . . delinquencies and failed or impaired repossessions,'" thus revealing an underlying flaw with the defendant company's collateral.  *Id.* Yet the *Dynex* court held that the plaintiffs' "broad reference to raw data lacks even an allegation that these data had been collected into reports that demonstrated that loan origination practices were undermining the collateral's performance" such that there was no inference of scienter.  *Id.* Likewise, Plaintiffs here have not alleged that the "raw data," *i.e.*, complaints arising from the tracking system, were "collected into reports" demonstrating the underlying CPI scheme.  *See id.* Notably, Plaintiffs do not allege that complaints were gathered into reports such as the "scorecard" distributed before National General's telephone meetings with Wells Fargo or the "business review deck" before National General's in-person meetings with Wells Fargo; nor do Plaintiffs allege that complaints were discussed at these meetings.  (*See* Compl. ¶ 153–54.) Thus, Plaintiffs have not "specifically identif[ied] the reports or statements" incorporating the complaints from the tracking system.  *See Novak*, 216 F.3d at 309.

Finally, Plaintiffs point to Weiner and Barry Karfunkel signing SOX certifications as evidence of conscious misbehavior or recklessness.  (*See* Compl. ¶ 164.)  "[W]hile the SOX certifications remain relevant to this action, they do not constitute a standalone basis for liability."  *Menaldi v. Och-Ziff Capital Mgmt. Grp.*, 277 F. Supp. 3d, 500, 517 (S.D.N.Y. 2017) (noting that without alleging defendants' "actual knowledge" of underlying bribery, SOX certifications were insufficient to establish scienter).  Without adequately alleging Defendants' actual knowledge of the illegal CPI scheme, "SOX certifications do not support an inference of scienter as to any Defendant."  *See Das v. Rio Tinto PLC*, 332 F. Supp. 3d 786, 816 (S.D.N.Y.

2018).

The Court is mindful of its obligation to consider "whether *all* of the facts alleged, taken collectively, give rise to a strong inference of scienter, not whether any individual allegation, scrutinized in isolation, meets that standard." *Tellabs*, 551 U.S. at 323.  But Plaintiffs have failed to adequately allege that Defendants had a motive and opportunity to commit securities fraud. Without showing motive, their uphill battle to plead a strong inference of scienter becomes that much steeper.  *See ECA*, 553 F.3d at 198–99 (describing the higher bar plaintiffs must clear in pleading conscious misbehavior or recklessness without showing motive).  Plaintiffs are left arguing that Barry Karfunkel, Weiner, and Castner were privy to information about the nature and scope of the CPI program because they were hands-on executives of a company that conducted due diligence and held meetings — before which certain documents were disseminated — regarding the CPI program:  Plaintiffs have not "specifically alleged defendants' knowledge of facts or access to information contradicting their public statements."  *Novak*, 216 F.3d at 308.  Accordingly, Plaintiffs have failed to plead a strong inference of scienter for the individual Defendants.  Nor have Plaintiffs pleaded corporate scienter, because they have not proven that anyone "whose intent could be imputed to the corporation acted with the requisite scienter."  *Dynex*, 531 F.3d at 195.[7]  Consequently, the claims against all Defendants must be dismissed.

### B.    Claim Under Section 20(a)

Plaintiffs further allege control-person liability under Section 20(a) of the Exchange Act, a claim which requires a successful allegation of a "primary violation."  *See ATSI*, 493 F.3d at

---

[7] The same deficiencies apply to the other National General employees mentioned in the complaint, like LPI representative Pedack or COO Rendall — Plaintiffs fail to specifically allege those employees' access to incriminating information about the CPI program.

108.  Since Plaintiffs' Section 10(b) claim — the primary violation alleged — fails as a matter of law, their claim under Section 20(a) must also be dismissed.

### C.    Leave to Amend

Plaintiffs have requested leave to amend in the event their claims are dismissed.  (Dkt. No. 88 at 25.)  Federal Rule of Civil Procedure 15(a)(2) provides that "[t]he court should freely give leave when justice so requires," a practice which is customary in the securities fraud context, *see ATSI*, 493 F.3d at 108 ("District courts typically grant plaintiffs at least one opportunity to plead fraud with greater specificity when they dismiss under Rule 9(b).").  Accordingly, Plaintiffs' request for leave to amend is granted.

## IV.    Conclusion

For the foregoing reasons, Defendants' motion to dismiss is GRANTED.  Plaintiffs are granted leave to amend, provided that any further amended complaint shall be filed within 21 days after the date of this Opinion and Order.  If Plaintiffs elect not to file an amended complaint, they are directed to file a letter to that effect by the same date, and the Court will enter judgment, permitting an appeal.

The Clerk of the Court is directed to close the motion at Docket Number 84.

SO ORDERED.

Dated: January 21, 2021
New York, New York

_____
J. PAUL OETKEN
United States District Judge